# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | |
| | : | |
| v. | : | No. 15-cr-00155 (RNC) |
| | : | |
| ROSS SHAPIRO, | : | |
| MICHAEL GRAMINS and | : | |
| TYLER PETERS | : | |
| | : | JANUARY 29, 2016 |
| | : | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR JOINT MOTIONS TO DISMISS AND FOR A BILL OF PARTICULARS

PETRILLO KLEIN & BOXER LLP
655 Third Avenue, 22nd Fl.
New York, New York 10017
Telephone: (212) 370-0330
*Attorneys for Ross Shapiro*

ALSTON & BIRD LLP
90 Park Avenue
15th Floor
New York, NY 10016-1387
Telephone: (212) 210-9400
*Attorneys for Tyler Peters*

GREENBERG TRAURIG LLP
200 Park Avenue
New York, NY 10166
Telephone:  (212) 801-9200
*Attorneys for Michael Gramins*

## TABLE OF CONTENTS

PROCEDURAL HISTORY...................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................. 2

THE SECOND CIRCUIT'S LITVAK DECISION................................................................. 6

ARGUMENT .......................................................................................................................... 8

    POINT I: The Wire Fraud Object In Count One and the Substantive Wire Fraud Allegations
    in Counts Four Through Ten of the Indictment Must Be Dismissed Because They Fail to
    Allege an Intent to Harm ....................................................................................................... 8

        A.   Applicable Law............................................................................................... 9

        B.   Discussion...................................................................................................... 13

    POINT II: The Wire Fraud Allegations in Counts Four Through Ten Must be Dismissed
    Because They Fail to Allege the Existence of Wire Communications "In Furtherance Of"
    Any Fraudulent Scheme ....................................................................................................... 17

        A.   No Connection is Alleged Between the Marketing Emails and the Alleged
             Fraudulent Scheme and None Makes Sense ................................................. 18

        B.   The Marketing Emails Were Not "In Furtherance of" Any Scheme Because
             They Increased the Likelihood that Any Alleged Scheme Would be Discovered ..... 20

        C.   The Trade Confirmation Emails Were Sent Only After the Completion of the
             Alleged Fraudulent Transaction and Thus Could Not Be "In Furtherance of"
             the Alleged Scheme ....................................................................................... 20

    POINT III: The Object of Count One Referring to Section 1001 Should Be Dismissed
    and All Reference to The United States Department of the Treasury's Legacy Securities
    Public-Private Investment Program Struck from the Indictment ........................................... 22

    POINT IV: Defendants Are Entitled to a Bill of Particulars Identifying the Trades That the
    Government Intends to Prove at Trial .................................................................................. 24

        A.   Legal Standard.............................................................................................. 24

        B.   Discussion..................................................................................................... 25

CONCLUSION...................................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*Hamling v. United States*,
   418 U.S. 87 (1974)..................................................................................... 9

*Lundy v. Catholic Health Systems of Long Island Inc.*,
   711 F.3d 106 (2d Cir. 2013)..................................................................... 20

*McCormack International Corp. v. Vohra*,
   858 F. Supp. 415 (2d Cir. 1994) .............................................................. 21

*Pereira v. United States*,
   347 U.S. 1 (1954)...................................................................................... 17

*United States v. Ali*,
   561 F. Supp. 2d 265 (E.D.N.Y. 2008) ..................................................... 24

*United States v. Altman*,
   48 F.3d 96 (2d Cir. 1995).................................................................... 17, 21

*United States v. Binday*,
   804 F.3d 558 (2d Cir. 2015)........................................................ 10, 11, 15

*United States v. Bortnovsky*,
   820 F.2d 572 (2d Cir. 1987)................................................................ 24, 26

*United States v. Carlo*,
   507 F.3d 799 (2d Cir. 2007).................................................................... 10

*United States v. Carpenter*,
   No. 3:13-CR-226 (RNC), 2015 WL 9305638 (D. Conn. Dec. 21, 2015)............... 15

*United States v. Castile*,
   795 F.2d 1273 (6th Cir. 1986) ................................................................. 19

*United States v. Coplan*,
   703 F.3d 46 (2d Cir. 2012)....................................................................... 22

*United States v. GAF Corp.*,
   928 F.2d 1253 (2d Cir. 1991)................................................................... 26

*United States v. Litvak*,
   808 F.3d 160 (2d Cir. 2015)............................................................ passim

*United States v. Luna*,
   No. 3:05-CR-58 (SRU), 2006 WL 1668006 (D. Conn. May 17, 2006) ................. 25

*United States v. Mahaffy*,
  446 F. Supp. 2d 115 (E.D.N.Y. 2006) ................................................ 25

*United States v. Martin*,
  411 F. Supp. 2d 370 (S.D.N.Y. 2006) ................................................. 9

*United States v. Maze*,
  414 U.S. 395 (1974) ........................................................... 17, 19, 20

*United States v. Mazer*,
  No. 14-1397-CR, 2015 WL 7694820 (2d Cir. Nov. 30, 2015) ................ 15

*United States v. Miller*,
  997 F.2d 1010 (2d Cir. 1993) ............................................................ 9

*United States v. Nachamie*,
  91 F. Supp.2d 565 (S.D.N.Y. 2000) ............................................ 26, 27

*United States v. Novak*,
  443 F.3d 150 (2d Cir. 2006) ...................................................... 10, 12, 15

*United States v. Paccione*,
  949 F.2d 1183 (2d Cir. 1991) .......................................................... 15

*United States v. Pirro*,
  212 F.3d 86 (2d Cir. 2000) ............................................................... 9

*United States v. Porcelli*,
  865 F.2d 1352 (2d Cir. 1989) .......................................................... 19

*United States v. Regent Office Supply Co.*,
  421 F.2d 1174 (2d Cir. 1970) ............................................. 9, 10, 11, 14, 16

*United States v. Reifler*,
  446 F.3d 65 (2d Cir. 2006) .............................................................. 17

*United States v. Rossomando*,
  144 F.3d 197 (2d Cir. 1998) ............................................................ 10

*United States v. Shellef*,
  507 F.3d 82 (2d Cir. 2007) .............................................................. 16

*United States v. Starr*,
  816 F.2d 94 (2d Cir. 1987) ...................................................... passim

*United States v. Tramunti*,
  513 F.2d 1087 (2d. Cir. 1975) ......................................................... 25

*United States v. Walker*,
　191 F.3d 326 (2d Cir. 1999)................................................................................... 15

*United States v. Wallach*,
　935 F.2d 445 (2d Cir. 1991)................................................................................... 17

*United States v. Webb*,
　24 F. Supp. 3d 432 (M.D. Pa. 2014) ..................................................................... 19

**Statutes**

18 U.S.C. § 371 .......................................................................................................... 24

18 U.S.C. § 1001 .................................................................................................... 7, 22

18 U.S.C. § 1341 ........................................................................................................... 9

18 U.S.C. § 1343 ........................................................................................................... 9

**Federal Rules of Criminal Procedure**

Fed. R. Crim. P. 12(b)............................................................................................. 8, 17

Fed. R. Crim. P. 7(f) .................................................................................................... 24

**Other Authorities**

The Amended and Restated Limited Partnership Agreement between the Treasury Department
　and AllianceBernstein ........................................................................................... 23

Defendants Ross Shapiro, Michael Gramins and Tyler Peters respectfully submit this memorandum of law in support of their joint pretrial motions: (1) to dismiss the wire fraud object in Count One and the substantive wire fraud allegations in Counts Four through Ten of the Indictment because they fail to adequately allege (a) an intent to harm and (b) the existence of wire communications "in furtherance of" any fraudulent scheme;  (2) to dismiss the false statements object in Count One and strike from the Indictment Paragraph 25 and all other references to the United States Department of the Treasury's Legacy Securities Public-Private Investment Program; and (3) for an order directing the government promptly to issue a bill of particulars.  Additionally we note that Defendant Peters today submits a separate memorandum of law in support of his motion for severance.

## PROCEDURAL HISTORY

The Indictment in this case charges the defendants with one count of conspiracy to commit offenses against the United States, including wire fraud, securities fraud, and making false statements, in violation of 18 U.S.C. § 371 (Count One); two counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. 240.10b-5 (Counts Two and Three); and seven counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts Four through Ten).

The Indictment was unsealed on September 3, 2015, and the defendants were arraigned before Magistrate Judge Martinez on September 10, 2015, and released on bail. (Dkt. No. 19). The parties appeared before this Court on October 7, 2015, and following colloquy, jointly submitted a proposed pretrial schedule, which the Court endorsed by order dated October 22, 2015 ("October 22, 2015 Order").  (Dkt. No. 73).  Pursuant to the October 22, 2015 Order, *inter alia*, expert notices and summaries, party witness and exhibit lists, and Jencks and reverse-Jencks materials are due on or before May 23, 2015; motions *in limine* are due on or before June 17, 2016; and trial is scheduled for October 18, 2016.  (Dkt. Nos. 74-77).

1

## FACTUAL BACKGROUND

All of the defendants worked on a Residential Mortgage Backed Securities ("RMBS") trading desk at Nomura Securities International, Inc. ("Nomura").  RMBS are collections of mortgages and home equity loans, grouped together and sold as packaged securities.  Indictment ("Ind.") ¶ 26.  Mr. Shapiro, a Managing Director in charge of the desk, oversaw trading of RMBS.  *See* Ind. ¶ 1.  Mr. Gramins, an Executive Director on the desk, traded bonds composed of sub-prime and option ARM loans.  Ind. ¶ 2.  Mr. Peters, a Vice President, focused primarily on Nomura's trading of bonds composed of prime and alt-A loans.  Ind. ¶ 3.

The RMBS in issue were traded through dealers like Nomura, by way of individually negotiated transactions by and among highly sophisticated investors consisting principally of banks, money managers and investment funds.  Ind. ¶ 26.  RMBS were not traded on public exchanges; rather, pricing information for RMBS was provided by dealers to counterparties with a presence in the market.  *See* Ind. ¶ 26.  Accordingly, the Indictment understandably fails to allege that the trading prices for RMBS bonds reflected a market consensus on fair value (as might be the case in an efficient, publicly traded market).

RMBS were typically transacted in three ways: "inventory" sales, "order" sales, and "Bid List" or "BWIC" (bids wanted in competition) sales.  In "inventory" sales, the dealer sold bonds from its inventory, meaning bonds that it had owned for a period for time.  Ind. ¶ 27.  In "order" sales, a seller engaged a dealer to seek a buyer or the buyer engaged the dealer to seek a seller, for a particular bond.  Ind. ¶ 27.  In a "BWIC" sale, a seller circulated a list of RMBS it sought to sell to dealers, so that the dealers could decide whether to buy the bonds for inventory or seek potential buyers willing to negotiate terms.  This approach was akin to an auction in which the dealers submitted bids, with the highest bid the winner.  Ind. ¶ 27.  In all three types of trades the

buyer and seller remained unaware of one another's identities and communicated through the dealer.  Ind. ¶ 28.

The Indictment misleadingly alleges that dealers acted as "brokers or conduits" in "order" and "BWIC" trades in exchange for "commissions" and assumed "little to no financial risk." Ind. ¶ 29.  Indeed, the Government has conceded (in *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015), a case undisputedly similar to this case, *see infra* at 6-7) that dealers transacting in the RMBS market always act as principals.[1]  Thus, by definition, dealers in the RMBS market always assume some risk that a counterparty to an "order" or "BWIC" trade may fail to consummate a trade and thereby expose the dealer to risk.

The Indictment further alleges that dealers can earn profit on RMBS trades either through "on top" trades or "all in" trades.  In "on top" trades, a buyer or seller agrees to provide to the dealer a payment for facilitating a trade, which is typically an "order" or "BWIC" trade.  Ind. ¶ 32(a).  Because dealers transact as principals, the Indictment's characterization of these "on top" payments as "commission" is incorrect to the extent the Indictment is suggesting the existence of an agency relationship by which dealers would be compensated by "commission."  Here, profits redounded to Nomura from principal trades based on the difference (spread) between the purchase and sale price and were not "commissions."  Thus, as has been recognized by the Court of Appeals in this precise context, any gain was "ordinary profits earned in a standard buyer-seller context."  *Litvak*, 808 F.3d at 187.

According to the Indictment, in an "all in" trade the dealer and the buyer agree on a purchase price without reference to the price paid by the dealer to the seller.  Ind. ¶ 32(b).  The

---

[1] Transcript of Oral Argument at 44, *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) ("Government: There was no dispute here that as a legal matter what Mr. Litvak was doing was acting as a principal"). The Second Circuit's *Litvak* decision is found *infra* at 6-7.

Indictment alleges that in this type of trade the difference between the amount the buyer paid to the dealer and the amount the dealer paid to the seller (which remains unknown to the buyer) is the dealer's profit. However, because Nomura acted as principal in connection with each of the alleged trades, the distinction drawn by the Indictment between the aggregate price paid in connection with "all in" trades and so-called "commissions" paid in connection with "on top" trades is misguided. In all circumstances, Nomura's profit resulted from the spread between the prices it paid for the bonds and the prices at which it sold them.

The Indictment acknowledges that, without regard to whether a trade was an "on top" trade or an "all in" trade, Nomura's counterparties were never deceived about which specific RMBS bonds they were purchasing or selling in any particular transaction; nor were they deceived about the collateral backing these bonds. Furthermore, buyers were always provided with accurate information about the total aggregate price they were to pay for a particular RMBS and sellers always knew the total aggregate price they were to receive for a particular RMBS.

The Indictment further alleges that the defendants acted with the purpose of "obtain[ing] secret and unearned compensation on RMBS trades" (Ind. ¶ 34), but it fails to articulate how this alleged purpose equated to an intent to harm given that the counterparties at issue were fully aware of (1) the specific bonds they were purchasing or selling, (2) the underlying collateral that they analyzed to value the bonds, and (3) the prices they paid or received. The Indictment also alleges an intent "to deprive Nomura's victim-customers of information relevant to making a discretionary economic decision," (Ind. ¶ 34), but fails to explain what this information consisted of, or how it operated to deprive Nomura's customers from making discretionary economic decisions concerning each RMBS transaction. In this principal to principal market, each counterparty, based on its own proprietary valuation analysis, received the very RMBS for which

it had bargained at the very price it had agreed to pay.  And, notably, the Indictment does *not* allege that counterparties purchased poorly performing bonds that were unprofitable.

To be sure, the Indictment alleges that defendants made misrepresentations related to "order" and "BWIC" transactions, including (1) overstatements of the price Nomura had paid for a security it was selling to a buyer who had agreed to buy the security at the price Nomura represented it paid plus an "'on top' commission," and (2) understating to the seller of a bond the price a buyer had agreed to pay.  Ind. ¶ 35(a).  In neither of these cases, however, does the Indictment allege that any defendant misrepresented the particular security to be purchased or sold, the underlying collateral, or the aggregate transaction price.

The Indictment also alleges the defendants falsely represented to buyers that Nomura was buying a security from a fictitious third-party seller rather than selling a bond it already owned, and thus induced these buyers to pay "'on top' compensation."  Ind. ¶ 35(b)(i).  But, as noted above, the government has conceded that these trades were executed on a principal basis.  Thus, the concept of "commission" is inapposite.  Buyers who were allegedly misled about whether a security was in inventory were not misled about the particular security they were purchasing, its underlying collateral, or the aggregate "all-in" transaction price.

The Indictment further alleges that defendants caused an investment advisor falsely to represent to other dealers that a bond being offered for sale was owned by the investment advisor rather than by Nomura.  Ind. ¶ 35(b)(ii).  But once again, there is no allegation that defendants misrepresented to other dealers the security being sold or the underlying collateral.  Nor is there an allegation that the dealers were somehow deceived about the ultimate price they paid for any such securities.

The Indictment additionally alleges that defendants trained their subordinates at Nomura, causing them to engage in the alleged practices described above by criticizing them when they failed to make misrepresentations that might have resulted in greater profits and by directing them on occasion to make specific misrepresentations.  Ind. ¶ 35(c).  The Indictment does not allege that the defendants ever directed their subordinates to misrepresent the nature of the securities being sold or the collateral backing the same.  Nor does the Indictment allege that the alleged victim-counterparties were ever confused about the aggregate prices they had agreed to pay or receive in connection with these allegedly "fraudulent" RMBS trades.

Thus, the Indictment does not allege that any counterparty was ever deprived of information necessary to: (i) identify the RMBS to be purchased or sold, (ii) value the RMBS to be purchased or sold (pursuant to counterparty valuation models or otherwise), or (iii) understand the total aggregate price it was paying or receiving in connection with each transaction.  In other words, the Indictment fails to allege that the counterparties were deprived of the benefit of their bargains, or that the defendants intended to so deprive them.

## THE SECOND CIRCUIT'S *LITVAK* DECISION

On December 8, 2015, the Court of Appeals ruled on the appeal motion brought by a former RMBS trader named Jesse Litvak, related to his conviction for securities fraud and for making a false statement in a matter within jurisdiction of the United States government, among other counts.  *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015).  Mr. Litvak had worked as a trader at another RMBS dealer, Jefferies & Company ("Jefferies"), and the indictment alleged that, while at Jefferies, he had made three types of misrepresentations, each analogous to a misrepresentation alleged here.  *See id.* at 166.  First, the indictment alleged that Mr. Litvak fraudulently misrepresented to potential purchasers the price that Jefferies would pay to acquire certain RMBS.  *Id.*  Second, the indictment alleged that Mr. Litvak had misrepresented to

potential sellers of certain RMBS the price at which Jefferies had negotiated to resell those same securities.  *Id.*  Third, the indictment alleged that Mr. Litvak misrepresented to potential purchasers that Jefferies was functioning as an intermediary between the potential purchaser of certain RMBS and an unnamed third-party seller, where, in fact, Jefferies owned the RMBS at issue and no third-party existed.  *Id.*  Based on these misrepresentations, a January 2013 indictment charged Mr. Litvak with securities fraud and with making false statements and committing fraud against the United States, specifically, the Department of the Treasury.  *Id.*  In March 2014, a jury convicted Mr. Litvak on those charges.  *See id.*

On December 8, 2015, the Court of Appeals (i) reversed the judgment of conviction for fraud against the United States and making false statements charges, (ii) vacated Mr. Litvak's conviction as to the securities fraud charges, and (iii) remanded for a new trial.  With respect to the false statement charges, the Court held that the evidence adduced at trial provided an insufficient basis for a rational jury to conclude that Mr. Litvak's misstatements were material to a decision of the Department of Treasury, and that, accordingly, such evidence could not sustain the conviction under 18 U.S.C. § 1001.  *See id.* at 172-75.  With respect to the securities fraud charges, the Court held that the District Court erroneously excluded (i) expert testimony as to the materiality of the alleged misstatements or omissions and as to the difference between "principal" and "agency" transactions, and (ii) evidence of Mr. Litvak's good faith in light of his supervisors' approval of conduct like his own.  *See id.* at 179-90.  Because the conduct at issue in *Litvak* closely resembles that which is alleged here, many of the Court's findings in *Litvak* bear directly on this case.

**ARGUMENT**

**POINT I**

**THE WIRE FRAUD OBJECT IN COUNT ONE AND THE SUBSTANTIVE WIRE FRAUD ALLEGATIONS IN COUNTS FOUR THROUGH TEN OF THE INDICTMENT MUST BE DISMISSED BECAUSE THEY FAIL TO ALLEGE AN INTENT TO HARM**

Defendants move to dismiss the wire fraud object of the conspiracy alleged in Count One and the substantive wire fraud charges set forth in Counts Four to Ten of the Indictment, pursuant to Fed. R. Crim. P. 12(b), because they fail to allege that the defendants contemplated economic harm to their counterparties, as required by the law of this Circuit.

The question presented is whether allegations that securities dealers misrepresented facts during negotiations can give rise to a wire fraud claim, even if the counterparty in these negotiations received the precise property bargained for, at the precise price agreed between the parties. As recently confirmed by *Litvak*, the answer to this question is a resounding "no" because such a scheme does not "contemplate harm," as required by the wire fraud statute. Indeed, no Second Circuit case of which we are aware has endorsed a theory of wire fraud where the allegedly wronged party obtained the very property she negotiated to buy at the very price she negotiated; nor has any case held that untruths in negotiations about price can sustain such a theory simply because the resulting negotiated price *might* have been different or because the counter-party "would have" wanted to know about the misrepresented negotiation facts.[2]

The government also refers in the Indictment to an "opaque market" for RMBS. However, as the government conceded in *Litvak*, the charged conduct involves principal to principal negotiations, involving sophisticated counterparties who had ample access to the

_____

[2] This question was not squarely presented in *Litvak*, which charged securities fraud but not wire fraud. Intent to harm is a component of the scienter element of the latter, but not the former, which requires only proof of intent to deceive.

information necessary to value the bonds they were trading. 808 F.3d at 183. At the same time, it can be accepted for purposes of this motion that such professionals will say that they would have liked to have as much information as possible to improve their negotiating position. That is almost always the case, however, in a bilateral commercial transaction. But interference with such negotiation objectives is not recognized as economic harm by the wire fraud statute. Accordingly, the wire fraud charges should be dismissed.

### A.    Applicable Law

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) ("A criminal defendant is entitled to an indictment that states the essential elements of the charge against him."). The elements of wire fraud are: (1) a scheme to defraud, with (2) money or property as the object of that fraud, and (3) use of the wires to further the scheme. *See, e.g.*, *United States v. Miller*, 997 F.2d 1010, 1017 (2d Cir. 1993).

"An essential element of the government's proof in a . . . wire fraud prosecution is proof of a 'scheme or artifice to defraud.'" *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (quoting 18 U.S.C. §§ 1341, 1343); *United States v. Martin*, 411 F. Supp. 2d 370, 373 (S.D.N.Y. 2006) (same). "Critical to a showing of a scheme to defraud is proof that defendants possessed a fraudulent intent." *Starr*, 816 F.2d at 98. "Although the government is not required to prove actual injury, it must, at a minimum, prove that defendants contemplated some actual harm or injury to their victims. Only a showing of intended harm will satisfy the element of fraudulent intent." *Id.* (citing *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970)).

Furthermore, misrepresentations that are "collateral to the sale and [do] not concern the quality or nature of the goods being sold . . . [do] not go to the basis of the customers' bargain with the salesmen." *Id.*  In such circumstances, the customers receive "exactly what they paid for" and thus the defendant may "at most" have held an "intent to deceive and to induce the customers to enter into the transaction," but "absent any evidence of an intent to harm the victims" the evidence is "insufficient to demonstrate a fraudulent intent."  *Id.; see also United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006) ("An intent to harm a party to a transaction cannot be found where the evidence merely indicates that the services contracted for were dishonestly completed.").  Accordingly, "misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution."  *Starr*, 816 F.2d at 98.  "Instead, the deceit must be coupled with a contemplated harm to the victim. Moreover, the harm contemplated must affect the very nature of the bargain itself."  *Id.*

"Since a defining feature of most property is the right to control the asset in question, we have recognized that the property interests protected by the [mail and wire fraud] statutes include the interest of a victim in controlling his or her own assets."  *United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007).  Accordingly, a cognizable harm occurs where defendant's scheme "den[ies] the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions."  *United States v. Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998).

"It is not sufficient, however, to show merely that the victim would not have entered into a discretionary economic transaction but for the defendant's misrepresentations."  *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015).  "The right to control one's assets does not render every transaction induced by deceit actionable under the mail and wire fraud statutes.  Rather,

the deceit must deprive the victim of potentially valuable economic information." *Id.* (internal quotation marks omitted). "Such harm is apparent where there exists a 'discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.'" *Starr*, 816 F.2d at 98.

The Court of Appeals explicated the "contemplated harm" requirement in a series of three cases. In *Regent Office Supply*, *supra*, defendants' salesmen engaged in aggressive marketing techniques to sell their office supply products, making numerous misrepresentations to customers, including that they had been referred by a friend, or that they had a large inventory to sell because of a death, or that the seller was a doctor who needed to dispose of stationery. *See* 421 F.2d at 1176. The Court reversed the convictions on grounds that although the evidence proved that "the defendants intended to deceive their customers," it fell short of proving that they "intend[ed] to defraud them." *Id*. at 1182. Specifically, there had been no showing that defendants contemplated "some actual injury" to their customers where their "deceit did not go to the nature of the bargain itself." *Id*.

Similarly, in *Starr*, *supra*, defendants contracted to provide mailing services to their customers, representing that funds deposited with defendants would be used only to pay the customers' postage fees. *See Starr*, 816 F.2d at 99. In fact, defendants buried higher-rate mailings in lower-rate bulk mailings, without paying the Postal Service the correct postage, and pocketed the difference. *See id*. at 96. They then delivered altered Postal Service forms to their customers, falsely indicating that the legally correct postage had been paid. *See id*. The Court reversed, explaining that, for fraudulent intent to exist, "deceit must be coupled with a contemplated harm to the victim" and "the harm contemplated must affect the very nature of the bargain itself." *Id*. at 98. The customers' defeated expectations about "the use to which the

11

money would be put" were insufficient, because the misrepresentations did not "affect the nature or quality of the services that was the basis of the customers' bargain." *Id*. at 99-100.

More recently, in *Novak*, *supra*, defendant, a union manager, induced employers to pay union employees for hours they did not work in return for forgiving violations of the collective bargaining agreement (and other reasons); but unbeknownst to the employers, defendant required the employees to kick back a portion of these wages. *Novak*, 443 F.3d at 153-54. Applying the principles of *Starr*, the Court held that the evidence did not "show the requisite intent to harm," because there was no "discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." *Id*. at 159 (citation omitted). The Court rejected the government's argument that the employers would not have paid the additional money if they had been aware that the defendant would take a portion. Instead, the Court concluded that, because the employers received what they bargained for, defendant's dishonesty in completing the promised services did not "affect the very nature of the bargain itself" and so was insufficient to support a finding of fraudulent intent. *Id*. (quoting *Starr*, 816 F.2d at 98).

Under the precedent of *Regent Office Supply*, *Starr*, and *Novak*, contemplated harm to a victim is a required component of fraudulent intent in a wire fraud case.[3] As in these bedrock cases, such contemplated harm, as discussed below, is absent here, and the wire fraud counts and object of the conspiracy must be dismissed.

---

[3] In *Litvak*, which did not involve mail or wire fraud allegations, the Court rejected defendant's claim that "intent to harm" is a component of the scienter element of securities fraud under Section 10(b), 808 F.3d at 179, but reiterated, in *dicta*, that it continues to "interpret 'intent to defraud' in the mail and wire fraud contexts [] as requiring proof of contemplated harm." *Id.*

### B.    Discussion

The wire fraud object alleged in Count One and the substantive wire fraud charges set forth in Counts Four through Ten of the Indictment must be dismissed because they fail to allege that the defendants contemplated harm to their counterparties. Although the Indictment accuses defendants of making various misrepresentations to counterparties during negotiations of RMBS transactions, it fails to allege that any counterparty was deprived of, or that any defendant intended to deprive a counterparty of, the benefit of its bargain. Defendants are alleged to have overstated the prices at which they were able to purchase bonds from third-party sellers, understated the prices at which they were able to sell bonds to third-party purchasers, and dissembled about whether particular bonds were owned by Nomura. None of these alleged misrepresentations, however, pertain to the "quality or nature of the goods being sold" and "therefore [do] not go to the basis of the customers' bargain" with defendants. *Starr*, 816 F.2d at 98. Accordingly, the Indictment fails to allege intent to harm and the wire fraud counts must be dismissed.

As in *Regent Office Supply*, *Starr*, and *Novak*, defendants' alleged misrepresentations were irrelevant to "the object of the contract," namely, to receive a security at an agreed-upon price. *See Starr*, 816 F.2d at 100. The Indictment fails to allege that investors considered the amount of Nomura's profit in making the decision to buy or sell RMBS or determining the prices they were willing to pay. And this is unsurprising given the complex independent valuation analyses performed by sophisticated RMBS investors, *see Litvak*, 808 F.3d at 183, analyses that did not consider the profit realized by the dealer but rather assessed the range of prices that the counterparties were willing to pay or accept.

Notably, the Indictment implicitly concedes that the counterparties transacted exactly the bonds that they bargained for at exactly the prices to which they agreed. The defendants are not

alleged to have "intended to get," nor to have actually received, "more for their merchandise than it was worth to the average customer," nor are they alleged to have misled anyone about the "quality or effectiveness of the thing being sold," and thus their misstatements did not constitute fraud. *Regent Office Supply*, 421 F.2d at 1180-82 ("[T]he defendants intended to deceive their customers but they did not intend to defraud them, because the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him, and thus no injury was shown to flow from the deception.").

Indeed, this case is virtually indistinguishable from *Starr*. In *Starr*, the customers independently determined the prices they would pay for the products at issue and were satisfied that the prices they negotiated were fair. Here, the Indictment is silent on the question of how RMBS investors determined the prices they would pay for the bonds, but the *Litvak* court made clear that RMBS counterparties, like the customers in *Starr*, independently determined the value of RMBS and the range of prices they would pay for such bonds. Additionally, defendants' counterparties, like the customers in *Starr*, received the product they expected at agreed-upon prices. Finally, here, as in *Starr*, defendants are alleged to have misrepresented the portion of the customers' funds that covered the cost of the product versus the portion kept by defendants' employer as profit. *See Starr*, 816 F.2d at 99.

Of course, the counterparties here presumably would have preferred, like the customers in *Starr*, to know how Nomura was using the funds. *See generally* 816 F.2d at 101-02 (Newman, J., concurring). Such knowledge might even have assisted them in their negotiations with Nomura. But, a customer's expectation about the use to which money will be put, even if it **"constituted a part of the bargain between the parties,"** is insufficient to establish fraudulent

intent, because it "would not affect the nature or quality of the [product] that was the basis of the customers' bargain." *Starr*, 816 F.2d at 99-100 (emphasis added); *accord Novak*, 443 F.3d at 159.[4]

Importantly, even had the Indictment alleged that the counterparties would have declined to transact had they been made aware of the information defendants withheld – which it does *not* allege – this would not have cured the Indictment's deficient wire fraud allegations.[5] "It is not sufficient . . . to show merely that the victim would not have entered into a discretionary economic transaction but for the defendant's misrepresentations." *Binday*, 804 F.3d at 570.

---

[4] Numerous cases involve the misrepresentations that affect the nature or quality of the product that is the basis of the customers' bargain. For example, in *United States v. Carpenter*, No. 3:13-CR-226 (RNC), 2015 WL 9305638 (D. Conn. Dec. 21, 2015), this Court denied a motion to dismiss mail and wire fraud counts that alleged an insurance fraud scheme in which insurance carriers were misled into providing stranger-originated life insurance ("STOLI") policies when they had not intended to do so. As the Court noted, a "STOLI policy is one obtained by the insured for the purpose of resale to an investor with no insurable interest in the life of the insured." *Id.* at *1 (quoting *Binday*, 804 F.3d at 565). Because the indictment in *Carpenter* alleged that STOLI policies differed from non-STOLI policies in material economic respects that affected the providers' underwriting decisions, the Court appropriately concluded that the indictment properly alleged an intent to harm in connection with the mail and wire fraud counts. *See id.* at *3 ("the superseding indictment sets forth a number of ways in which the misrepresentations were material to the providers' underwriting decisions" including "earlier and greater payout of death benefits, less premium income, increased unreliability of projections, decreased cash flow and payout of large commissions" which "created discrepancies between the benefits that the Life Insurance Providers reasonably anticipated from issuing the policies . . . and the actual benefits that the Providers received in doing so."); *see also United States v. Mazer*, No. 14-1397-CR, 2015 WL 7694820, at *3 (2d Cir. Nov. 30, 2015) (affirming conviction where defendant's misrepresentations caused victim to "pay for one thing—two weeks of hours worked and a uniquely capable subcontractor—but receive[] another—no hours worked and an average, but high-priced, subcontractor."); *United States v. Walker*, 191 F.3d 326, 335-36 (2d Cir. 1999) (affirming conviction where defendant attorneys "consistently misrepresented to their clients the nature and quality of the legal services they were providing . . . for a hefty fee."); *United States v. Paccione*, 949 F.2d 1183, 1196 (2d Cir. 1991) (affirming mail fraud conviction for a "scheme to offer services in exchange for a fee, with the intent not to perform those services"). But the Indictment alleges no such discrepancy between the benefits the counterparties reasonably anticipated (the RMBS they bargained for at the final transaction prices) and the actual benefits received (the RMBS they bargained for at the final transaction prices).

[5] The absence of such an allegation derives from the likelihood that the counterparties, in fact, would *not* have so declined to transact. *See* Transcript of Oral Argument at 3, 12, 64, *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) (Litvak's counsel noting repeatedly and without contradiction that the counterparties testified that they "would have transacted again at the same price").

Rather, the Indictment must allege a "discrepancy between benefits reasonably anticipated" and those actually received, *Starr*, 816 F.2d at 98, which this Indictment fails to do. *See, e.g.*, *United States v. Shellef*, 507 F.3d 82, 108-09 (2d Cir. 2007) (rejecting a "no-sale" theory of wire fraud liability based on the allegation that defendant's misrepresentation induced the victim to sell an industrial chemical "it would not have sold had it known" of defendant's misrepresentation that defendant would only sell the chemical abroad in order to avoid the imposition of excise taxes, because, "as in *Starr*, the indictment here does not allege, pursuant to the government's 'no-sale' theory, that there was a 'discrepancy between benefits reasonably anticipated' and actual benefits received" (quoting *Starr*, 816 F.2d at 98)).

In essence, the Indictment alleges that defendants made misrepresentations that provided "Nomura an extra and unearned profit at the buying victim-customer's expense." Ind. ¶ 35(b)(i). But proof of such allegations was held insufficient to prove fraudulent intent in *Regent Office Supply*, *Starr*, and *Novak*, where "the evidence had shown an intent to deceive and to induce the customers to enter into the transaction" for the defendants' profit. *Starr*, 816 F.2d at 98 (discussing *Regent Office Supply*). On the same reasoning, the allegations in the Indictment are insufficient.[6] Accordingly, this Court should dismiss the wire fraud object in Count One and the substantive wire fraud charges in Counts Four through Ten because they fail to allege that defendants acted with the requisite intent to harm, as required under the wire fraud statute.

---

[6] Defendants did not owe fiduciary duties to their counterparties because Nomura acted as principal and not as agent for its counterparties. *See Litvak*, 808 F.3d at 187. Nor is the Indictment's allegation that the counterparties entered into agreements with Nomura to pay "commissions" for "facilitating the trades," correct. Nomura's profits on the trades were "ordinary profits earned in a standard buyer-seller context." *Id.*

16

## POINT II

**THE WIRE FRAUD ALLEGATIONS IN COUNTS FOUR THROUGH TEN MUST BE DISMISSED BECAUSE THEY FAIL TO ALLEGE THE EXISTENCE OF WIRE COMMUNICATIONS "IN FURTHERANCE OF" ANY FRAUDULENT SCHEME**

Counts Four through Ten, charging wire fraud, must be dismissed, pursuant to Fed. R. Crim. P. 12(b), on the additional ground that the email communications cited in those counts were not "in furtherance of" the alleged fraudulent scheme described in the Indictment.[7]

To plead criminal wire fraud, the Government must identify specific acts of wire communication, and adequately allege that defendants used the wire communications "in furtherance of" the scheme alleged. *See United States v. Altman*, 48 F.3d 96, 101 (2d Cir. 1995) (citing *United States v. Wallach*, 935 F.2d 445, 461 (2d Cir. 1991)).[8] A communication occurs "in furtherance of" the scheme alleged, where the communication occurred "for the purpose of executing" or "incident to an essential part of the scheme." *See id.* at 101-02 (citing *Pereira v. United States*, 347 U.S. 1, 8 (1954)). Critically, the Supreme Court has held that not all wire communications bearing a tangential relationship to a fraudulent scheme are "in furtherance of" that scheme; a wire will not be "in furtherance of" the scheme if "there is no indication that the success of [the] scheme depended" on the wire. *United States v. Maze*, 414 U.S. 395, 402 (1974). Nor will a wire be considered to be "in furtherance of" an alleged scheme if that scheme "reached fruition" before the wire was made. *See id.* at 402.

---

[7] The Government appears to have cited these particular wires to generate jurisdiction in the District of Connecticut. The Indictment identifies only two alleged victims who received the emails referenced in Counts Four through Ten, Victim 5 and Victim 6. Ind. ¶ 40. According to the Indictment, Victim 5 is an investment and advisory firm headquartered in Connecticut, and Victim 6 is an asset management firm and investment advisor headquartered in Connecticut. Ind. ¶¶ 21-22.

[8] In interpreting the wire fraud statute, court looks not only to cases decided under that statute but also to cases involving the mail fraud statute. *United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006).

Here, the Indictment alleges that Defendants "sent, or caused to be sent," seven wires, specifically, emails, "in furtherance of the scheme, [with] each use of the wires constituting a separate count of th[e] Indictment."  Ind. ¶ 40. The seven emails fall into two categories: (i) five communications described in the Indictment as "[m]arketing email[s] sent by Nomura" to customers, advertising that Nomura had traded certain RMBS (the "Marketing Emails") (Counts Four, Five, Seven, Eight and Nine);[9] and (ii) two emails "sent from Nomura" to customers, confirming the sale of certain RMBS (the "Trade Confirm Emails," and, collectively, with "Marketing Emails," the "Nomura Emails") (Counts Six and Ten).[10]  Notably, the Indictment does not allege that any of the Nomura Emails contained a material misstatement or explain in any way how the communications are alleged to be "in furtherance of" the alleged scheme.

None of these communications can, as a matter of law, be in "in furtherance of" the alleged scheme because (i) there is no allegation to demonstrate that the Marketing Emails (which advertised Nomura's legitimate RMBS business) contributed in any way to the success of the transactions alleged by the Indictment to be fraudulent, (ii) the Marketing Emails necessarily increased the likelihood that any scheme would be discovered, and (iii) the Trade Confirm Emails were sent following completion of the alleged fraudulent transactions and thus made no contribution to the success of the alleged fraud.

A.     **No Connection is Alleged Between the Marketing Emails and the Alleged Fraudulent Scheme and None Makes Sense**

There is no allegation in the Indictment – or even a suggestion – that the Marketing Emails were in any way an essential part of the fraudulent scheme charged or that the scheme in

---

[9] *See* Declaration of Joshua Klein, dated January 29, 2016 ("Klein Decl."), Exs. 1-5.

[10] *See* Klein Decl., Exs. 6-7.

any way depended on those communications. Indeed, the Indictment characterizes the
Marketing Emails as nothing more than "advertising." Ind. ¶ 40 (Count 4 ("advertising" Nomura
RMBS desk's sale of bond "FOR OVER $150MM TOTAL VOLUME."); Count 5
("advertising" that Nomura RMBS desk had traded bond); Count 7 ("advertising" that Nomura
RMBS desk had traded bond); Count 8 ("advertising" that Nomura RMBS desk had traded
bond); Count 9 (same). The Indictment is devoid of any allegation as to how that "advertising"
advanced any scheme to defraud.

Nor is there any allegation that any fact stated in any Marketing Email was false. And,
there is no suggestion that most bonds mentioned in the Marketing Emails were bought from or
sold to Victim 5 or Victim 6 (the alleged recipients of the Marketing Emails) in a fraudulent
manner; or that Victim 5 or 6 was ever induced by the Marketing Emails to purchase or sell any
security at a price determined as a result of any alleged misstatement or omission. Quite simply,
there is no allegation at all that the Marketing Emails had any role in aiding, perpetuating, or
ensuring the success of any fraudulent transaction. As such, these communications – wholly
unrelated to the alleged scheme – cannot form the basis of a wire fraud charge against
Defendants. *See Maze*, 414 U.S. at 402 (reversing conviction where "there was no indication
that the success of [the defendant's] scheme depended in any way" on the alleged wire
communication); *United States v. Porcelli*, 865 F.2d 1352, 1359 (2d Cir. 1989) (mailing not
"sufficiently closely related" to defendant's scheme to support the mail fraud count); *United
States v. Castile*, 795 F.2d 1273, 1278 (6th Cir. 1986) (reversing conviction where "the scheme's
completion or the prevention of its detection . . . [never] depended in some way on the charged
mailing.").[11]

---

[11] Nor would it be sufficient to sustain a wire fraud charge that the alleged communications were
generally beneficial to defendants' business. *See United States v. Webb*, 24 F. Supp. 3d 432, 438 (M.D.

**B.    The Marketing Emails Were Not "In Furtherance of" Any Scheme Because They Increased the Likelihood that Any Alleged Scheme Would be Discovered**

Far from perpetuating the alleged scheme, the Marketing Emails actually *increased* the likelihood that the alleged scheme would be discovered. As the Indictment notes, "[u]nlike stocks that trade on the New York Stock Exchange or the NASDAQ, RMBS [are] not publicly traded on an exchange and pricing information [is] not publicly available." Ind. ¶ 26. By disclosing that it had traded a specific RMBS, Nomura induced market participants to inquire about the trade in an attempt to discover the price at which Nomura and its customer traded the RMBS. Such price discovery carried the potential to reveal to market participants a discrepancy between the price at which the RMBS actually traded and the price at which the alleged victim believed the RMBS traded. For this reason as well, the Marketing Emails could not be "in furtherance of" the alleged scheme. *See Maze*, 414 U.S. at 404 ("the successful completion of the mailings . . . increased the probability that respondent would be detected and apprehended," and thus were not "for the purpose of executing [the] scheme"); *Lundy v. Catholic Health Systems of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (defendant's mailing of paystubs was not in furtherance of the alleged scheme to defraud workers out of overtime pay because mailing "would have revealed (not concealed)" the scheme).

**C.    The Trade Confirmation Emails Were Sent Only After the Completion of the Alleged Fraudulent Transaction and Thus Could Not Be "In Furtherance of" the Alleged Scheme**

The Trade Confirmation Emails were sent by Nomura following completion of a particular trade to confirm the terms (price and quantity) at which the trade was executed. *See* Ind. ¶ 40 (Count 6 ("confirming the sale of RMBS JPALT 2007-A22 A1 to Victim 5"; Count 10

Pa. 2014) (granting motion to dismiss and holding that "for the purpose of executing the fraudulent scheme; it is irrelevant that [the wires are] integral to [defendant's general business].").

("confirming the sale of RMBS PPSI 2004-WWF1 M3 to [] Victim 6")). Although the Indictment alleges that Defendants made false or misleading statements in connection with the transactions identified in the Trade Confirmation Emails, on the face of the Indictment, the Trade Confirmation Emails were sent *after* the completion of those alleged fraudulent transactions. There is no allegation to suggest that the Trade Confirmation Emails provided any additional information to any counterparty, or did anything to advance or enhance the alleged fraud; in other words, the Nomura Emails occurred only *after* the alleged misstatements and omissions had allegedly induced Nomura's customer to transact and the alleged transaction had been completed.

It is settled that such communications sent after the completion of the fraudulent scheme cannot form the basis of a wire fraud charge. *See Altman*, 48 F.3d at 103 ("A mailing cannot be said to be in furtherance of a scheme to defraud when it occurs after the scheme has reached fruition."); *McCormack International Corp. v. Vohra*, 858 F. Supp. 415, 421 (2d Cir. 1994) (motion to dismiss granted where "fraudulent acts . . . were completed" prior to mailing forming basis of mail fraud claim). Here, as alleged in the Indictment, the Trade Confirmation Emails were sent only *after* completion of the transaction alleged to have been tainted by Defendants' fraud. As post-fraud communications cannot form the basis of a wire fraud charge, Count 6 and Count 10 should be dismissed.

## POINT III

## THE OBJECT OF COUNT ONE REFERRING TO SECTION 1001 SHOULD BE DISMISSED AND ALL REFERENCE TO THE UNITED STATES DEPARTMENT OF THE TREASURY'S LEGACY SECURITIES PUBLIC-PRIVATE INVESTMENT PROGRAM STRUCK FROM THE INDICTMENT

Defendants move to dismiss that part of the conspiracy charge that alleges as an object of the conspiracy the making of false statements in violation of 18 U.S.C. § 1001.  This object is insufficient as a matter of law under *Litvak*.

Count One charges Defendants with conspiracy to violate 18 U.S.C. § 1001, which makes it an offense to make "materially" false statements "in any matter within the jurisdiction of the executive, legislative, or judicial branch" of the federal government. 18 U.S.C. § 1001. "[I]n order to secure a conviction under [18 U.S.C.] § 1001(a)(2), the Government must prove that a defendant (1) knowingly and willfully, (2) made a materially false, fictitious, or fraudulent statement, (3) in relation to a matter within the jurisdiction of a department or agency of the United States, (4) with knowledge that it was false or fictitious or fraudulent." *United States v. Coplan*, 703 F.3d 46, 78 (2d Cir. 2012).  For purposes of the second element, "a statement is material if it has a natural tendency to influence, or be capable of influencing, the decision of the decision-making body to which it was addressed . . . ." *Id*.

This part of the Indictment is founded on grounds held insufficient by *Litvak*. Specifically, defendants are charged with having agreed to make misstatements to portfolio managers employed by private investment firms who traded RMBS through Public-Private Investment Funds ("PPIFs") under the Public-Private Investment Program ("PPIP") established by the Department of Treasury ("Treasury") during the financial crisis.  Ind. ¶¶ 25, 33, 36.  But, the *Litvak* Court held that Defendant's misrepresentations to PPIFs – precisely as alleged here – constituted an insufficient basis on which to establish a violation of Section 1001.  *Litvak*, 808

F.3d at 172-75 (evidence insufficient to conclude misstatements were material to Treasury, the pertinent government entity). Under the very structure of PPIP, Treasury, as a limited partner in the PPIFs, retained "no authority to tell the investment managers" which RMBS to purchase or at what price to transact. *Id.* at 172 (noting "unequivocal" testimony by the Treasury's former Chief Investment Officer that "the PPIFs were deliberately structured in a manner that 'kept the Treasury away from making buy and sell decisions.'"). Although Treasury received monthly reports from PPIFs, participated in periodic calls with PPIF managers, and received access to detailed trade level data upon request, the "investment decisions were managed by the fund managers" who held "complete discretion over which eligible assets to buy and sell." *Id.* at 171. Accordingly, because the evidence did not show that "Litvak's misstatements were reasonably capable of influencing a *decision* of the *Treasury*," the Court reversed the false statements conviction. *Id.* at 171-74.[12]

The same reasoning applies here. The Indictment does not allege, and the evidence will not show, that the misstatements alleged were reasonably capable of influencing a *decision* of the *Treasury*.[13] Accordingly, Count One should be dismissed to the extent of its allegation that false statements to the government constituted an object of the charged conspiracy.

---

[12] The Court expressly rejected three grounds for affirmance advanced by the government: (1) that Litvak's misstatements stymied certain PPIFs from transacting RMBS "at the best possible prices," thereby impeding the Treasury's ability to reap optimal returns on their investments in those funds; (2) "the information the PPIFs reported to [the] Treasury was affected by Litvak's conduct"; and (3) that "[t]he fact that [the] Treasury actually referred the matter to [the special inspector general] for investigation demonstrates that [the] Treasury regarded Litvak's conduct as significant." *Litvak*, 808 F.3d at 172-74.

[13] The government would be expected to call some of the same witnesses that it called in *Litvak* to testify about the PPIP program. In *Litvak*, a key government witness, Michael Canter of AllianceBernstein, testified to his role as a PPIF manager and his firm's participation in PPIP. Here, discovery produced by the Government suggests that Mr. Canter will also be a witness in this case. *See* Ind. ¶ 36(d). The limited partnership agreement between the Treasury and AllianceBernstein, as a matter of law, placed all investment decisions outside the purview of the Treasury. *See* The Amended and Restated Limited Partnership Agreement between the Treasury Department and AllianceBernstein, *available at*

Defendants also move to strike from the Indictment any references to PPIP or PPIF. Because, concerning the PPIP object of the conspiracy, the evidence will not prove an "offense against the United States," *see* 18 U.S.C. § 371, no conspiracy liability can attach to this allegation. *See United States v. Ali*, 561 F. Supp. 2d 265, 267 (E.D.N.Y. 2008) ("[S]ince the conduct allegedly underlying the conspiracy was not a crime, no § 371 conspiracy to commit that conduct can exist either."). As such, those portions of Count One that refer to PPIP or PPIF should be ordered struck from the Indictment. Otherwise, the Indictment will confuse the jury and risk prejudice to the defendants by mention of a government program in a circumstance where there is no supported basis for use of such terms in the charge.

**POINT IV**

**DEFENDANTS ARE ENTITLED TO A BILL OF PARTICULARS IDENTIFYING THE TRADES THAT THE GOVERNMENT INTENDS TO PROVE AT TRIAL**

Defendants seek an order requiring the government to particularize the trades it intends to prove at trial, listing for each, the security CUSIP, parties involved, date of trade, and the amount of the trade in units and dollars.

**A.      Legal Standard**

A bill of particulars is warranted under Fed. R. Crim. P. 7(f) so that Defendants can adequately prepare their defense, avoid surprise at trial, and, if prosecuted a second time for the same offense, interpose a plea of double jeopardy. *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

---

https://www.treasury.gov/initiatives/financial-stability/TARP-Programs/credit-market-programs/ppip/Documents/AB%20Complete%20LPA%20(redacted).pdf (last visited Jan. 29, 2016) (noting in Section 5.1 that "Except as expressly provided in this Agreement, no Limited Partner shall have the right or power to participate in the management or affairs of the Partnership").

"Perhaps the most frequent case in which particulars are warranted is where discovery is overwhelmingly extensive *and* the government fails to designate which documents it intends to introduce and which documents are merely relevant to the defense." *United States v. Mahaffy*, 446 F. Supp. 2d 115, 119 (E.D.N.Y. 2006) (emphasis in original). "[O]verwhelming a defendant with discovery can obscure the particulars of a charge as fully as denying discovery. Thus, when faced with 'mountains' of discovery or 'massive disclosures,' a defendant may still be unable to prepare for trial and prevent surprise." *United States v. Luna*, No. 3:05-CR-58 (SRU), 2006 WL 1668006, at *2 (D. Conn. May 17, 2006) (denying government's motion for reconsideration of order granting defendant's motion for a bill of particulars). The decision to grant a bill of particulars is committed to the broad discretion of the trial court. *United States v. Tramunti*, 513 F.2d 1087, 1113-14 (2d. Cir. 1975).

**B.    Discussion**

The government has declined a defense request for a bill of particulars, arguing that that (1) the Indictment highlights the specific trades that will be subject to proof at trial; (2) the government's production of discovery obviates a need for a bill of particulars because defendants will have sufficient time to review discovery; and (3) it plans to disclose a witness and exhibit list by May 23, 2016. None of these arguments suffice to delay issuance of the necessary bill.

This is precisely type of case in which a bill of particulars is warranted. Based on discovery to date, Defendants appear to have received more than one hundred thousand electronic files relating to approximately 900 trades. In addition to the thirteen (13) trades charged in the Indictment, an additional ten (10) trades appear to have been the subject of testimony in the grand jury. And, the government has acknowledged to the defendants its intention to prove at trial trades beyond those charged in the Indictment. In view of the conspiracy count—relating to which we expect the government would argue that hundreds of

25

trades in the database constitute potential overt acts—and the sheer number of total trades covered by the database, it would not be possible for the defense to prepare to address the government's trial proof in the absence of greater particularity concerning the trades that the government will seek to prove in its case in chief. A bill would also prevent unfair surprise and allow the defendants later to plead the bar of double jeopardy. *United States v. GAF Corp.*, 928 F.2d 1253, 1260 (2d Cir. 1991).

By way of illustration, in *Bortnovsky*, the Court of Appeals held that the government's production of documents prior to trial did not provide the required notice to defendants and that the district court abused its discretion in refusing to order a bill of particulars, where the indictment charged defendants with submitting false claims for burglary losses but failed to identify which burglary/false submission episodes it would prove at trial. *Bortnovsky*, 820 F.2d at 572. In *Bortnovsky*, the government had provided the defense with four thousand documents, a cache that encompassed the documents concerning the four burglaries that were ultimately proven to have been fabricated at trial. The Court ruled that, by failing to identify these fictitious burglaries prior to trial, the government had impermissibly shifted the burden of proof to the defense, which was forced to prove to the jury that all of the remaining burglaries actually had occurred. *See id.* at 574-75.

Likewise, in *United States v. Nachamie*, 91 F. Supp.2d 565 (S.D.N.Y. 2000), a bill of particulars was ordered where the defendants were charged with conspiracy to commit Medicare fraud, and the government "produced over 200,000 pieces of paper in hundreds of boxes and files, relating to 2,000 Medicare claims." *Id.* at 571. As the court noted, the government had "not yet informed the defendants which of these claims were false and in what way they were false," *id.* at 571, and, relying on *Bortnovsky*, ordered a bill of particulars specifying the names of

unindicted co-conspirators, the identity and details of each allegedly false claim submitted and/or filed as part of the conspiracy, and the identity and details of the allegedly false documents used in the conspiracy." *Id.* at 572-75.

Here, the raw number of possible trades that the Government might seek to prove at trial and the massive volume of communications associated with these trades well warrant a bill of particulars. For the defense to analyze each of the potential candidate trades and related communications would easily absorb months of time and likely thousands of hours of lawyer time. The burden involved would far exceed that outlined in *Bortnovsky* and *Nachamie*.

Furthermore, the expected production of the exhibit list in late May 2016 does nothing to obviate the Defendants' immediate need of greater specificity. Indeed, May 23, 2016 is also the deadline for expert notices. For the Defendants' experts to be able to exercise their role, Defendants will need to provide to the experts trade information concerning the trades likely to be the subject of trial testimony. At present, however, the Government has produced information concerning as many as 900 individual trades, rendering the processes overwhelmingly burdensome.

Accordingly, Defendants should immediately receive a bill of particulars identifying each trade that the Government will seek to prove at trial, listing for each, the security CUSIP, parties involved, date of trade and the amount of the trade in units and dollars.

## CONCLUSION

For the reasons stated above, defendants respectfully request that this Court issue an Order: (1) dismissing the wire fraud object in Count One and the substantive wire fraud allegations in Counts Four through Ten of the Indictment for failure to allege (a) an intent to harm, and (b) the existence of wire communications "in the furtherance of" any fraudulent scheme; (2) dismissing the false statements object in Count One and striking all references to the

27

PPIP from the Indictment; (3) directing the government to respond immediately to the defense

requests for particulars; and (4) granting such other relief as this Court may deem warranted.

Respectfully submitted,

PETRILLO KLEIN & BOXER LLP

By:  /s/ Guy Petrillo
Guy Petrillo (CT19924)
Josh Klein (PHV07748)
Leonid Sandlar (PHV07700)
655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0330
Facsimile:  (212) 370-0391
gpetrillo@pkbllp.com
*Attorneys for Ross Shapiro*

ALSTON & BIRD LLP

By:  /s/ Brett D. Jaffe
Brett D. Jaffe (PHV07701)
Craig Carpenito (PHV0424)
Joseph G. Tully (PHV07702)
90 Park Avenue
15th Floor
New York, NY 10016-1387
Telephone: (212) 210-9400
Facsimile:  (212) 210-9444
Brett.Jaffe@alston.com
*Attorneys for Tyler Peters*

GREENBERG TRAURIG LLP

By:  /s/ Marc L. Mukasey
Marc L. Mukasey (PHV07694)
Greenberg Traurig LLP
200 Park Avenue
New York, NY 10166
Telephone:  (212) 801-9200
Facsimile:  (212) 801-6400
mukaseym@gtlaw.com
*Attorneys for Michael Gramins*

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 29, 2016 a copy of foregoing Memorandum of Law in Support of Defendants' Joint Motions to Dismiss and for a Bill of Particulars was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York
      January 29, 2016

                                      <u>/s/ Leonid Sandlar</u>
                                        Leonid Sandlar (PHV07700)
                                        655 Third Avenue, 22nd Floor
                                        New York, New York 10017
                                        Telephone: (212) 370-0330
                                        Facsimile: (212) 370-0391
                                        lsandlar@pkbllp.com