UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - x
                     :
UNITED STATES OF AMERICA     :  No.  3:15CR155(RNC)
                     :
       vs.             :
                     :
ROSS SHAPIRO, ET AL,       :
                     :  HARTFORD, CONNECTICUT
          Defendants.  :  AUGUST 2, 2016
                     :
- - - - - - - - - - - - - - - x


TELEPHONE CONFERENCE


BEFORE:

HON. ROBERT N. CHATIGNY, U.S.D.J.


Darlene A. Warner, RDR-CRR
Official Court Reporter

```
 1

 2    APPEARANCES:

 3

         FOR THE GOVERNMENT:
 4
             U.S. ATTORNEY'S OFFICE-NH
 5           157 Church Street
             P.O. Box 1824; 23rd Floor
 6           New Haven, Connecticut 06510
             BY:  LIAM BRENNAN, AUSA
 7                HEATHER L. CHERRY, AUSA

 8
         FOR ROSS SHAPIRO:
 9
             PETRILLO, KLEIN & BOXER LLP
10           665 Third Avenue
             22nd Floor
11           New York, New York 10017
             BY:  GUY PETRILLO, ESQ.
12                JOSHUA KLEIN, ESQ.
                  LEONID SANDLAR, ESQ.
13                MIRAH CURZER, ESQ.

14
         FOR MICHAEL GRAMINS:
15
             GREENBERT TRAURIG
16           MetLife Bldg.
             200 Park Avenue
17           New York, New York 10166
             BY:  MARC L. MUKASEY, ESQ.
18                JEFFREY B. SKLAROFF, ESQ.
                  ROBERT S. FRENCHMAN, ESQ.
19

20

21

22

23

24

25
```

```
 1      APPEARANCES (CONTINUED):

 2

 3          FOR TYLER PETERS:

 4              ALSTON & BIRD, LLP-NY
                90 Park Avenue
 5              12th Floor
                New York, New York 10016
 6              BY:  MICHAEL L. BROWN, ESQ.
                     JOSEPH G. TULLY, ESQ.
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                          10:30 A.M.

2

3           COURT REPORTER:  Good morning, Judge Chatigny

4    has joined the conference.  Please state your appearances.

5           MR. BRENNAN:  Hello, Liam Brennan and Heather

6    Cherry for the United States.

7           MR. PETRILLO:  Guy Petrillo, Josh Klein and

8    Lenny Sandlar for Mr. Shapiro; and, Your Honor,

9    Mr. Shapiro is on the line as well.

10          MR. KLEIN:  Mirah Curzer is on as well.

11          MR. MUKASEY:  Good morning, Judge, Marc Mukasey,

12   with my partners, Bob Frenchman and Jeff Sklaroff, for our

13   client, Michael Grammins, who is also on the phone with

14   us.

15          MR. BROWN:  And this is Mike Brown with Alston &

16   Bird on behalf of Tyler Peters; and Joe Tully is also on

17   the line for Tyler Peters.

18          THE COURT:  Is that everybody?

19          MR. BRENNAN:  I believe so, Your Honor.

20          THE COURT:  Okay, thank you.

21          This is a telephone conference to address the

22   defendants' motion relating to Rule 17 subpoenas.  The

23   government filed an opposition last evening.

24          Have defense counsel seen the government's

25   opposition?

1          MR. KLEIN:  Yes, Your Honor.  This is Josh

2    Klein, Your Honor, on behalf of Ross Shapiro.  Yes, we

3    have seen it and reviewed it.

4          THE COURT:  All right.  Let me ask you to start

5    by focusing on where there appears to be agreement.  I'm

6    hoping that we'll be able to clarify the extent of that

7    agreement and then turn to the matters that are disputed.

8          With regard to the area of agreement, the

9    government states at page 5 of its opposition that it does

10   not object to the defendants' requests for subpoenas to

11   counterparties for their financial models or other

12   analyses of the RMBS that were part of the charged trades

13   in this case or otherwise part of the government's case in

14   chief.

15         In a footnote, the government talks about its

16   need for clarification with regard to whether the subpoena

17   requests a model for a bond that was in a trade other than

18   one of the subject trades.

19         So in that context, let me ask government

20   counsel:  What exactly is it that you're unclear about,

21   please?

22         MR. BRENNAN:  Yes, Your Honor, this is Liam

23   Brennan for the United States.

24         Your Honor, what we're unclear about is each

25   subpoena that goes out to the recipients, the

1     counterparties, lists all the bonds at issue, although

2     they may only have transacted in one or two of those

3     bonds; and, however, the justification in the motion and

4     memo that come along with the subpoenas is that the

5     recipients of the subpoenas engaged in the trading of that

6     bond.

7              So it appears we believe what the defense is

8     saying is that they're subpoenaing these counterparties

9     for the models about the bonds that they traded in.  To

10    the extent that is the case, we do not object to that.  To

11    the extent they are subpoenaing all of these people for

12    models on all of these bonds that we don't know whether or

13    not they exist, that's a different matter, and that would

14    be something we'd likely object to.

15             So that's the point where we don't have

16    clarification.  Because the actual subpoenas -- the

17    written words in the motions seem to say the

18    counterparties for models of the bonds that they traded

19    in, but the actual subpoenas say to all counterparties

20    modeled on all the bonds whether or not they traded in

21    them or not.

22             THE COURT:  All right.  Am I correct that

23    counsel have not discussed this prior to this telephone

24    conference?

25             MR. BRENNAN:  That is correct, Your Honor.

1           THE COURT:  Okay, all right.

2           Let me hear from the defense, please.  What

3   exactly is it that the defense is seeking?

4           MR. KLEIN:  Yes, Your Honor, Josh Klein again.

5           We are definitely seeking -- we're seeking both

6   categories.  We're seeking models related to the subject

7   bonds that are identified in the subpoena that the

8   particular counterparties traded as alleged in the charges

9   in the case.  But to the extent that the particular asset

10  manager in issue has models relating to the other bonds,

11  again the other subject bonds in issue, we think that that

12  evidence is relevant to have assessing materiality and

13  fair value.

14          Materiality is assessed in securities fraud

15  under the reasonable investor standard.  So the question

16  is not -- the ultimate question is not whether a

17  particular counterparty did not deem the alleged

18  misrepresentations to be material because they relied on

19  their model, the ultimate question is whether a reasonable

20  investor would have processed the misrepresentations in

21  that fashion.

22          And we believe that to the extent counterparties

23  have -- there's more evidence of counterparty models

24  relating to the subject trades, that's additional evidence

25  of how a reasonable investor in this RMBS market would

1    have assessed materiality.

2           So we think to the extent that counterparties

3    have models relating to more than just the particular

4    trade that they're alleged to have transacted in

5    connection with this case, we think it's squarely relevant

6    to the central issues in the case.

7           THE COURT:  Okay.  Does that help the government

8    understand what's being requested?

9           MR. BRENNAN:  It does help us understand what's

10   being requested, Your Honor.

11          THE COURT:  You agree that category 1 is

12   relevant and properly sought under Rule 17, but you do not

13   agree with regard to category 2, is that right?

14          MR. BRENNAN:  That's right, Your Honor.  My

15   understanding is that category 1 is the subpoenant (sic)

16   traded in the bonds so they want the models in the bonds.

17   We agree that's proper.

18          Category 2 renders then to be, they're saying,

19   as Mr. Klein just said, to the extent that this subpoenant

20   (sic) has models on these other bonds, they want that as

21   well, and that's the portion we oppose.

22          THE COURT:  What the is the basis for your

23   objection?

24          MR. BRENNAN:  I think, as the defense just said,

25   Your Honor, they said to the extent these exist -- there's

1       actually multiple objections -- but to the extent these

2       exist is the very definition of a fishing expedition that

3       Rule 17 is meant to prevent from occurring.

4              There is a lack of specificity here on the

5       models.  They do not know that they exist; there is no

6       reason to think that they have models on these other

7       bonds; and so this is just not what Rule 17 motions are

8       meant for.

9              We also have -- I mean this whole discussion of

10      fair value is a whole other aspect that we object to.  But

11      we think just the bond lack of specificity, the motion

12      fails.

13             THE COURT:  Going past specificity to the

14      question of relevance, what about category 2?

15             MR. BRENNAN:  The issue of relevance is -- I

16      mean, what we understand the defense to be saying, and

17      this does -- we're not exactly sure, based on their

18      motion -- but it seems when they say "fair value," it

19      appears that they're saying fair "market value."

20             This is an issue that the Second Circuit

21      specifically ruled on in the Litvak case, and they said

22      that this was irrelevant to this case.  Under the Second

23      Circuit's ruling in Litvak, that is not relevant to this

24      case here, and so it is not discoverable.  If it fails the

25      first prong that it doesn't have relevance.

1          THE COURT:  It's not relevant to materiality and

2    it's not relevant to intent, is that right?

3          MR. BRENNAN:  That is correct, Your Honor.

4          We did not address intent -- I do know we

5    submitted a motion in limine on this issue.  We did not

6    address intent in our opening brief.  We plan to address

7    it in our reply brief that's due on Friday.  But yes, it's

8    not relevant.

9          The Second Circuit said there are two things we

10   need to be concerned about here:  Did the defendants

11   intend to deceive?  And then, did the defendant -- was

12   this material to a reasonable investor?

13         And they said fair market value addresses

14   neither.

15         THE COURT:  Mr. Brennan, it would be helpful to

16   me, from a big picture standpoint, to have a better

17   understanding of why this is a criminal case.

18         I think for the average person, lawyer and

19   non-lawyer, the idea that somebody got fair value would

20   seem to be relevant to an allegation that the person was

21   defrauded, and if the government is, in effect, conceding

22   that these people got fair value, where is the crime?

23   What makes this a criminal case as opposed to a civil

24   case?

25         MR. BRENNAN:  Yes, Your Honor.  I mean, fair

1       value, fair market value, is a range of prices that

2       something could be done in the market.

3              What makes this a criminal case is a scheme to

4       deceive and defraud.  And so in this instance where the

5       defendants say it is not possible to purchase this thing

6       except for at a certain price or that this person is not

7       willing to sell except at this certain price, so you need

8       to pay me this, plus you need to pay me more on top, that

9       is intent -- what we will establish at trial, is that is

10      intent to take more money from the victims than they would

11      have otherwise got; that they're trying to jack up the

12      prices, secretly steal this extra money from the victims

13      to pocket it for Nomura.

14             Whether this price was, in general, something

15      that people in the market might potentially pay, because

16      this market is so opaque, there is no opacity, there's no

17      way to know what other people are paying for these bonds,

18      and there's no way to truly assess fair market value.

19             So the victims in this case have to rely on what

20      the defendants say, and they do rely on what the

21      defendants say.  And so when the defendants lie to them

22      about what a selling price is and then ask them to be paid

23      commissions on top, they are defrauding these crimes and

24      they're engaging in a crime to steal money.

25             THE COURT:  Why not leave it to them to bring a

1    civil action if that's in fact what happened?

2            What is it about this that makes it wreak of

3    criminal culpability?

4            Why is this a criminal case rather than simply a

5    civil case?

6            MR. BRENNAN:  Because it meets the elements --

7    it's the government's position it meets the elements of

8    security fraud and wire fraud.

9            And also the defendant, I mean, these

10   individuals could not find this out but for the

11   investigative powers of the government.

12           THE COURT:  In other words --

13           MR. BRENNAN:  Market participates in an opaque

14   market that no one knew the broad scheme that was being

15   enacted by Nomura but for our investigation to find it

16   out.

17           THE COURT:  Well, let me rephrase the question,

18   and please be patient because it's important to me to have

19   a better understanding of what's at stake here.

20           No doubt in today's world fraud is happening all

21   the time, and this can be consumer fraud, it can be

22   involving uneducated, unsophisticated people who are

23   exploited by miscreants, selling used cars, selling

24   appliances, selling siding, roofing, I mean, you name it,

25   and it undoubtedly also extends to sophisticated business

1      people who get cheated, but the U.S. Attorney's Office

2      doesn't have the resources to bring a criminal case every

3      time somebody is cheated.

4              I'm trying to understand why I have this case on

5      my docket.  If these sophisticated investors got fair

6      value for these bonds, why do we have this case?

7              I mean, let's take the example of a used car,

8      granted, a very different scenario in the details; but,

9      again, I'm talking big picture here.

10             Let's say we have a used car and we -- our

11     market may not be totally opaque, but it's not totally

12     transparent either.  The ordinary consumer can figure out

13     that people who are buying this model in this model year

14     are paying between $5,000 and $7,000, and so the consumer

15     is hoping to be able to get the car for $5,000 but realize

16     that some people have paid $7,000.

17             MR. BRENNAN:  Hello everybody?  I'm sorry.

18             THE COURT:  In that context, the consumer is

19     haggling with the salesman.

20             Again, the consumer wants to pay $5,000 and the

21     salesman wants to get $7,000.  The salesman volunteers

22     that they paid $6,000 for the car when in fact they paid

23     $5,500, and the consumer takes it for granted that they

24     did pay $6,000 -- although we're not supposed to trust

25     used car salesmen -- and winds up paying $6,250 on the

1     assumption that the fellow was telling the truth when he

2     said he paid $6,000, not $5,500.

3              Is the U.S. government going to prosecute that

4     case?  Probably not.  I mean, I haven't seen such a case.

5              I see those cases on the civil side of our

6     docket under CUTPA.  We have consumer counsel who are very

7     active on the civil side of our docket bringing cases just

8     like that.  The consumer paid a price within the range of

9     $5,000 to $7,000, but the consumer feels cheated because

10    the person explicitly lied about the cost paid to get the

11    car, and we have these cases.  These are cases that we see

12    under CUTPA, Connecticut Unfair Trade Practices Act cases.

13             But why is this case a criminal case and not a

14    civil case?

15             MR. BRENNAN:  Your Honor, my apologies.  To

16    begin, I hit a button and disconnected from the phone for

17    a moment there, but I believe I heard enough of it to be

18    able to answer, but please bear with me if I missed

19    something key there.

20             This is a criminal case, Your Honor, because

21    what the government has discovered is that in this very

22    opaque market in the securities fraud that there was a

23    scheme, a conspiracy, to train market participants, to

24    supervise market participants, to have them go out and

25    actively deceive other market participants in the

15

1    securities market.  The securities fraud statute makes

2    that illegal.

3             And it's very important particularly in these

4    opaque markets when people's pensions, people's careful

5    investments, just anybody's investments that are invested

6    in these bonds, that people receive accurate information

7    and that they do not engage in fraud to deceive and engage

8    in a conspiracy to defraud their customers.

9             And so it is not a simple notion of what is fair

10   market value for one of these particular bonds, as the

11   defendants have stated in their own motion trade at

12   various ranges, and no one can actually tell what the

13   bonds trade at.  No one actually knows when someone else

14   buys a bond how much that costs.  And so they must rely on

15   broker/dealers.

16            And the reason we have federal antisecurity

17   fraud statutes obligating broker/dealers to speak

18   truthfully is for this very reason.

19            And so when they don't speak truthfully and

20   especially when they train their subordinates that they

21   could make more money if they lied to their clients, it is

22   incumbent on the Department of Justice to stand up for the

23   public for fair market and say that that is illegal and

24   that will be prosecuted.

25            What the defendants did here, and what we have

1    uncovered, is that the defendants engaged in a systematic

2    scheme to lie to market participants to make more money

3    from people by deceiving them.  That's illegal under the

4    securities fraud statute.  That hits the elements, it hits

5    the elements of a wire fraud statute too.

6            There's a question of policy, why to choose this

7    case, and there's a question of the elements.

8            We think on elements grounds it satisfies the

9    elements.  We think on policy grounds, it's a very

10   important one to pursue.

11           THE COURT:  Okay.  I don't want to get into the

12   policy, I don't mean to inquire about that.  I acknowledge

13   that it's the prerogative of the U.S. Attorney's Office to

14   decide which cases to bring, I'm just trying to understand

15   what we're doing here so that I can do my job to the best

16   of my ability.

17           Picking up where we left off with the used car

18   example:  In that situation, let's suppose that a criminal

19   case was brought.  Why shouldn't the dealer, the used car

20   dealer, be able to show the jury that the market for this

21   used car was such that people were paying between $5,000

22   and $7,000, and people paid more for this car than this

23   person paid without complaint?  Why shouldn't the dealer

24   in that hypothetical be able to inform the jury of those

25   facts?

1              MR. BRENNAN:  In this instance, Your Honor, we

2       don't know what other people were told, so the question

3       here -- the Second Circuit in Litvak at page 186 said,

4       "The principal issues at trial were whether a reasonable

5       investor might have found the misstatement important and

6       whether Litvak intended to deceive the purported victims."

7              Testimony about fair market value would have

8       addressed neither, would not have addressed either.

9              We don't know what these other participants are

10       told.  We don't know if these broker/dealers are lying to

11       them.  It's not like there's an exchange out there where

12       everything is for sale, we know the price it's being sold

13       for, we know the commissions you pay to a broker to

14       acquire it for you, and we can assess that.

15              But this idea of the fair market in these

16       instances, what Joe Schmo paid for a bond, that never is

17       exactly the same bond, with a different broker/dealer down

18       the street, you have no idea what he was told by that

19       broker/dealer, and so what you need to do is assess the

20       payment in light of the statements made by the defendants.

21              THE COURT:  Okay.  Suppose the defense has an

22       expert who would purport to be able to credibly

23       demonstrate to the jury that these bonds did have a fair

24       market value within a certain range and that the prices at

25       issue in this case were within the range, suppose that

1    could be done.  Why would I be exercising my discretion

2    properly if I prevented the defense from putting on that

3    evidence?

4                MR. BRENNAN:  If you prevented the expert from

5    putting on evidence of fair market value, Your Honor?

6                THE COURT:  Right.  I understood you to say just

7    now, Mr. Brennan, that there is no fair market value.  I'm

8    saying, okay, let's suppose that the defense can put on an

9    expert who can credibly establish that there was a market

10   value; why is that not admissible?

11               MR. BRENNAN:  Well, Your Honor, I mean -- I

12   think it's not admissible because it's not relevant under

13   the Second Circuit's holding.  That's what we're basing

14   our argument on.

15               And also the question here, I think everyone --

16   I don't think there's anyone who would say that there was

17   a specific market price for these.  I think they will say

18   there's a range, and the question here is whether the

19   defendants deprived the victims of their right to a

20   discretionary economic decision to buy at that specific

21   price; or if they had the true information, would they

22   have tried to buy at a cheaper price, which is that

23   execution within that range.

24               So no one, I don't think, can know what the

25   range is without taking every single trade from every

1    single bond and knowing exactly what was said to every

2    single market participant there, which is just in this

3    sort of market, it's unknowable.

4         And so the people have their models and the

5    models are admissible, or they can cross-examined on their

6    models or whatever, and that is fair.  But this idea of

7    fair market value bears on neither -- as the Second

8    Circuit said -- neither whether the defendant had the

9    intent to deceive or defraud and whether a reasonable

10   investor would have relied upon their statements, would

11   have taken their statements into the mix of information

12   they made to transact that bond at that particular price.

13        THE COURT:  So as I'm listening to you now, I

14   understand your position to be a bit different than what I

15   thought it was before this phone call.

16        I thought that your position was that, yes,

17   there is a fair market value for these bonds, there is a

18   range, but it's irrelevant.  Now I hear you saying

19   something a bit different.  I think now you're saying

20   there is no fair market value and it's irrelevant.

21        MR. BRENNAN:  May I have just one moment, Your

22   Honor?

23             (Pause)

24        MR. BRENNAN:  Your Honor, my understanding of

25   your question is are we saying whether or not there is a

1    fair market value?

2              THE COURT:  Right.

3              MR. BRENNAN:  I think, Your Honor, I don't know.

4    We don't know whether or not there is a fair market value.

5    I think that is a post hoc analysis that occurs when you

6    look back at all the trades and like what a bond is worth

7    in the absolute.

8              What we are saying is, is that -- and the Second

9    Circuit has said -- whether or not an absolute package

10   relevant in -- I mean, whether or not that exists is

11   irrelevant to whether a reasonable investor would rely on

12   the statements of the defendants and whether a

13   reasonable -- and whether the defendants had the intent to

14   deceive; whether the fair market value is something apart

15   from those two things.

16             This is a case on specific actions of the

17   defendants and the defendants are what they did.  Did they

18   have the intent?  And would a reasonable investor rely on

19   those statements, use that in the mix of information to

20   transact at that price?

21             And I just do want to say, this is an issue we

22   are still briefing, Your Honor, and so it puts us at a

23   little bit of a disadvantage to have to fight the

24   defendants on this ground on this motion when we're not

25   due to reply to them until Friday.  So I would just beg

1    the Court's indulgence to just wait for our full reply

2    briefing on this issue if this is an issue that is

3    determinative to the Court's decision.

4              THE COURT:  Okay.  Well, just for what it's

5    worth, to the extent the used car hypothetical is useful

6    to the analysis, I think that in that hypothetical case it

7    would be difficult for a Court to exclude evidence of fair

8    value.  It may well be that fair value is not strictly

9    relevant to issues of materiality and intent in that the

10   government might be able to prove materiality and intent

11   without evidence of fair value, but I would think that in

12   a criminal case, evidence of fair value would be fair game

13   in the used car hypothetical.

14             Whether that salesman had an intent to defraud,

15   meaning an intent not just to deceive, but to harm, the

16   customer by causing the customer to do something the

17   customer otherwise would not do to the customer's

18   detriment seems to me to be something that would be

19   informed by evidence of fair market value.

20             If the used car example is at all helpful, I

21   just want you to know that it seems to me it's not cut and

22   dry.

23             Before we depart this point, the Litvak opinion

24   on this point is about a paragraph long.  The Court says

25   that the fairness of the prices was not an element of the

1        crime, which I think is clear enough; but does that mean

2        that the evidence is inadmissible when proffered by the

3        defense?

4                If in our used car hypothetical the salesman

5        believed that the car was worth the price paid by the

6        consumer and used the deception to get the customer to buy

7        when in the salesman's view it was a fair deal, why

8        shouldn't the salesman be able to explain that to the

9        jury?

10               The person is being charged with a crime and

11       that's a big difference, in my opinion, between criminal

12       and civil litigation.

13               The government has the burden of proving beyond

14       a reasonable doubt that the person has criminal

15       culpability, not just that the person lied, not just that

16       the person was one of many people who lied, but that the

17       person deserves to be convicted of a felony which has

18       very, very significant implications for an individual.

19               MR. BRENNAN:  Yes, Your Honor.  If I may?  May I

20       comment on that, Your Honor?

21               THE COURT:  Sure.

22               MR. BRENNAN:  I believe Your Honor hit the point

23       exactly when Your Honor said, if the salesman believed the

24       car was worth this, and I think what Your Honor is

25       presenting there is a good faith defense of what the

1    salesman believed.  That is different from what the fair

2    market is.

3            So what Your Honor laid out is the mental state

4    of the salesman, so there would have to be some other sort

5    of evidence as to what -- if the defendants were engaged

6    in competitions where like everybody thinks this is fine,

7    I believe this is fair and they know I'm telling them this

8    is fair, some sort of evidence of what the defendants

9    believed, that is a different issue.

10           The issue of what is fair market value, bids

11   that go out elsewhere, bids they don't know about, bids

12   that go to UBS and RBS and all sorts of other

13   broker/dealers that they have zero knowledge of does not

14   in any way -- and there's no evidence to show -- that it

15   is what these salesmen believed.

16           And so I think that's two separate issues we

17   have there.

18           And I think that's why the Second Circuit said

19   that this sort of testimony won't address the intent or

20   whether a reasonable investor would rely on these

21   statements.  It just addresses something a little bit

22   different, what the fair market is.

23           What Your Honor spoke about what the salesman

24   believed, relates to intent in this case.  That's a whole

25   other line of evidence.

1          THE COURT:  I have not looked at the briefs

2    submitted to the Second Circuit on this point.  I should

3    do that and I will do that, and hopefully I'll have a

4    better handle on what the Second Circuit was saying in

5    response to the briefing.

6          In any case, we have to keep moving.

7          Does anybody on the defense side want to comment

8    further with regard to why category 2 is fair game under

9    Rule 17?

10         MR. KLEIN:  Yes, Your Honor, it's Josh Klein

11   again.

12         First of all, putting fair value aside, models

13   that assets managers had relating to the particular

14   subject trades in question are directly relevant to an

15   assessment of materiality under an objective standard.

16         In other words, the only reason why the

17   counterparty models for the specific counterparties in

18   issue are relevant is because they are some evidence of

19   how a reasonable investor would assess materiality.  And

20   I'm not sure why the analysis is any different with

21   respect to a different counterparty that has a model that

22   shows us similar information about how they went about

23   valuing these bonds and is relevant to their particular

24   assessment of materiality.

25         In other words, every -- at every -- any asset

1    manager's model and assessment of materiality,

2    irrespective of whether it's a particular Counterparty

3    with regard to a charged trade or another counterparty's

4    model with respect to that charged trade, shows I think

5    similar indicia with regard to the reasonable investor's

6    assessment, which is what's at issue here.

7         So even putting fair value aside, it seems to me

8    that just under the Second Circuit's analysis with regard

9    to the models in question, there's a clear basis for that

10   evidence to come in.

11        On moving to the issue of fair value, I just --

12   we agree that the Second Circuit essentially dealt with

13   this in a power glass, it was a very skeletal component of

14   the briefing in this case.  There was some briefing on it,

15   not a whole lot.

16        One, I think, critical issue that the government

17   is leaving out is that Litvak did not charge wire fraud.

18   This is a case in which the defendants are charged with

19   six counts of substantive wire fraud and they're charged

20   with conspiracy to commit wire fraud and the intent

21   requirement differs.

22        We believe all of this is relevant under

23   securities fraud.  And if the Court wants, I can get into

24   why we believe that the Second Circuit's comments did not

25   preclude the admission of that evidence with regard to the

1    securities fraud allegation.  But let's focus a moment on

2    the substantive counts of wire fraud and the conspiracy to

3    commit wire fraud.

4         Under the wire fraud statute, as the government

5    indicated, the government has to prove beyond a reasonable

6    doubt not only that the defendants acted with intent to

7    deceive, but that they acted with intent to harm.

8         It's well settled in the Second Circuit that

9    there is no intent to harm or defraud -- and I'm now

10   quoting from U.S. v. Regent Office Supply, "When there is

11   no proof the defendants intended to get more for their

12   merchandise than it was worth to the average customer."

13        Or to put it another way, quoting U.S. v. Gold,

14   "A scheme to induce someone to purchase property at fair

15   value is not a scheme to defraud merely because the

16   defendant intended to persuade the buyer to act by false

17   statements that do not go to the issue of the ultimate

18   value of the sale."

19        And, by the way, that case cites a couple of

20   other Second Circuit cases:  U.S. v. Dinome, 86 F.3d 277,

21   a Second Circuit case, 1996; and the other case is In Re

22   Seizure of all funds, 68 F.3d 577, and that's a Second

23   Circuit case from 1995; and the cite for United States v.

24   Gold, which is the Eastern District case citing to those

25   two Second Circuit cases, is 21 F. Supp. 2d 161, jump cite

1   167.

2   And so I think a central issue, Your Honor, that

3   the government has omitted here is that under the wire

4   fraud statute, there cannot be fraud in a circumstance

5   where there is no intent to harm.  And it is well settled

6   in the Second Circuit that there cannot be intent to harm

7   where counterparties obtained the benefit of their

8   bargain.

9   And it is also well settled in the Second

10   Circuit that in a circumstance where there's no proof that

11   the defendants attempted to get more than what the good or

12   service was worth to an average investor, in other words,

13   where there's no proof that the defense intended to obtain

14   more than fair market value by lying or misrepresenting,

15   the element of intent to harm is not satisfied.

16   And so one question that I have is that, how did

17   the government intend to prove this case if they think

18   that fair value is not integrally intertwined with a

19   central element of wire fraud?  And all of the Second

20   Circuit case law squarely indicates that.

21   And Litvak, in particular, that was a case in

22   which the defendant actually made the argument at the

23   district court level and to the circuit that under

24   securities fraud the courts should find that there is

25   intent to harm -- that there is an intent to harm

1    requirement, and they actually asked for an instruction at

2    the district court level that the government was required

3    to prove intent to harm, the judge refused to give that

4    instruction, that issue went up on appeal, and the Second

5    Circuit spent like two pages differentiating the intent

6    element from the securities fraud context from the wire

7    fraud context.  And they concluded that the intent element

8    under securities fraud does not contain the same intent to

9    harm requirement that is contained in the mail and wire

10   fraud statutes, and they squarely affirmed that the mail

11   and wire fraud statutes do in fact contain such an

12   element.

13            So I think we can put aside I think the

14   discussion of materiality and whether or not Litvak is

15   instructive, we think it is not instructive given the few

16   sentences devoted to this issue under the securities fraud

17   statute, but even putting all of that aside, I'm still not

18   grasping what conceivable argument may exist that this

19   evidence is not highly relevant to what we perceive to be

20   a central issue in the case with regard to the wire fraud

21   statutes.

22            THE COURT:  All right.  Mr. Brennan, would you

23   please respond to that?

24            MR. BRENNAN:  Yes, Your Honor.

25            First I would just like to reiterate that we are

1    still briefing the intent issue as to fair market value

2    and that is coming on Friday.  They raised it the first

3    time in their opposition.  So we are at a disadvantage on

4    this, and we are requesting the Court wait on deciding

5    this, if it's determinative, until we fully brief that

6    issue.

7              First of all, this indictment alleges that under

8    wire fraud the defendants have the intent that they tried

9    to deprive their victims of the right to make a

10   discretionary economic decision; that they are depriving

11   them of this information.  That is the harm that's

12   occurring here.

13             What Mr. Klein just did was misstate some of the

14   evidence that is going to come in at trial.

15             What we will show at trial is that the

16   defendants at times would state to victims that the ticks

17   that they would make for a commission were four to eight,

18   that they were in the range of four to eight ticks, that

19   was a fair value what their work was worth on top of the

20   fair price when they were doing pay on top.

21             So there was a sales price and they would ask

22   for a range of four to eight ticks on top of that.  They

23   lied about the sales price and add the four to eight ticks

24   on top.  And they would deprive victims of the information

25   necessary to decide that what they were going to pay by

1      saying, this is what we are going to buy it at and this is

2      what we work for, this is our commission.  And so pay X at

3      the end.  And that's the value of the service.  They're

4      saying it's four to eight, and they're making a whole lot

5      more, which is thousands and thousands of dollars of

6      value.

7                The Second Circuit on fair market value, when

8      the Second Circuit says on page 186 that fair market value

9      addresses neither what the defendants' intent was and what

10     a reasonable investor would think of the defendants'

11     statement, that makes no difference whether it is a

12     securities fraud or wire fraud if the defendants intended

13     to deprive the victims of information necessary to make a

14     discretionary economic decision, which is what we allege.

15     That what the fair value, the fair market value of the

16     bonds actually is -- which is not something that they even

17     say that they know.  I mean, there's no way -- they have

18     no evidence that these defendants know what the fair

19     market value of this evidence is.  But what that actually

20     is in the absolute is irrelevant to whether they intended

21     to deceive them so as to deprive them of information

22     necessary to make a discretionary economic decision.  And

23     that under Litvak is it's no different on that whether

24     it's securities fraud or wire fraud.

25                MR. KLEIN:  Your Honor, can I be heard again?

1          THE COURT:  Yes.

2          MR. KLEIN:  I think the government misapprehends

3     the controlling case law.

4          The concept of depriving a counterparty of

5     discretionary economic -- or of information necessary to

6     make a discretionary economic decision, that cannot occur

7     under the relevant case authority in a circumstance where

8     the counterparty has not been deprived of the benefit of

9     the bargain.  In other words, that cannot occur in a

10    circumstance where the counterparty obtains the good or

11    service at fair market value at a value that is no more

12    than what the average customer would pay for it.

13         So the wire fraud cases and the right to control

14    cases under the mail and wire fraud statutes make

15    abundantly clear that in a circumstance where a

16    counterparty has been deprived of information, where

17    they've been lied to, but where the deprivation of

18    information did not deprive them of the ability to obtain

19    the good or service at fair market value, there is no

20    intent to harm.

21         And I'm not sure exactly what the government is

22    saying when they indicate their view that there's no

23    distinction between the context of intent to deceive under

24    securities fraud and the context of intent to harm under

25    wire fraud statute.

1             I do think we could have a separate discussion

2    about the implications that all this has under the

3    materiality element of securities fraud.  And I think

4    there's a compelling argument that all of this is highly

5    relevant to materiality under the SEC fraud statute.

6             But I think the notion that the concept of

7    intent to harm and intent to deceive are equivalent is

8    just flatly incorrect under the relevant case authority.

9             THE COURT:  All right, thank you.

10            MR. BRENNAN:  Your Honor, may I be heard on this

11   point?

12            THE COURT:  All right.

13            MR. BRENNAN:  Thank you, Your Honor.

14            Just briefly, what Mr. Klein is saying is

15   incorrect.  In this instance, if there is a fair market

16   value, which no one knows because it's an opaque market,

17   but if there is, it is a range.  Everyone says that their

18   models produce ranges.  And to say there can be no intent

19   to harm, it would be within a range, which is worth

20   thousands of dollars.  These ranges are worth, like,

21   significant amounts of money when someone could, for their

22   clients or for whatever they're transacting money for, get

23   it at a much cheaper price if they were not lied to, if it

24   still falls within that range, they could get a better

25   execution, and that goes into the mix of information,

1    there clearly is intent to harm and there can be intent to

2    harm.

3              So just saying like that if there is a fair

4    market value, you have to tie it to the specific case.  If

5    the defendants say there is a fair market value that is a

6    specific price point, that might be different.  But I've

7    never heard of anybody in any of these situations say

8    there is a specific price that's fair market value for one

9    of these bonds.

10             So when there is a range and you deprive

11   somebody of information to decide where in that range

12   you're willing to transact -- because some of these

13   people, if they knew the truth, they tell us, if they knew

14   the truth and they knew they were being lied to, they

15   wouldn't transact at all because they know they're

16   engaging with or participating in a market with people

17   that harm those victims -- so it's just a misstatement of

18   the case law.

19             Secondly, I just want to say, the government is

20   not saying that there's no difference in intent to deceive

21   and intent to harm.  What we're saying is here, under

22   Litvak, that fair market value is irrelevant in schemes

23   like this to the issue of intent.

24             Now, if the defendants put on evidence of what

25   they believed, what they thought and what their good faith

1     was, that's a different issue and that relates to intent.

2          But just what fair market value is in the

3     absolute -- in the market, does not bear on intent.

4          MR. KLEIN:  Can I respond briefly, Judge?

5          THE COURT:  Yes, but please understand, at the

6     rate we're going, we're going to be on the phone all day,

7     and I don't think that's feasible.

8          So, yes, I'll give you an opportunity, but

9     please be aware of our time.

10         MR. KLEIN:  I'll keep it very short.

11         I would note that I think in almost every wire

12    fraud case, fair market value is always a range.  If

13    someone claims they've been defrauded with respect to a

14    refrigerator, TV set or a car, you're not going to find

15    the exact same price at every outlet and every store for

16    that particular product.

17         So I think the notion -- they're very limited

18    circumstances where you would find only one price, and I

19    think most of the wire fraud cases occur in a context

20    where fair value is a range.

21         The notion that some people may testify they

22    wouldn't have transacted, that's irrelevant under the wire

23    fraud and mail fraud statute.  The case law specifically

24    says that so long as they were not deprived of the benefit

25    of the bargain, even if they were induced to act by false

1     statements, that is not wire fraud, it is not mail fraud

2     in the circumstance where they obtained the benefit of the

3     bargain, meaning they obtained the goods at fair market

4     value.

5            And I would also point out that this notion --

6     and this is the last point -- that the fact that there

7     were misrepresentations alleged to have been made with

8     respects to the ticks on top, in effect what the

9     government is claiming is there were misrepresentations

10    made about the cost to the dealer, to the defendants, to

11    Nomura, of the bonds that they resold.  And I think there

12    are many, many, many cases in which there are

13    misrepresentations involving cost.  Starr is a case in

14    point.  U.S. v. Starr, which we cited in the brief in

15    support of our motion to dismiss.

16            So I think, again, that's neither here nor there

17    under the case law so long as the counterparties obtained

18    the benefit of the bargain.

19            THE COURT:  Okay, thank you.

20            With regard to these models, is the Court

21    obliged to give the third parties notice and an

22    opportunity to be heard before authorizing the issuance of

23    the subpoenas?

24            That's a question for defense counsel.

25            MR. KLEIN:  Judge, I don't think that that's

1    necessary here.  We have a protective order in place.

2    This is information, you know, of a kind that -- some of

3    which has already been produced in the case, some of which

4    we've already obtained from the government, and we're

5    talking about trades here that are, I think, anywhere

6    from, you know, seven or six to three years old at this

7    juncture.

8              I don't conceptualize the information that we're

9    seeking from the dealers, the trade blotter information,

10   to be of the same type of information of the models.

11             I think with respect to the models that we're

12   attempting to obtain, those subpoenas would go directly to

13   the owners of the models.  And to the extent they have a

14   concern or want to move to quash, they would be able to do

15   that.

16             THE COURT:  If we look at Rule 17(c)(3) cited by

17   the government in its opposition memorandum, I'm

18   instructed as follows, "Before entering the order, and

19   unless there are exceptional circumstances, the Court must

20   require giving notice to the victim so that the victim can

21   move to quash or modify the subpoena or otherwise object."

22             That rule applies when the information sought by

23   the subpoena is in the nature of confidential information.

24             Why does that not apply to these models?

25             MR. KLEIN:  I think it does apply to the models,

1    and we are going to serve the subpoenas that call for the

2    production of the models on the respective owners of the

3    models.

4         So, in other words, we are going to be serving

5    these subpoenas on the alleged victims, and I don't think

6    any further notice is required.  They will be the

7    recipients of the very subpoena calling for the production

8    of their models.  And to the extent that they consider

9    that model confidential and/or want to move to quash based

10   on some other reason, they're free to do so.

11        But we are going to be providing notice to the

12   owners of the models that we're subpoenaing those models

13   because they will be the recipients.

14        So, for example, Asset Manager A will receive a

15   subpoena for Asset Manager A's model.  We are not seeking

16   Asset Manager A's model from any dealer or from any other

17   asset manager.  We are only seeking Asset Manager A's

18   model from Asset Manager A.

19        THE COURT:  So the thrust of your point is that

20   this rule does not apply in that circumstance?  In other

21   words, if you were seeking confidential information about

22   a victim from a third-party, you would need to give notice

23   to the victim so that the victim could intervene to

24   protect his, her or its interest in the confidential

25   information requested from a third-party but not, as in

1    this instance, where the information is going to be sought

2    from the alleged victim itself, is that right?

3            MR. KLEIN:  That is correct.  That's our

4    position.  And we agree with respect to the models.

5            There are other categories of information that

6    we're seeking where the analysis may differ.

7            THE COURT:  I think with respect to the models,

8    you're right, since the models are being sought from the

9    people who own the models rather than third parties.

10           Okay, so I think we've covered category 1.

11           I will defer giving you a rule until I see the

12   government's reply brief which I guess is coming in on

13   Friday.  But for the moment -- and by that I mean I will

14   defer any ruling on the disputed issue of a fair market

15   value, as the government has requested me to do.

16           But on the papers before me and in light of your

17   agreement, I think it's clear that Rule 17 subpoenas

18   should issue for the models and certainly the models in

19   category 1.  That's agreed.

20           As to the models in category 2, I'm inclined to

21   think that those models are fair game too.  I'll wait to

22   see what the government says on Friday.

23           But let's depart that request and turn to the

24   next one; specifically the request for documents

25   reflecting non-agency RMBS bids submitted to asset manager

1    counterparties for subject trades, including lists of bids
2    received in connection with BWIC's.
3              The government says that the basis for this
4    request is unclear and goes on to say that to the extent
5    that this information is sought in connection with the
6    issue of fair market value, it's out of bounds.
7              Is there anything more the government wants to
8    say at this point with regard to this request?
9              MR. BRENNAN:  No, Your Honor.
10             We read it to be fair market value, and then
11   that is as we've discussed.  If it is based on anything
12   else, we request clarity on what that is and the
13   opportunity to respond to it.
14             THE COURT:  Okay, thank you.
15             Let me hear from defense counsel, please.
16             MR. KLEIN:  Yes, Your Honor.
17             It is based in part on the claim that it is
18   directly relevant to fair market value.  The RMBS bids
19   that are submitted to the asset manager counterparties in
20   connection with BWIC's, or bids wanting in competition,
21   that's the circumstance in which -- and when asking for
22   that, only for the subject trades.
23             So in the circumstance where an asset manager
24   wants to sell a bond that is alleged to be the subject of
25   the securities and wire fraud that's alleged in the

1    superseding indictment, they will sometimes go out to the

2    market and solicit bids, meaning they'll solicit a

3    representation from various potential counterparties what

4    they're willing to pay for the bond.

5              We think that that is direct evidence of one

6    mechanism of showing how the market, this RMBS market

7    values, or what the range of value is placed on that

8    particular bond at that particular time.

9              We also think that it's directly relevant to

10   materiality, both under the wire fraud statute and the

11   securities fraud statute, because it's reflective of

12   information that the investor is receiving in realtime

13   about the range of values that various market participants

14   are representing that they're willing to transact at.

15             And we think that is squarely relevant to an

16   investor's assessment of, you know, the materiality of the

17   alleged misrepresentations.  They're getting direct

18   information in realtime of how various market participants

19   are -- of the levels at which market participants are

20   willing to transact.

21             THE COURT:  Okay.

22             Anything further on that, Mr. Brennan?

23             MR. BRENNAN:  Your Honor, may I just have a

24   minute to -- a moment on this one?

25             THE COURT:  Yes.

1          MR. BRENNAN:  Thank you.

2              (Pause)

3          MR. BRENNAN:  Your Honor, so I'm going to try

4     and restate what I understood was the second basis for

5     Mr. Klein, and I hope it's correct, and I want to confirm

6     that it's correct.

7          My understanding is that he said part of the

8     request for bid is based on fair market value, and then

9     the other part is it's relevant to materiality.

10         And my understanding is that in instances where

11    the requests for bids are from sellers who are alleged

12    victims of the crime receive multiple bids on the bonds,

13    on the subject trades, those multiple bids are relevant to

14    materiality.

15         Is that what Your Honor understood that's what

16    the defense was -- is that what the defense is saying?

17         THE COURT:  I believe so.

18         MR. KLEIN:  Yes, that's what we're saying.

19         MR. BRENNAN:  Thank you.

20         In instances where the subpoenas go to the

21    sellers and the sellers receive other bids, we believe

22    that's fine, that is the case.  We do believe that would

23    be reflective of materiality and that is permissible.

24         I do think the subpoenas ask for more than that.

25    Because, as Mr. Klein said, they're based in part on fair

1       market value.  So they're going to people who are not just

2       the sellers of our alleged victims.

3               So if there are targeted subpoenas just to

4       sellers of the particular bonds where the sellers are

5       alleged to have been victims of the trade, of the

6       defendants' misinformation, we think the defendants should

7       be able to receive the other bids that came in.

8               THE COURT:  All right, fine.

9               With regard to notice to the recipient of the

10      subpoenas, do I need to be concerned that this information

11      is confidential and is being sought from third parties?

12      Or is this again a situation where the request is being

13      made to the owner of the information?

14              MR. BRENNAN:  This is tricky, Your Honor.  I

15      think you were directing your question to me.

16              I think if the sellers are just asked to provide

17      the bids, then I don't think there's any sort of

18      confidentiality of third parties that is being requested,

19      because it's just a bid that the seller has, so I think

20      that's fine.

21              I think some of these markets just say their

22      bids are confidential.  But if you don't know who put that

23      bid in, then there's no harm to the third-party, it's just

24      the seller has a bid from someone.  So I think that's

25      fine.

1              If there is request for, like, who put the

2      specific bid in, which I don't think the defense is asking

3      for, then, you know, my understanding of this market is

4      that some of the participants would say that's

5      confidential information.  Some might not.

6              That raises a different question, but I think

7      it's one we don't have to address.

8              THE COURT:  All right, fine.

9              Let's turn then to the next category of

10     documents.

11             This request applies to documents reflecting

12     non-agency RMBS trades in the 30-day period surrounding

13     the dates of the subject trades.

14             The government in its opposition memorandum

15     states that this request should be denied because it fails

16     both for lack of relevance and also because of the

17     specificity requirement.

18             Anything further on that, Mr. Brennan?

19             MR. BRENNAN:  No, Your Honor.  No.

20             The relevance on fair market value, our

21     understanding is it's being based on fair market value and

22     we argue that that's not relevant.

23             Specificity, they ask for the same or comparable

24     bonds.

25             One, we don't know whether or not they exist.

1    It appears to be a fishing expedition for whether or not

2    they exist.

3              Secondly, we don't even know what the defendants

4    argue are comparable bonds.  So there's no way to know

5    with specificity whether these people have them.

6              We don't even know if they have 30 days

7    information on the same bonds whether or not they have

8    comparable bonds and whether the recipients would have

9    such bids.

10             THE COURT:  All right.  Let me hear from defense

11   counsel, please.

12             MR. KLEIN:  Yes, Your Honor.

13             It's the defense's view that this information is

14   relevant both to fair value and it's also relevant to

15   materiality.  Because again this is not information that

16   exists in some vacuum and that is unknowable to anybody.

17   This is information that is in the possession of the asset

18   managers who are the alleged counterparties to the subject

19   trades.

20             And so to the extent that this information helps

21   them to assess based on where various RMBS bonds are

22   trading around that timeframe.  The value of those RMBS

23   bonds we think is also relevant to the question of

24   materiality.  It's part of the mix of information that

25   they have and that a reasonable investor standing in their

1    shoes would have in the context of assessing the

2    materiality of the alleged misrepresentations.

3              And as to the question of specificity, we're

4    asking specifically for non-agency RMBS trades that are

5    trading in a particular window surrounding the bonds.

6              It's a very specific request.  I don't think

7    this is anything like the kind of fishing expedition that

8    the courts generally refer to in the context of precluding

9    the issuance of 17(c) subpoenas.

10             The case the government relies upon, all of

11   which sought impeachment material, I don't think we're

12   near a circumstance where we're asking for all the

13   documents without knowing what the documents contain.

14             We know they're asking for trades, they are

15   business records, and we're not seeking anything along the

16   lines of impeachment material.

17             THE COURT:  What do you mean by comparable RMBS

18   bonds?

19             MR. KLEIN:  I don't think I mentioned

20   comparable.  I think what we're asking for are documents

21   relating to other non-agency RMBS bonds that traded in

22   that window.  And I think, there would be mechanisms

23   distinguishing between certain subsegments of the bonds in

24   terms of which are more or less comparable.  For example,

25   bonds that are of the same vintage are more comparable to

1    the particular bonds in issue than are certain other

2    bonds.

3              But I think our position is that the volatility

4    in the non-agency RMBS market generally is also relevant,

5    and that's why the request is for non-agency RMBS as

6    opposed to a narrower request.

7              THE COURT:  How many trades do you think

8    occurred within this 30-day period?  And by that I'm

9    asking for an order of magnitude.

10             MR. KLEIN:  I don't know what the total number

11   of trades would be in that window.  But I think, you know,

12   we were mindful of the burden issue.  And our

13   understanding is that, you know, this is material that is

14   stored in databases and you can basically hit a button and

15   produce an electronic spreadsheet or other formulation of

16   the data.

17             But I don't know the answer in terms of the

18   number of trades that would be.

19             THE COURT:  With regard to the 30-day period,

20   are you talking about -- well, what period are you talking

21   about?

22             Suppose the trade occurred on June 1, what

23   30-day period would be captured by your request?

24             MR. KLEIN:  The 15 days prior and post the

25   trade.  Two weeks prior and two weeks after.

```
 1              THE COURT:  All right.  Let me turn to trade
 2    blotters and market color spreadsheets.
 3              As to this request seeking information for the
 4    period January 1, 2010 through June 1, 2013, the
 5    government again says that it's not relevant and it's not
 6    specific.
 7              Anything further on that, Mr. Brennan?
 8              MR. BRENNAN:  Your Honor, no.
 9              Our relevance is based on fair market value.  If
10    there's a materiality argument that Mr. Klein just
11    articulated, which we'd like to be heard on on the
12    previous section, we might have something to say similar
13    on this section as well.
14              But what we understand from the briefing is that
15    it's just based on fair market value, and so that would be
16    irrelevant.
17              The specificity as outlined as well.
18              We don't know what people have the bonds or what
19    comparable bonds they're talking about or looking for.
20              THE COURT:  Mr. Klein?
21              MR. KLEIN:  Yeah, I mean, I think this is
22    relevant data to assessing fair market value in the last
23    category, number 4, and this is not a market in which we
24    could go to an exchange and obtain publicly available
25    data; these were not bonds reportable to TRACE, which is a
```

1   repository for obtaining other bond information.

2          And so we think that this data is very relevant,

3   again, to first of all identifying and assessing the

4   volatility that existed within the market during the

5   various periods that overlapped with the trade alleged in

6   the indictment, which runs from 2010 between November of

7   2013.

8          We think that this data would also be relevant

9   to show how frequently or infrequently particular bonds

10  traded.  We think that there are arguments to be made to

11  the extent that a bond over a period of time traded very

12  infrequently, that would be a more illiquid asset and that

13  has consequences for how sophisticated parties would go

14  about assessing and valuing those bonds and the market for

15  those bonds and how they mark-to-market, which is a

16  process in which sophisticated parties are required to

17  undertake.  And the very mark-to-market concept is one in

18  which you are assessing what the fair market value is of

19  an illiquid asset for which you don't have the kind of

20  volume of information that you get on a more liquid

21  security, for example, traded on The New York Stock

22  Exchange.

23          So the notion that there is no fair market value

24  I think is squarely undermined by the notion that these

25  parties were suppose to mark-to-market the bonds.

1            So we think it would show the marketability.  We

2    think it would show the frequency or infrequency with

3    which these bonds are being traded.

4            Our understanding based on a trading blotter

5    that we do have from Nomura is that they also maintain

6    color information, which is information about different

7    bids submitted in connection with these securities.

8            And so, of course, to the extent that this data

9    reflects information specific to the subject trade, that

10   would be highly relevant.  But we think that the

11   information that reflects generally about being non-agency

12   RMBS market during the relevant timeframe which runs from

13   2010 to 2013 is also relevant.

14           THE COURT:  Mr. Brennan?

15           MR. BRENNAN:  Your Honor, before I respond, I

16   just want to check on the argument on both these issues of

17   volatility and frequency.

18           When the defense said it's relevant, is it

19   relevant -- just so we make our best record here is what

20   I'm concerned about -- is it relevant to fair market value

21   or is it relevant to something else?  Like, what is the

22   relevance of the volatility and the frequency in this

23   case?

24           THE COURT:  Mr. Klein?

25           MR. KLEIN:  Our position is that it's relevant

1    to both.  Our position is that all of these requests are

2    relevant to both.  Because our position is that while

3    under the wire fraud statute fair market value comes in

4    under the entirely independent element of intent to harm,

5    our position is that the issue of fair market value is

6    also relevant to an assessment of materiality.

7              And I think this case, from a factual

8    standpoint, is completely untethered to the ruling in

9    Litvak, because the proposed evidence of fair market value

10   in Litvak involved an expert's abstract deconstruction of

11   certain securities and then a weak construction of the

12   price that those securities would have traded on based on

13   the way in which the expert reconstructed the attributes.

14             I think there one might potentially have an

15   argument that the analysis is somewhat disconnected from

16   what people know; but, I mean, I think here, you know,

17   market participants have varying degrees of access, and we

18   intend to elicit this in our case; or on cross, have

19   varying degrees of access to market information.  That's

20   one of the reasons why they're in touch with dealers on a

21   regular basis.  And they speak to dealers.  And that's one

22   of the reasons you have market color and request for bids

23   in connection with BWIC's.  And we think all of that data

24   at any given moment has relevance for materiality

25   assessment.

1          THE COURT:  All right.  Does that help,

2    Mr. Brennan?

3          MR. BRENNAN:  Since this wasn't briefed, Your

4    Honor, I am -- I understand the defense argument.  Got it.

5    But to be able to respond to the relevance to materiality

6    is what I'm trying to formulate a response to.  I don't

7    know what the defense is saying the relevance to

8    materiality is.  I apologize.  I don't know if I missed it

9    in there, but how the volatility and the frequency of the

10   trade of bonds relates to materiality is still a question.

11   If it does.  It might not.

12          THE COURT:  Mr. Klein, could you please explain?

13          MR. KLEIN:  Yeah, we think that evidence in the

14   market that goes to the question of the fair market value

15   for a particular bond is information that exists in the

16   total mix of information that is in the marketplace; and

17   to the extent that participants in the marketplace have

18   access to various pieces of this information or to the

19   extent that a reasonable investor is participating in this

20   market and has access to various pieces of this

21   information, we think that's relevant to an assessment of

22   materiality with regard to the alleged misrepresentations.

23          In other words, we think that the evidence will

24   show that market participants, even though this was a much

25   more opaque market than a New York Stock Exchange -- than

1    The New York Stock Exchange market, we think it was still

2    a market in which the evidence will show participants had

3    access to do some price discovery through their own

4    trading and through BWIC's and through communications with

5    others.

6            And then, even putting all of that aside, to the

7    extent that under intent to harm, courts have said that

8    where you obtain the benefit of the bargain and where you

9    have not been deprived of information to make an economic

10   decision because you obtained the product or service at

11   fair market value, to the extent that that's a

12   circumstance where the courts are saying you have not been

13   deprived as a matter of law of information necessary to

14   make an economic decision, we think that concept cuts

15   right to the heart of materiality.

16           And, in fact, we apprised the Court recently, a

17   couple months ago of the Weimert decision of the Second

18   Circuit -- I can't remember whether it was a wire fraud or

19   mail fraud -- but I think it was a wire fraud case in

20   which there was a reversal, and the court conducted its

21   entire analysis under the materiality prong of wire fraud.

22           So we think the government's theory here is that

23   that there was a deprivation of information necessary to

24   make an economic decision.  We think that whole concept is

25   very intertwined with the concept of materiality.

1          Our concept will be that both under securities

2     fraud and wire fraud, that to the extent the information

3     did not deprive the counterparties of the ability -- of

4     the ability to make economic decisions insofar as it did

5     not deprive them of the ability to obtain fair market

6     value, that it was not material.

7          THE COURT:  This request for trade blotters and

8     market color spreadsheets would be addressed to what

9     recipients?

10          MR. KLEIN:  We would -- we're addressing this to

11     other major RMBS dealers in the marketplace like Nomura.

12     And we anticipate that as Nomura was essentially able to

13     produce this in electronic format, that they would be able

14     to do the same; that there's an Excel spreadsheet they

15     maintain containing the data.

16          THE COURT:  And does this implicate the section

17     of Rule 17 that we've been talking about?  Confidentiality

18     of victim information requested from third parties?

19          MR. KLEIN:  I don't believe so, Your Honor.

20          THE COURT:  I don't want to anticipate problems

21     for fear that I might in the process create them, but do

22     you think that these requests are likely to be greeted

23     with compliance or objections?

24          I'm thinking about our schedule.

25          MR. KLEIN:  Well, we obviously would like to get

1      them out as soon as possible so that we can get the

2      process moving and deal with any concerns anyone has.  But

3      we designed our request to minimize the burden on the

4      various counterparties.  And we believe that even though

5      this is trade data that covers a few years, we think that

6      it's relatively easy to produce.  We think it would just

7      require, you know, essentially unloading the data onto a

8      hard drive or a thumb drive and producing it.

9              So we don't think that this is particularly

10     burdensome.  I don't know.  Obviously I can't discern what

11     the responses will be.

12             I can tell the Court that we have this

13     information from Nomura, and so we know what it looks

14     like, and it didn't seem to be something that was overly

15     burdensome to produce.

16             THE COURT:  Okay.  Thank you.

17             At this point, given the government's

18     understandable request for an opportunity to submit its

19     reply in advance of any ruling that would be based on fair

20     market value, I guess I can't do a lot more today.

21             We expect to see that brief on Friday, and I

22     think the best I can do is take a look at that and give

23     you a ruling early next week.

24             So I propose to leave it at that for now unless

25     there's something that somebody would like to raise while

1    we're together on the phone.

2              MR. BRENNAN:  Your Honor, this is Liam Brennan

3    for the government here.

4              Just on the issue for these categories 3 and 4,

5    the government hasn't been given the opportunity to

6    address materiality, which we didn't address in our

7    briefing because we don't think the defendants laid it out

8    in the briefing.  So we could do that at a subsequent time

9    if it matters.

10             But we would, at some point if it's important to

11   determining this, like to be heard on this.  Because I

12   think what Mr. Klein just laid out in both these

13   instances, subpoenas call for more -- if they're not

14   granted on fair market value grounds but on materiality

15   grounds, they call for more than just what the materiality

16   argument would encompass.

17             Secondly, just on the -- on whether the request

18   number 4 contains confidential information that requires

19   notice to the parties, it does, Your Honor.  Our

20   understanding is that these -- the trade blotters and the

21   color spreadsheets contain information from third parties

22   that the corporate dealers maintained.  This information

23   in this opaque market is confidential.  And so that would

24   require notice to those third parties who traded those

25   bonds or who provided that color, the color being

1     information about a bond.

2             So sometimes a third-party would tell the

3     broker/dealer they work with, hey, I like this bond at X

4     price, or my model says this is a good price, so they note

5     it in their color spreadsheet and they hold it there for

6     their own kind of price discovery information.  So that is

7     information to those third parties and they would require

8     notice.  And so under those, it does require notice to

9     third parties in categories 3 and 4.

10            Just on materiality on this issue as well, and

11    this is request number 4 for the trade blotters and color

12    spreadsheets, if this goes to broker/dealers, how that

13    reflects on materiality of the counterparties who don't

14    have that information is completely lost to the

15    government, but that's one of the many materiality

16    arguments that the government has.

17            THE COURT:  Okay.  Well, why don't we do this,

18    this would be my suggested approach:  In light of the

19    briefing and the discussion today, I would be inclined to

20    go ahead and authorize the issuance of the subpoenas for

21    the materials encompassed by the first two requests, the

22    counterparty models for the subject trades and other bids

23    submitted to the counterparties for the subject trades;

24    and given the importance of moving forward, I would be

25    inclined to just go ahead and get that in the works.

1              As to the other two requests, RMBS trades

2    executed within a 30-day period surrounding the dates of

3    the subject trades, I would be inclined to authorize the

4    subpoenas insofar as they are directed to the

5    counterparties in the subject trades themselves.

6              This would leave category 4, the trade blotters

7    and market color spreadsheets as well as requests to third

8    parties, not counterparties to the subject trades, but

9    third parties, with regard to trade data for this 30-day

10   period surrounding the subject trades.

11             To be clear, Mr. Klein, that request, the trade

12   data request would go to entities other than the

13   counterparties to the subject trades, is that right?

14             MR. KLEIN:  Well --

15             THE COURT:  If not, that's fine.

16             MR. KLEIN:  What we're talking about would be

17   serving a subpoena on a particular counterparty for their

18   trading in the two weeks prior and two weeks after the

19   dates of the subject trades.

20             THE COURT:  Okay, that's great.  I am inclined

21   to authorize that as well.

22             With regard to the fourth category, trade

23   blotters and market color spreadsheets, I'm happy to give

24   you a further opportunity to weigh in on that.

25             Mr. Brennan has requested a chance to be heard,

1    and that's okay with me.

2          How is that as a suggested approach?  We can go

3    with other three requests and hold off on fourth until the

4    government's had a chance to file a supplemental memo and

5    the defense has had a chance to reply.  Hopefully those

6    papers could be done in the next week or so.

7          MR. BRENNAN:  Your Honor, so is category 3,

8    being the 30-day trade, the 15 -- that being granted on

9    the fair market value grounds?

10          THE COURT:  I think there's a pretty good

11    argument for that, but also for materiality.

12          MR. BRENNAN:  We have not been able to address

13    materiality on those grounds either.

14          THE COURT:  I think in a criminal case,

15    Mr. Brennan, if the alleged victim is going to be

16    testifying about how it was defrauded, it's probably

17    appropriate for the defense to have a look at the trade

18    data that the victim possesses with regard to this 30-day

19    window.  Certainly it would be fair game in a civil case,

20    and I have a feeling that it ought to be fair game in a

21    criminal case.

22          Whether we call it materiality or intent or good

23    faith or all three, I'm sympathetic to the defendants'

24    argument that they ought to be able to see what these

25    alleged victims paid in the 15 days before and the 15 days

1    after for these bonds, and I think that if I were to

2    preclude that, it would detract from the fairness of the

3    process.

4            MR. BRENNAN:  Your Honor, the government fully

5    agrees as to the counterparties.  What these subpoenas ask

6    for is for the 30-day trading in these bonds of all the

7    subpoenants (sic) for all of the bonds.  But fully agree

8    that as to materiality, what we didn't get to address that

9    the defendants should have this bid information from the

10   victims for those bonds in that timeframe, completely.

11   Because it does relate to those -- on those issues to

12   materiality.  The bids to other parties on those bonds in

13   that time period, which is what the subpoena calls for, do

14   not relate to materiality to the victims.

15           That's the only point that we never got to

16   address because we never heard the materiality argument.

17           THE COURT:  I thought I just got clarification

18   that the request for the trade data would go only to the

19   counterparties involved in the subject trades.  I thought

20   that that was just made clear.

21           MR. BRENNAN:  I understand from the subpoenas

22   that are attached that it goes to the counterparties for

23   the subject trades but for all the trades other people did

24   as well.

25           THE COURT:  I'm not following you, Mr. Brennan.

1          MR. KLEIN:  Your Honor, maybe I can try to

2     clarify.

3          There are 20 dates that relate to the

4     corresponding subject trades.  We are asking for the asset

5     managers to provide us trade information for the 30-day

6     period surrounding each of those 20 dates.

7          THE COURT:  And by asset managers, you're

8     referring to the people who worked for the alleged victims

9     here, correct?

10         MR. KLEIN:  Yeah, each asset manager is a victim

11    or a counterparty to a trade involving a victim for one or

12    more of the subject trade.

13         THE COURT:  The government is saying that you

14    already have the information that's covered by this

15    request, is that right?

16         MR. BRENNAN:  No, Your Honor.  This is Liam

17    Brennan for the government.

18         What the subpoenas are -- what we're saying is

19    the subpoenas asks, for example:  Party A engages in

20    bond -- purchase and sale of bonds one.  Okay?  The

21    subpoena asks party A for the bids on bond one, two,

22    three, four and five even though party A only engaged in

23    transacting bond one.

24         And so we think they should, for materiality

25    purposes, they should get the bids for that bond that that

1   party engaged in.

2           So if party A engaged in bond one, it should get

3   the 15 days for those bonds.  But as to bonds two, three,

4   four and five, which don't involve party A, that's what

5   the subpoenas call for, and that's irrelevant to

6   materiality.

7           THE COURT:  Well, the reporter needs a break and

8   I can't continue on the phone much longer.  We've been on

9   the phone for over an hour and a half, and it seems like

10  we could spend more time.  Maybe it would make sense if I

11  allowed you an opportunity to talk about this off line, as

12  ordinarily happens in these circumstances.  Maybe you

13  could have a dialogue among yourselves and you could get

14  clarification about what exactly is covered by a request,

15  what's important, what's not important, and then you could

16  get back to me and let me know what's left for me to

17  address.

18          Shall we leave category 3 in that posture?  In

19  other words, you'll talk about it and get back to me?

20          MR. BRENNAN:  That works for the government,

21  Your Honor.  Thank you.

22          MR. KLEIN:  That's fine, Your Honor.

23          THE COURT:  Okay.  And we'll leave category 4

24  pending your getting back to me with additional input.  I

25  don't want to deny anybody an opportunity to be heard.

1           But in the meantime, the first two categories

2    are okay with me, and there being no need to provide

3    notice, I would ask defense counsel to proceed

4    accordingly.

5           Terri Glynn, our courtroom deputy clerk, is

6    here.  I don't know what else you need from me, but I

7    think we can go ahead in accordance with our discussion

8    today as to those two categories.

9           I will leave it to you to talk further about

10   category 3 and category 4, and I would hope to hear from

11   you soon with regard to a briefing schedule on any matters

12   that you think require further briefing, whether it's

13   limited to category 4 or goes beyond category 4.  If there

14   is a felt need for a further briefing, I'll give you the

15   opportunity to do more briefing.

16          I'm hoping --

17          MR. KLEIN:  Your Honor, on category 1, we had

18   initially discussed that there were two subcategories for

19   category 1, the models of the particular counterparty that

20   is the alleged victim with respect to a particular trade,

21   that would be category 1.

22          And then category 2 would be a different

23   counterparty's model, alleged victim, with a different

24   trade, a trade B, but if that counterparty has a model

25   relating to trade A, we're seeking that as well.

1          I think Your Honor indicated you were inclined

2     to do that.  But you weren't certain you would allow us to

3     do that today.  I just want to make sure we're clear on

4     whether we're permitted to seek information on both

5     categories we respect to first requests.

6               THE COURT:  You are.  Yes.

7          To the extent I expressed uncertainty about that

8     earlier on, after having an opportunity to listen to your

9     presentation, I'm satisfied that you should be able to go

10    ahead and get both.

11              MR. KLEIN:  Okay, thank you, Your Honor.

12              THE COURT:  Anything else?

13         Okay.  Please get back to me after you've had a

14    chance to talk further.  I think probably the best thing

15    to do would be to send an email to Ivan, who is here, and

16    up to date, and in that way you can keep me informed as to

17    where things stand.

18         Luckily for Ivan, his last day is Friday, so

19    you'll want to be sure to make use of his assistance while

20    it's still available.

21              MR. KLEIN:  Okay.

22              MR. BRENNAN:  Thank you, Your Honor.

23              THE COURT:  Thank you all.

24              (Proceedings adjourned at 12:15 p.m.)

25

1                    C E R T I F I C A T E

2

3              In Re: U.S. vs. CARPENTER

4

5

6           I, Darlene A. Warner, RDR-CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15
                    /s/_____
16
                    DARLENE A. WARNER, RDR-CRR
17                    Official Court Reporter
                    450 Main Street, Room #223
18                   Hartford, Connecticut 06103
                        (860) 547-0580
19

20

21

22

23

24

25