1                    UNITED STATES DISTRICT COURT

2

3                  FOR THE DISTRICT OF CONNECTICUT

4

5     – – – – – – – – – – – – – – – x
                                    :
6     UNITED STATES OF AMERICA      :   No.  3:15CR155(RNC)
                                    :
7              vs.                  :
                                    :
8     ROSS SHAPIRO, ET AL,          :
                                    :   HARTFORD, CONNECTICUT
9                  Defendants.      :   June 1, 2017
                                    :
10    – – – – – – – – – – – – – – – x

11

12

13                    JURY TRIAL – VOLUME XIII

14        BEFORE:

15             HON. ROBERT N. CHATIGNY, U.S.D.J.

16

17

18

19

20

21                                 Darlene A. Warner, RDR–CRR
                                   Official Court Reporter
22

23

24

25

1    APPEARANCES:

2

           FOR THE GOVERNMENT:
3
                U.S. ATTORNEY'S OFFICE-NH
4                157 Church Street
                 P.O. Box 1824; 23rd Floor
5                New Haven, Connecticut 06510
                 BY:  LIAM BRENNAN, AUSA
6                     HEATHER L. CHERRY, AUSA
                      DAVID E. NOVICK, AUSA
7
           FOR ROSS SHAPIRO:
8
                 PETRILLO, KLEIN & BOXER LLP
9                665 Third Avenue
                 22nd Floor
10               New York, New York 10017
                 BY:  GUY PETRILLO, ESQ.
11                    JOSHUA KLEIN, ESQ.
                      LEONID SANDLAR, ESQ.
12                    MIRAH CURZER, ESQ.

13         FOR MICHAEL GRAMINS:

14               GREENBERG TRAURIG
                 Metlife Building
15               200 Park Avenue
                 New York, New York 10166
16               BY:  MARC L. MUKASEY, ESQ.
                      ROBERT S. FRENCHMAN, ESQ.
17                    JEFFREY B. SKLAROFF, ESQ.
                      DANIEL P. FILOR, ESQ.

18

19

20

21

22

23

24

25

```
1    APPEARANCES (CONTINUED):

2

3        FOR TYLER PETERS:

4            ALSTON & BIRD, LLP-NY
             One Atlantic Center
5            1201 West Peachtree Street
             Atlanta, Georgia 30309-3424
6            BY:  MICHAEL L. BROWN, ESQ.
                  LEANNE M. MAREK, ESQ.
7
             BRAFMAN & ASSOCIATES, PC
8            767 Third Avenue, 26th Floor
             New York, New York 10017
9            BY:  ALEX SPIRO, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2

3    Initial Instructions by the Court ............... 2625

4    Closing Argument by Mr. Novick .................. 2675

5    Closing Argument by Mr. Novick .................. 2745

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          9:20 A.M.

2

3              THE COURT:  Good morning.  I've received your

4    correspondence with regard to the jury instructions.  I

5    appreciate the efforts you made to present your views in

6    writing.

7              I've had a chance to consider your views, and

8    let me tell you how I see it very briefly.

9              Focusing on the government's letter, the

10   government requests that I instruct the jury with regard

11   to omissions.  The defense responds that this is not an

12   omissions case.  The parties cite the Autuori case, which

13   I've read.  This is not the Autuori scenario where an

14   individual touting an investment speaks of it in glowing

15   terms while failing to disclose his knowledge that the

16   investment is actually not very good.

17             In that case, following a verdict in favor of

18   the government, Judge Burns set it aside on the ground

19   that the touting statements were mere puffery, and there

20   was no obligation to disclose the adverse information

21   because there was no fiduciary duty.

22             The Court of Appeals disagreed with that.  The

23   court said that the touting statements were material, and

24   go on to say that in any event, once the defendant chose

25   to offer those statements, he incurred a duty to reveal

1      the information known to him that made the investment

2      quite unattractive.

3              I guess in some sense one could say that the

4      individual had an obligation to correct his lie, which is

5      another way of looking at the case we have here.  So I

6      guess I will give the jury a correct statement of the law

7      under 10(b)(5) in that it does proscribe material

8      omissions.  In that way the government will be able to

9      point to the language in the instruction on that topic.

10             At the same time, I don't propose to litter the

11     instructions with talk about omissions because, from my

12     perspective, that's not this case.  The indictment alleges

13     affirmative misrepresentations, as I explain in the

14     instructions.  The case has always been about affirmative

15     lies, and I want to give the government a fair opportunity

16     to make its case, and I'll be interested to hear what the

17     government says in its closing argument.

18             So the bottom line is that I will add language

19     about omissions, although I'm not going to do it in a

20     manner that makes omissions a prominent or as prominent a

21     feature of this case as the affirmative

22     misrepresentations, which is what this case has been

23     about, in my mind, to this point.

24             With regard to the next request by the

25     government, with regard to the definition of what

1   constitutes an untrue statement, mindful of my obligation

2   to give the government an opportunity to argue to the jury

3   based on a correct statement of the law, I think I need to

4   say something about this.

5           What do I mean?

6           From early on in the case, I think it has been

7   apparent to everybody that the government is advancing the

8   theory that although the defendants had no obligation to

9   say anything about the acquisition price, the sales price,

10  or the margin, once they spoke on those matters, they had

11  an obligation to be truthful.  That is something the

12  government has specifically said from early on.

13          If one accepts that, the question is whether the

14  matter is material, and the case could turn on that.

15          I think the law does provide that if a party

16  voluntarily undertakes to speak about a material matter,

17  it has a duty to be truthful.

18          With that in mind, I will add language to 11D.

19  Here's what I propose to say:

20          "A statement that is literally true can be

21  deliberately misleading depending on the circumstances in

22  which the statement is made.  If the statement concerns a

23  material matter, the party may have a duty to disclose

24  information in order to avoid committing fraud."

25          I think that makes the point.

1          With regard to the issue of reliance, the

2     government requests an instruction that tells the jury the

3     following:  Materiality does not require proof of a

4     substantial likelihood that disclosure of the truth or the

5     omitted fact would have caused a reasonable investor to

6     act differently.

7          Judge Hall gave this instruction in Litvak.

8          The defendants object on the ground that it

9     would be confusing to the jury and outweigh any potential

10    benefit.

11         I agree that it is confusing.  I don't

12    understand how we could expect the jury to handle that.

13         If we come back to my simple hypothetical where

14    a person is seeking to buy a bond and Nomura says, "I know

15    you wanted to pay eight, but I couldn't get it for less

16    than ten," and in fact the seller was happy to get eight,

17    how would this work, this request to charge?

18         I would tell the jury that the government has

19    the burden of proving that it would be significant to the

20    buyer to know that the price was really eight, but it

21    doesn't have to prove that the buyer would have bought it

22    for less than ten or refused to pay ten.

23         It's confusing.  It's significant, but it's not

24    really significant.  It's significant enough to be

25    material, but not significant enough to matter.  It's

1    confusing, very confusing.

2          If the government wants to help explain to me

3    how I could give the jury a balanced instruction that

4    would enable them to work their way through that, and also

5    explain to me why it's worth it, I'd be happy to consider

6    it; but if I'm a juror, I'm not sure how I deal with that

7    concept.

8          It's significant enough that I want to know

9    about it, and I'm going to take it into account, but it

10   doesn't need to be significant enough to really matter to

11   me in the end.

12         I'm happy to draw that line.  I just don't know

13   how to do it in a way that doesn't confuse the jury.

14         With regard to bluffing and candor, I understand

15   the government's point about bluffing, and so I'm going to

16   take that out.  We'll still have haggling, and I don't

17   think it's marshaling the case for the defendants.  I

18   think it's presenting an instruction that allows the

19   defendants to argue their case to the jury.  I don't think

20   it's heavy-handed.

21         By the same token, I'm going to leave in the

22   statement the government asked me to delete with regarding

23   suspicion and unreliability.  I think the defendants are

24   entitled to an opportunity to argue their case in a manner

25   that ties into the law as I understand it.  To my mind, if

1    a counterparty views a statement with suspicion, discounts

2    it as unreliable, how can it be material?

3            I could say, the parties disagree about whether

4    these statements were material.  The government says they

5    were.  In the government's view they would significantly

6    alter the total mix of information.  The defendants say

7    they were not because a reasonable investor in this market

8    would distrust them, view them with suspicion, discount

9    them and not rely on them.

10           Do you see?

11           MR. NOVICK:  I understand that, Your Honor.  I

12   think the government's point was that that point can be

13   argued from without that latter clause.

14           I think our concern with the statement was, it

15   says, "or with regard to the statement with suspicion and

16   discounted as unreliable."  And I think our point was, you

17   can regard something with suspicion -- you can take

18   something with a grain of salt and it would still be

19   significant in your deliberations.

20           THE COURT:  Really.

21           MR. NOVICK:  Well, it would have to be enough

22   suspicions to -- in other words, there's two statements

23   here, with regard to the statement of suspicion and

24   discounted as unreliable.

25           I understand the Court's point as to the second

1    one.  Discounted as unreliable is something -- in other

2    words, just the suspicion alone, I don't think would be as

3    a matter of law, which is what the Court's instructing

4    here.

5              In other words, in our view, in the government's

6    view, it's confusing the way that statements are put

7    together as implying that one or the other would be

8    sufficient to say, as a matter of law, that it's not

9    material.

10             So just because something -- just because

11   someone is suspicious of information doesn't mean they

12   discount it as unreliable.  I think you would need to show

13   as a matter of law, if we're talking about -- certainly

14   they can consider the level of suspicion that they have.

15             THE COURT:  Are you saying I should remove the

16   word "suspicion" and leave the rest?

17             MR. NOVICK:  Can I have one moment, please, Your

18   Honor?

19                  (Pause)

20             MR. NOVICK:  I think, Your Honor, if you

21   removed -- obviously we would like the whole statement

22   struck, or if it said, "would discount the statement as

23   unreliable."

24             THE COURT:  Okay.  That's what I'll do.  It's

25   not my intention to argue the case for either side.  My

1        intention is to give a balanced charge that's reasonably

2        accurate and allows each side to advocate its theory of

3        the case.

4              With regard to the next request by the

5        government, dealing with Instruction 12G, the third

6        paragraph, "The use of the wires need not itself include a

7        fraudulent representation, but it must serve to assist in

8        carrying out the scheme to defraud."

9              The government wants me to add the following:

10       "There is no requirement that the use of the wires precede

11       the fraud.  Where the defendant is not charged with

12       isolated or unrelated swindles but rather participation in

13       a fraud scheme, wires may further the scheme by, for

14       example, furthering some objective of the scheme or

15       helping to keep the scheme in operation."

16             What does the defense say about that?

17             The defense says it doesn't apply and shouldn't

18       be included.  We have five discrete counts of wire fraud,

19       each alleging a specific transaction on a particular date;

20       therefore, this is not an appropriate instruction.

21             The government wants me to emphasize that the

22       wires don't have to precede the fraud because in this case

23       the wires come after.  The defense reminds me that it

24       seeks dismissal on this very basis, on the ground that the

25       wires occurred after the frauds were completed.

1          I will insert after the first sentence the

2     following:  "Nor does the law require that the wire

3     precede the fraud; however, the wire must serve to assist

4     in carrying out the scheme to defraud."

5          With regard to the government's next request on

6     agency, this is Instruction 15, the government's concern

7     is I could be viewed as attacking the credibility of these

8     witnesses, so they ask me to strike the word "testimony,"

9     and insert the word "evidence."  They also ask me to say

10    that certain defendants held themselves out to be acting

11    in that capacity.

12          I'm not going to make those changes.  That's

13    open to argument by both sides.

14          The government is free to argue that the

15    evidence, including Mr. Gramins' own words as quoted in

16    this part of the government's letter, shows that the

17    defendants held themselves out in this way.  That's

18    argument.

19          MR. NOVICK:  Your Honor, may I request as an

20    alternative just to strike the first paragraph of that

21    instruction?

22          I'm not sure that it is necessary.  The

23    statement of the law is what it is.

24          THE COURT:  Fine.  I appreciate the suggestion.

25          MR. NOVICK:  Thank you.

1              THE COURT:  Let's see where we are.

2              With regard to the defendants' other requests, I

3       think those are relatively easy to address at this time.

4              I will insert the words "to testify" on page 14.

5              All right?  I think that's a reasonable request.

6       This case is all about materiality.

7              With regard to the next request in the

8       defendants' letter regarding Section F of the securities

9       fraud charge, "defendant cannot be convicted unless the

10      government proved it engaged in a conscious wrongdoing

11      with a sufficiently culpable state of mind to do something

12      unlawful."

13             I think this is a difficult matter for the

14      Court.  There is case law cited by both parties that is

15      intention on this point.  Both sides cite authority to

16      support their positions, and the problem is particularly

17      acute in this case where the defendants have moved to

18      dismiss the indictment on the ground that this prosecution

19      violates their right to due process.

20             My research on this point has led me to find

21      that others have struggled and apparently will continue to

22      struggle with this.  The model penal code deliberately

23      avoids using the term "willfully" because it's freighted

24      with difficulty, and the authors say that it becomes a

25      matter of statutory construction.  If you look at the

1   legislative history of the relevant statutes, it's not

2   helpful.

3            So we have a problem, and for me the question

4   becomes, what is fair and reasonable in the circumstances.

5            The government has no obligation to prove that a

6   defendant knew he was violating Rule 10(b)(5), but I don't

7   think you can be convicted under the Constitution unless

8   you had a sufficiently culpable state of mind such that

9   you made a conscious choice to cross an important line and

10  expose yourself to potential imprisonment.

11           If the defendants are convicted in this case,

12  I'm sure the government's going to be asking me to

13  incarcerate them for years.

14           So in that context, given the state of the law,

15  I've struggled to figure out what to say.

16           I don't think the Second Circuit case law

17  requires the government to prove that the defendants knew

18  their conduct was unlawful, but at the same time, I don't

19  think it can be the case that they can be convicted, even

20  if they didn't realize their conduct was not unlawful.

21           Some of the cases cited by the defendants are in

22  the securities area, and in those cases, the court said,

23  indeed the government had a burden of proving that the

24  defendants knew their conduct was unlawful.

25           The Supreme Court has recognized that when a

1    challenged action or course of conduct is a technical

2    violation of the law as opposed to morally reprehensible,

3    it becomes more important to make it clear to the jury

4    that the government has a burden to prove that the

5    defendant knew his conduct was unlawful.

6           Why?

7           Because we don't want to be exposing people to

8    conviction and incarceration if they didn't know that this

9    is what they were risking.

10          So it's a problem, and I'm trying to do what I

11   can in the circumstances of this particular case to

12   address the parties' legitimate needs and concerns, and

13   I'm going to go with what I have.  I would rather risk

14   error on the side of lenity than the other way.

15          With regard to the next request, I think that's

16   already been dealt with.  I'm going to grant that request

17   and delete that transition sentence.

18          With regard to the last request in the

19   defendants' letter, uncalled witnesses, I don't think I

20   need to do that this minute, and I don't want to keep the

21   jury waiting any longer.

22          Bear in mind, the instructions I'm giving the

23   jury now take me through what is now, for me, closing

24   arguments on page 42.  The uncalled witnesses instruction

25   won't be given at this time.

1             With regard to the motions to strike, I've read

2    the defendants' submissions.  I'm not going to strike

3    anything more than we have already ordered or agreed to

4    strike.  I don't think that the defendants are entitled to

5    that relief substantially for the reasons stated by the

6    government.

7             My intention is to bring in the jury and provide

8    them with these jury instructions and see where we are.  I

9    don't know how long it's going to take to do, but

10   certainly it will take enough time so that a break will be

11   in order once I'm done.  Perhaps a break will be necessary

12   along the way.

13            But Katie tells me that you have different views

14   on how we should proceed, and we can address that after we

15   see where we are.

16            MR. NOVICK:  Your Honor, not on that point, but

17   on -- earlier on in your discussion of the government's

18   letter, you had mentioned Number 3, entitled "Reliance Not

19   Required," that if the government would suggest an

20   alternative.

21            We can certainly try to do that.  I don't know

22   if we can do that now.  But if I could express to the

23   Court, really what we're driving at here is exactly what

24   the heading says, which is that reliance is not required;

25   in other words, to make it clear to the jury that all we

1       have to prove for materiality is that the statement would

2       have assumed significance in the deliberations of a

3       reasonable investor and not necessarily that the

4       reasonable investor would have acted based on that.

5               There's been a lot of cross-examination on that

6       point, and I think that's an accurate statement of the

7       law.

8               In other words, we don't have to go back and

9       prove what would have happened six years ago.  We just

10      have to prove that would have assumed significance in

11      their deliberation.  But whether a particular victim could

12      have decided to change his price or might not have decided

13      to change his price, we don't have to prove necessarily

14      that he would have or wouldn't have, because nobody could

15      do that.

16              And we believe the fact that reliance is not

17      required is what distinguishes criminal -- at least one of

18      the ways -- criminal securities fraud from civil

19      securities fraud as we've talked about during the course

20      of the trial.

21              So if there's a way to fashion something like

22      that, the government would ask for it.  We can go back and

23      try to do that, but I know the Court wants to instruct

24      now.

25              THE COURT:  It would be helpful to me,

1   Mr. Novick, if you could make your pitch with reference to

2   my hypothetical; in other words, put yourself in the shoes

3   of a juror, and these are the facts:  I wanted to buy the

4   bond as cheaply as possible; you told me I had to pay ten;

5   and I went along with that, not realizing that you were

6   getting it for eight.

7           The government has to prove that your

8   misrepresentation was material to me, that your statement

9   to me that ten was the best you could do would be

10  significant to somebody in my position, okay?  But --

11          Fill in the blank for me.

12          MR. NOVICK:  In that scenario, if I had known

13  the truth, that is that the acquisition price was really

14  eight, the government doesn't need to prove that he would

15  necessarily have transacted at a different price; in other

16  words, he could have chosen to continue to transact at

17  ten, plus a pay on top; he could have chosen to go back,

18  as some of the witnesses have said, and try to get the

19  bond for cheaper; he could have decided to walk away.

20          But one way or the other, the question that

21  needs to be asked is:  Would it have assumed significance

22  in his deliberations about how to proceed?

23          That's the government's point, Your Honor.

24          THE COURT:  You think that without a further

25  instruction you can't make that point?

1           MR. NOVICK:  I think I can make the point, Your

2      Honor, but I think that without that instruction, the jury

3      could be confused as to what the government does, in fact,

4      need to prove.  That's our position.

5           And I believe -- I could be wrong, Your Honor,

6      but I think something was given in Litvak for that exact

7      reason.

8           I understand the Court and the defense have

9      argued that it's confusing, but I guess what I'm just

10     trying to explain to the Court is why we believe it's an

11     important instruction.

12          THE COURT:  Any comments?

13          SPEAKER:  Your Honor, we believe the

14     additional --

15          THE COURT:  Who are you, sir?

16          MR. FILOR:  Good morning, Your Honor, Dan Filor

17     for Mr. Gramins.

18          The addition of this sentence that the

19     government suggests would actually confuse the jury

20     further.  What the Court has currently is a very good

21     explanation for materiality.  While the misstatement need

22     not be outcome determinative, the buyer didn't have to

23     change the price.

24          The language that the government suggests about

25     a substantial likelihood is just not -- should not be

1    introduced here, Your Honor, and it's kind of contrary to

2    the rest of the Court's charge with respect to the

3    significant likelihood that it would alter the mix of

4    information for the investment decision.

5              MR. NOVICK:  Can I try one, Your Honor?

6              THE COURT:  Okay.

7              MR. NOVICK:  Perhaps an instruction that says:

8    "The government need not prove, however, that a reasonable

9    investor would necessarily have relied on the

10   misrepresentation."

11             THE COURT:  That sounds right.

12             Do you want to pass that up, and I'll just paste

13   it in.

14             MR. NOVICK:  I'll write it out a little bit

15   neater, Your Honor, and I'll do that.

16             THE COURT:  Where have you been hiding?

17             MR. FILOR:  Your Honor, it's nice to be able to

18   come up to the big kids' table, so I appreciate it, Your

19   Honor.

20             THE COURT:  Nice to see a new face around here.

21             Are you the person who wrote that letter last

22   night?

23             MR. FILOR:  Pretty late last night.

24             I don't think I'll have an opportunity to sum up

25   today, but I'll leave that to Mr. Mukasey.

1           THE COURT:  I'm glad you disclosed that, because

2    I was laboring under the misapprehension that Mr. Mukasey

3    did that letter.

4           MR. MUKASEY:  I don't even know what it says, I

5    just signed it.

6           MR. NOVICK:  May I approach, Your Honor?

7           THE COURT:  Yes.

8           You would ask me to insert this language where

9    exactly, please?

10          MR. NOVICK:  It goes, Your Honor, I believe on

11   page 24.  It says under Section E, "Securities Fraud,

12   Second Element," and I think would go after the sentence,

13   "In other words, the government must prove that the

14   misstated fact likely would have assumed significance,"

15   et cetera.

16          THE COURT:  All right.

17          Terri, would you please tell the jury that we're

18   going to be ready for them in just a few minutes?

19          THE CLERK:  Sure.

20          THE COURT:  Okay.  I think I'm ready to go with

21   these instructions.  Again, thank you for your

22   suggestions.

23          MR. BROWN:  Judge, would you just mind reading

24   again what you're going to insert?

25          THE COURT:  Yes.

1           "The government need not prove, however, that a

2    reasonable investor would necessarily have relied on the

3    misrepresentation."

4           MR. BROWN:  Thank you.

5           MR. PETRILLO:  Your Honor, when you complete

6    your instructions this morning, will you be giving the

7    jury an idea of what would happen next?

8           THE COURT:  I'm going to ask them to give us a

9    few minutes, and then I'll hear from you, and then we can

10   decide.

11          I will say, Mr. Petrillo, that my preference in

12   the ordinary course would be to go ahead, and closing

13   arguments are a critical stage, so I want to do what I can

14   to make it work for everybody.  So I'll hear what people

15   have to say on what the schedule should be going forward,

16   but at least this way we get the jury in here and we get

17   some work done.

18          Given what happened the last time they were

19   here, I think it's important that we do that.

20          MR. PETRILLO:  Understood.

21          THE COURT:  Okay.  I think we're ready for the

22   jury.

23               (Whereupon, the jury entered the

24                courtroom.)

25          THE COURT:  Thank you.

1           Good morning, everyone.  Welcome back.  It's a

2    nice day.  It's good to see the sun again.

3           As always, we appreciate your very conscientious

4    service in this case.  I am going to speak with you this

5    morning about the law that applies here.

6           The instructions that I have are unfortunately

7    lengthy.  I know the old saying about how the preacher

8    doesn't save any souls after a half an hour, and I'm

9    mindful of that.  Even so, the law requires me to instruct

10   you in detail, and the rules require me to present these

11   instructions to you orally here in open court in the

12   presence of the parties.  That is required even though you

13   are going to have a written copy of these instructions in

14   the jury room when you deliberate.

15          The instructions include a table of contents,

16   and they proceed in a manner that aims to be of assistance

17   to you as you work your way through the issues that are

18   entrusted to you in this case.

19          Even so, I must ask you to please give me the

20   same careful attention that you have given throughout this

21   case as I now present you with these instructions.

22          Can everybody hear me okay?

23          If at any time anybody wants to stand up and

24   stretch, that's okay with me, I won't be offended; and if

25   at any time anybody would like to take a break, that's

1      fine with me too.  In fact, I'd appreciate you letting me

2      know.  As always, I want you to be able to do your best

3      work, and whatever I can do to be of assistance in that

4      regard, I'm more than happy to know and to do.  So please

5      don't hesitate, okay?

6              These instructions will be given to you in three

7      parts.  First, I'll have some general rules for you on the

8      role of the Court -- me, the presiding Judge -- and your

9      duty as jurors; I will have instructions for you

10     concerning the elements of the offenses charged in the

11     indictment in this case, in other words, the facts the

12     government has to prove beyond a reasonable doubt in order

13     to obtain a conviction on any given charge; and then,

14     third, some rules and guidance for your deliberations.

15             As I said, when you retire to the jury room, you

16     will have a written copy of these instructions.  You will

17     also have a verdict form, a form that you will complete.

18     This form will be the vehicle by which you record your

19     verdicts.

20             Also with you in the jury room will be the

21     exhibits that have been admitted into the evidence during

22     the trial.

23             Please understand that you should not single out

24     any one part of these instructions and ignore the rest.

25     Instead, you should consider all the various instructions

1    as a whole and consider each one in light of all the

2    others.

3              You must not read into these instructions or

4    into anything I have said or done any suggestion from me

5    as to what your verdict should be.  That is a matter

6    entirely up to you.

7              This is a criminal case brought by the United

8    States Government against three defendants:  Ross Shapiro,

9    Michael Gramins, and Tyler Peters.  The charges against

10   the defendants are contained in a document called an

11   indictment.  As I explained at jury selection, an

12   indictment is the mechanism provided by law for bringing a

13   criminal charge before a court for trial.

14             As I have emphasized, an indictment is merely an

15   accusation.  It is not evidence of guilt and may not be

16   regarded as evidence of guilt.  In addition, the

17   defendants are not on trial for any conduct that is not

18   alleged in the indictment.

19             The indictment alleges that the defendants,

20   while employed as bond traders at Nomura Securities

21   International, Inc., violated federal statutes prohibiting

22   conspiracy, securities fraud, and wire fraud.

23             The indictment alleges that the defendants

24   agreed to make and did make false statements of material

25   fact to customers of Nomura in connection with

1    transactions involving residential mortgage-backed

2    securities, or RMBS.

3            As the indictment alleges, RMBS bonds are

4    collections of mortgages and home equity loans that are

5    grouped together and sold as packages between and among

6    large institutional investors.  Unlike stocks traded on

7    public stock exchanges, RMBS bonds are not traded on a

8    public exchange.  Instead, buyers and sellers of RMBS

9    bonds use broker-dealers like Nomura to carry out purchase

10   and sales transactions that are negotiated on an

11   individual basis.

12           The indictment alleges that the defendants

13   conspired to and did defraud Nomura's customers by making

14   false statements of material fact in the course of

15   negotiations in order to obtain secret unearned

16   compensation on RMBS trades as follows:

17           One, when a buyer agreed to buy a bond at a

18   price equivalent to that for which Nomura paid for the

19   bond plus an on-top commission, the defendants or their

20   subordinates, at the defendants' direction, falsely

21   inflated the price Nomura had paid in order to

22   fraudulently induce the buyer to pay a higher overall

23   price, thereby providing Nomura with extra unearned profit

24   at the buyer's expense;

25           Two, when a seller understood that Nomura had

1    negotiated a sale price for a bond with a buyer, the

2    defendants and their subordinates at the defendants'

3    direction falsely deflated the price the buyer had agreed

4    to pay in order to fraudulently induce the seller to sell

5    the bond at a lower price, thereby providing Nomura with

6    extra unearned profit at the seller's expense; and

7          Three, in selling bonds from inventory, the

8    defendants misrepresented and caused their subordinates to

9    misrepresent that Nomura was buying a bond from a

10   fictitious third party in order to fraudulently induce the

11   customer to pay on-top compensation.

12          The defendants have pleaded not guilty to the

13   charges in the indictment and they are presumed innocent

14   of the charges.  In this trial, it will be your

15   responsibility to determine whether the government has

16   proven the charges beyond a reasonable doubt.

17          As the presiding judge at the trial, I perform

18   basically two functions:  First, I decide what evidence is

19   admissible for the jury's consideration; and, second, I

20   provide the jury with instructions on the applicable law.

21          As I have explained, you must follow the law as

22   given in these instructions whether you agree with it or

23   not.

24          During the course of the trial, I ruled on

25   various objections concerning the admissibility of

1    evidence.  A lawyer has an obligation to object when

2    opposing counsel asks a question of a witness the lawyer

3    thinks is improper or offers evidence that the lawyer

4    thinks is inadmissible.

5         You are not to concern yourselves with why a

6    lawyer made an objection or why I ruled as I did.  If an

7    objection to a question asked of a witness was sustained,

8    you must disregard the question.  If an objection was

9    overruled, you must treat the witness's answer to the

10   question like any other evidence in the case.

11        From time to time during the trial counsel

12   requested conferences with me outside the hearing of the

13   jury.  You should not show any prejudice against a party

14   because such a conference was requested, and you must

15   refrain from speculation about any communications between

16   the lawyers and me held outside your presence and hearing.

17        In our adversary system of justice, we rely on

18   counsel to represent their clients vigorously within the

19   bounds permitted by applicable law.  Under our system, the

20   attorney's responsibility as an advocate for his or her

21   client includes offering evidence, making objections,

22   requesting conferences with the judge, and presenting

23   arguments to the jury.

24        In this case the government is represented by a

25   team of lawyers supported by assistants, and each of the

1    three defendants is represented by his own team of lawyers

2    and assistants.  Bear in mind that the charges against the

3    three defendants are separate and could be tried in three

4    separate trials.  We are trying the charges jointly in one

5    trial for the sake of convenience.  That we are having a

6    joint trial does not detract from the separate nature of

7    the charges as to each defendant or the need for separate

8    consideration of the charges as to each defendant.

9         None of the defendants should be prejudiced in

10   any way because we are having a joint trial.  Each

11   defendant is entitled to a verdict reflecting careful

12   consideration of the evidence with regard to him

13   individually.

14        Numerous attorneys have actively participated in

15   the trial.  The number of attorneys and assistants is not

16   unusual for a case of this type and you should not let the

17   number of representatives in the courtroom affect you.

18        Counsel on both sides have consulted and

19   cooperated with each other in an effort to save time and

20   avoid duplication.  That they consulted and cooperated in

21   this way is normal and proper and has no bearing on any of

22   the issues you are called on to decide.

23        Especially in a trial involving numerous

24   lawyers, one can't help but notice the various

25   personalities and styles of the attorneys; however, it is

1    important for you to recognize that a trial is not a

2    contest among attorneys.  Any opinion you might have

3    formed regarding any of the lawyers in the case should not

4    enter into your deliberations.

5         Your duty as jurors is to decide whether the

6    government has met its burden of proving guilt beyond a

7    reasonable doubt as to the charges in the indictment.

8    Under your oath as jurors, you are to be guided solely by

9    the evidence and the applicable law as I give it to you,

10   and the question you must ask with regard to each charge

11   in the case is simply this:  Has the government proven

12   guilt beyond a reasonable doubt, or has it failed to do

13   so?

14        It is for you alone to decide whether or not the

15   government has met its burden of proving guilt beyond a

16   reasonable doubt.

17        The indictment is comprised of nine different

18   counts.  Each count charges a separate offense.  As to

19   each count, you must return a separate verdict as to each

20   defendant.

21        Your verdict of guilty or not guilty with regard

22   to a charge against a defendant must be based solely on

23   the evidence or lack of evidence as to that defendant.

24   Your verdict with regard to a charge against a defendant

25   does not control your verdict as to any other charge in

1      the case.

2              To prove a defendant guilty of an offense

3      charged in the indictment, the government must prove each

4      element of the offense beyond a reasonable doubt.  In your

5      deliberations, you must analyze each charged offense in

6      detail, element by element.

7              A defendant may be found guilty of an offense

8      only if the government has proven each and every element

9      of the offense as to that defendant beyond a reasonable

10     doubt.

11             In determining whether the government has met

12     its burden of proof as to any given charge, you must

13     analyze the evidence in a fair and impartial manner.

14     Remember, the evidence consists of the testimony of the

15     witnesses, the exhibits, and the stipulations of the

16     parties, nothing else.

17             What the lawyers have said in their opening

18     statements, in their questions to witnesses, in their

19     objections and in their closing arguments is not evidence.

20             What I say is not evidence, anything you might

21     have seen or heard outside the courtroom is not evidence,

22     and any testimony or exhibits that I have instructed you

23     to disregard is not evidence.

24             If, after fair and impartial consideration of

25     the evidence or lack of evidence regarding a charge in the

1        indictment you have a reasonable doubt about a defendant's

2        guilt, you should not hesitate for any reason to return a

3        verdict of not guilty.

4              On the other hand, if you are satisfied that the

5        government has met its burden of proving guilt beyond a

6        reasonable doubt, you should not hesitate, because of

7        sympathy or any other reason, to return a verdict of

8        guilty.

9              That this case is brought in the name of the

10       United States does not mean that the government is

11       entitled to greater consideration than that accorded the

12       defendants.  By the same token, the government is entitled

13       to no less consideration; rather, all parties, the

14       government and the defendants, stand as equals under the

15       law and must be treated as equals by the jury.

16             Moreover, the question before you can never be:

17       Will the government win or lose the case?  The government

18       always wins when justice is done, regardless of whether

19       the verdict is guilty or not guilty.

20             Under your oath as jurors, you must decide the

21       issues entrusted to you based on fair and impartial

22       consideration of the evidence and without bias or

23       prejudice of any kind.  If you let prejudice, bias,

24       sympathy or other emotions interfere with your clear

25       thinking about the evidence, there is a risk you will not

1    arrive at a just verdict.

2            In reaching your decision, it would be improper

3    for you to consider any personal feelings you might have

4    about the race, sex, age, lifestyle, or other features of

5    the parties, the witnesses, the lawyers, or anybody else

6    involved in the case.  It also would be improper for you

7    to be influenced by any feelings you might have about the

8    nature of the charges in this case or the wisdom of the

9    laws the defendants are charged with violating.

10           Your responsibility is to determine whether the

11   government has proven guilt beyond a reasonable doubt.

12   Your verdict must be based solely on the evidence or lack

13   of evidence regarding a given charge and must reflect

14   dispassionate analysis of the evidence.

15           Again, the key question you must answer as to

16   each charge and as to each defendant is whether the

17   government has met its burden of proving each element of

18   the offense beyond a reasonable doubt.

19           As we have discussed, there are three basic

20   rules in a criminal case.  The first basic rule is the

21   presumption of innocence.  Under the Constitution, an

22   accused is presumed innocent of a criminal charge.  The

23   presumption of innocence can be overcome only by legally

24   admissible evidence establishing guilt beyond a reasonable

25   doubt.

1            The defendants were protected by the presumption

2       of innocence when the trial began.  They continue to be

3       protected by the presumption of innocence now, and you

4       must give each defendant the benefit of the presumption of

5       innocence during your deliberations.  In other words, you

6       must presume that a defendant is not guilty of a charge

7       unless and until such time, if ever, that you become

8       convinced his guilt has been proven beyond a reasonable

9       doubt.

10           The second basic rule involves the burden of

11      proof.

12           The burden of proof in a criminal case is always

13      on the government.  The burden of proof never shifts to

14      the defendant.  The defendant in a criminal case has no

15      burden to prove he is not guilty.  The law does not

16      require a defendant to testify, to call witnesses, produce

17      evidence, or even cross-examine witnesses for the

18      government.

19           That defense counsel have cross-examined

20      witnesses called by the government and offered other

21      evidence does not mean that any of the defendants has

22      assumed a burden of proof on any issue in the case.

23      Again, the burden of proof remains on the government at

24      all times.

25           The third basic rule is that the government must

1    prove each and every element of an alleged offense beyond

2    a reasonable doubt.  The government is not required to

3    prove guilt beyond all possible doubt.  The test is one of

4    reasonable doubt.

5            What is a reasonable doubt?

6            It is a doubt based on reason and common sense,

7    the kind of doubt that would make a reasonable person

8    hesitate to act.  Accordingly, proof beyond a reasonable

9    doubt is proof of such a convincing character that a

10   reasonable person would not hesitate to rely on it in the

11   most important of his or her affairs.

12           I'll repeat:  Proof beyond a reasonable doubt is

13   proof of such a convincing character that a reasonable

14   person would not hesitate to rely on it in the most

15   important of his or her affairs.

16           In determining whether the government has met

17   its burden of proving guilt beyond a reasonable doubt, a

18   jury may consider whether there is a lack of evidence with

19   regard to an element of the offense.  A lack of evidence

20   may provide a reasonable doubt upon which a jury decides

21   to find a defendant not guilty.

22           If, after fair and impartial consideration of

23   all the evidence and any lack of evidence, you have a

24   reasonable doubt as to a defendant's guilt on a given

25   charge, it is your duty to find him not guilty.

1            On the other hand, if, after fair and impartial

2    consideration of all the evidence and any lack of

3    evidence, you are satisfied that his guilt has been proven

4    beyond a reasonable doubt, you should find him guilty.

5            If you view the evidence as reasonably

6    permitting either of two conclusions, guilty or not

7    guilty, you must find the defendant not guilty.

8            Throughout these instructions I used the word

9    "prove" with reference to the government's burden.

10   Whenever I say that the government must prove a fact to

11   you, I mean that it has to prove that fact beyond a

12   reasonable doubt as I have explained that term to you.

13           Similarly, when I say that you are required to

14   find a fact in order to return a guilty verdict, I mean

15   that you must find that the fact has been proven beyond a

16   reasonable doubt.

17           I will now provide instructions regarding the

18   offenses charged in the indictment.

19           The indictment alleges violations of a number of

20   federal criminal statutes.  Under our system, conduct does

21   not constitute a federal crime unless it violates a

22   statute enacted by Congress.  Federal criminal statutes

23   are compiled and published in a series of bound volumes

24   called the United States Code.

25           A criminal statute serves several important

1    functions:

2            First, it defines the elements of the crime; in

3    other words, the facts the government must prove in order

4    to establish that the statute has been violated;

5            Second, it provides notice to the public that

6    the conduct prohibited by the statute is punishable as a

7    crime, thereby reducing the risk of inadvertent or

8    innocent violations; and

9            Third, by spelling out the elements or facts the

10   government must prove beyond a reasonable doubt to

11   establish a violation, the statute provides a check

12   against arbitrary or discriminatory enforcement.

13           In this case, Count One of the indictment

14   charges each of the defendants with the crime of

15   conspiracy in violation of Title 18, United States Code,

16   Section 371;

17           Counts Two and Three charge each of the

18   defendants with the crime of securities fraud in violation

19   of Title 15, United States Code, Sections 78jb and 78ff,

20   Title 17 on Code of Federal Regulations, Section 2040

21   10(b)(5), and Title 18, United States Code, Section 2.

22           Counts 4 through 9 charge each of the defendants

23   with the crime of wire fraud in violation of Title 18,

24   United States Code Sections 1343 and 2.

25           These instructions will cover each statute and

1    describe the essential elements of the crime defined by

2    each statute.  Bear in mind that conduct is a crime only

3    if it is defined as such by a statute.  A feeling that

4    something wrong has been done is insufficient to support a

5    criminal conviction, and not every instance of unfairness

6    or sharp business practice constitutes a federal crime.

7            Instead, for each defendant and for each charge,

8    you must analyze the evidence and determine whether the

9    government has or has not met its burden of proving all

10   the essential elements of the offense as defined by the

11   statute.

12           I will instruct you first on the law related to

13   the charges of securities fraud and wire fraud, and then I

14   will instruct you on the law related to the conspiracy

15   charge.

16           Counts Two and Three of the indictment allege

17   that each of the defendants committed violations of the

18   securities laws.  These counts allege that the defendants

19   made false statements of material fact in connection with

20   the purchase or sale by Nomura of certain RMBS bonds.

21           Both counts charge the defendants with the same

22   crime, securities fraud, but each count involves a

23   different transaction as follows:

24           Count Two involves a transaction that occurred

25   on or about December 21, 2011; Count Three, a transaction

1     that occurred on or about May 1, 2012.

2            In the indictment, which you will have, you will

3     see that each count sets out a description of the

4     transaction at issue in that count.

5            Again, as to each count, you must consider the

6     evidence separately as to each defendant.

7            The offenses charged in these counts arise under

8     the Securities Exchange Act of 1934, which is codified in

9     Title 15 of the United States Code.

10           Section 78jb of Title 15 provides in relevant

11    part, quote:  "It shall be unlawful for any person

12    directly or indirectly by the use of any means or

13    instrumentality of interstate commerce or of the mails, or

14    of any facility of any national securities exchange, to

15    use or employ in connection with the purchase or sale of

16    any security, any manipulative or deceptive device or

17    contrivance in contravention of such rules and regulations

18    as the Securities and Exchange Commission, the SEC, may

19    proscribe as necessary or appropriate in the public

20    interest or for the protection of investors."

21           Another section of this statute, Section 78ffa,

22    provides, quote:  "Any person who willfully violates any

23    provision of this chapter or any rule or regulation

24    thereunder, the violation of which is made unlawful or the

25    observance of which is required under the terms of this

1    chapter, shall be guilty of a crime."

2             Rule 10(b)(5) provides, quote:  "It shall be

3    unlawful for any person, directly or indirectly, by the

4    use of any means or instrumentality of interstate

5    commerce, or of the mails, or of any facility of any

6    national securities exchange to employ any device, scheme,

7    or artifice to defraud, to make any untrue statement of a

8    material fact, or to omit to state a material fact

9    necessary in order to make the statements made in the

10   light of the circumstances under which they were made not

11   misleading, or to engage in any act, practice, or course

12   of business which operates or would operate as a fraud or

13   deceit upon any person in connection with the purchase or

14   sale of any security."

15            In order to sustain its burden of proof under

16   Counts Two and Three with regard to a defendant, the

17   government must prove beyond a reasonable doubt the

18   following four elements:

19            One, in connection with the purchase or sale of

20   the security identified in that count, the defendant

21   employed a device, scheme, or artifice to defraud, or made

22   an untrue statement of a fact, or omitted to state a fact

23   which made what was said under the circumstances

24   misleading, or engaged in an act, practice, or course of

25   business that operated or would operate as a fraud or

1    deceit upon a purchaser or a seller;

2              Two, the statement or conduct related to a fact

3    that would be material to a reasonable investor in the

4    non-agency RMBS market;

5              Three, the defendant acted willfully, knowingly,

6    and with intent to defraud; and

7              Four, the defendant knowingly used or caused to

8    be used any means or instruments of interstate commerce in

9    furtherance of the fraudulent conduct.

10             I will now explain each of these elements in

11   greater detail.

12             The first element the government must prove with

13   regard to the offense alleged in Counts Two and Three is

14   that in connection with the purchase or sale of the RMBS

15   bonds identified in that count, the defendant did one or

16   more of the following:

17             One, employed a device, scheme, or artifice to

18   deceive; two, made an untrue statement of material fact or

19   omitted to state a fact which made what was said under the

20   circumstances misleading; or engaged in an act, practice,

21   or course of business that operated or would operate as a

22   fraud or deceit upon a purchaser or seller of the bonds.

23             As used here, a device, scheme, or artifice is a

24   plan for accomplishing an objective.

25             The term "fraud" refers to conduct intended to

1    deprive an another of money or property by dishonest or

2    deceitful means.

3              An untrue statement means a statement that was

4    false when made and known to be false by the person making

5    it or causing it to be made.

6              A statement that is literally true can be

7    deliberately misleading depending on the circumstances in

8    which the statement is made.  If the statement concerns a

9    material matter, the party may have a duty to disclose

10   information in order to avoid committing fraud.

11             The government need not prove that a defendant

12   engaged in all three types of unlawful conduct in order to

13   prove this first element of securities fraud.  Any one of

14   the three types of conduct is sufficient; however, you

15   must be unanimous as to which type of unlawful conduct you

16   find to have been proven beyond a reasonable doubt with

17   regard to a defendant.

18             In addition, if you find that the only type of

19   fraudulent conduct the government has proven beyond a

20   reasonable doubt is that the defendant made or caused to

21   be made an untrue material statement, which I will define

22   later, then you must be unanimous as to the particular

23   statement the defendant made or caused to be made that was

24   untrue.

25             To find that a defendant participated in

1    fraudulent conduct in connection with the purchase or sale

2    of the bonds identified in Counts Two and Three, you need

3    not find that he directly participated in the purchase or

4    sale.

5           The "in connection with" requirement is

6    satisfied if you find there was some nexus between the

7    defendants' allegedly fraudulent conduct and the purchase

8    or sale of the bonds.

9           It is not a defense that a defendant played a

10   minor role in the alleged scheme and had no contact with

11   the sellers and purchasers of the securities in question,

12   nor do you need to find that a defendant was the actual

13   seller or offeror of the securities.  It is sufficient if

14   a defendant knowingly participated in a fraudulent scheme

15   that involved the purchase or sale of the bonds.

16          The second element the government must prove

17   with regard to the offense charged in Counts Two and Three

18   is materiality.

19          Under the relevant statutes, not every false

20   statement in connection with a purchase or sale of

21   securities is a crime; rather, making a false statement in

22   connection with a purchase or sale of securities is

23   criminal only if it concerns a material fact.

24          The word "material" serves to distinguish

25   certain statements of fact that a reasonable investor

1    would likely view as significantly altering the total mix

2    of available information from statements that would not be

3    given weight by a reasonable investor.

4           To be material, a false statement of fact must

5    be of such importance that it could reasonably be expected

6    to cause a reasonable investor to act or not act in some

7    way with respect to the transaction at issue.

8           If you find that the government has proven

9    beyond a reasonable doubt that a defendant has made an

10   untrue statement of fact in connection with the

11   transaction in question, you must determine whether the

12   untrue statement was material under the circumstances that

13   existed at the time of the transaction.

14          In order for you to find that a

15   misrepresentation was material, the government must prove

16   beyond a reasonable doubt that there was a substantial

17   likelihood a reasonable investor in the non-agency RMBS

18   market would view the misstated fact as one that

19   significantly altered the total mix of information

20   available to the investor; in other words, the government

21   must prove that the misstated fact likely would have

22   assumed significance in the deliberations of a reasonable

23   investor.

24          The government need not prove, however, that a

25   reasonable investor would necessarily have relied on the

1    misrepresentation.

2            For purposes of this case, a reasonable investor

3    is an investor in the non-agency RMBS market.

4    Accordingly, in determining whether an alleged

5    misstatement was material, you must consider the matter

6    from the standpoint of such a reasonable investor.  To do

7    that, you should consider the evidence relating to the

8    sophistication of the investors in the non-agency RMBS

9    market, their objectives, the information available to

10   them, the analyses they employed, and the way the market

11   worked.

12           You should also consider the evidence relating

13   to the nature of the relationship between Nomura and the

14   counterparties who negotiated to buy and sell the RMBS

15   bonds at issue; the parties' reasonable expectations with

16   regard to their relationship; any assurances given by

17   Nomura with regard to the accuracy and reliability of its

18   statements and negotiations with counterparties, or the

19   lack of such assurances; whether a false statement

20   concerned the subject of the party's bargain or a

21   collateral matter; and whether the false statement

22   deprived the counterparty of the benefit of any bargain

23   that was made.

24           You must assess whether a false statement was

25   material in light of the norms and practices in the

1    non-agency RMBS market that existed at the time of the

2    transaction, and not based on hindsight.  A false

3    statement might not have been material if, under then

4    prevailing conventions in negotiation, a reasonable

5    investor would have viewed the statement as mere sales

6    talk in the nature of haggling with respect to which a

7    party was not expected to be truthful.

8             Accordingly, in deciding whether a false

9    statement was material, ask whether in the context of the

10   operations of the non-agency RMBS market at the pertinent

11   time as shown by the evidence, a reasonable investor would

12   consider the statement at issue as significantly altering

13   the total mix of information available or would discount

14   the statement as unreliable.

15            The third element the government must prove with

16   regard to the offense charged in Counts Two and Three is

17   that the defendant participated in the scheme to defraud

18   knowingly, willfully, and with intent to defraud.

19            "Knowingly" means to act voluntarily and

20   deliberately rather than mistakenly or inadvertently, and

21   not because of ignorance, mistake, accident, or

22   carelessness.

23            "Willfully" means to act with the intent to do

24   something the law forbids; that is, with a bad purpose to

25   disobey or disregard the law.

1          The government does not have to prove that a

2     defendant knew he was violating a particular statute.

3     However, a defendant cannot be convicted of a crime unless

4     the government proves that he engaged in conscious

5     wrongdoing with a sufficiently culpable state of mind to

6     support a criminal conviction.

7          To act with intent to defraud means to act with

8     specific intent to deceive.  A person acts with intent to

9     defraud when he deliberately uses deception to induce

10    another to act to his detriment.  An act is intentional

11    only if it is deliberate and purposeful.  To be

12    intentional, the defendants' conduct must have been the

13    product of his conscious objective rather than the product

14    of mistake.

15         The question whether a defendant acted

16    knowingly, willfully, and with intent to defraud is a

17    question of fact for you to determine from all the

18    evidence.  In making this determination, you may consider

19    the defendants' words and conduct and the surrounding

20    circumstances.  If you find that the defendant profited

21    from the alleged scheme, you may consider that in deciding

22    whether the defendant acted with intent to defraud.

23         Because an essential element of the crime

24    charged in Counts Two and Three is intent to defraud, a

25    defendant cannot be convicted if you find that he acted in

1      good faith; in other words, that he held an honest belief

2      his actions were permissible and not in furtherance of

3      unlawful activity.

4              A defendant has no burden to prove he acted in

5      good faith; rather, the burden is on the government to

6      prove beyond a reasonable doubt the defendant acted with

7      fraudulent intent.

8              A defendant's honest belief that ultimately no

9      one would lose money, or even that everyone would make a

10     profit, is not a defense to securities fraud.  If all the

11     essential elements of securities fraud are proven, a

12     defendant's belief that a fraudulent scheme would

13     ultimately turn out to be profitable for the victim does

14     not relieve him of criminal liability.

15             The fourth element the government must prove

16     with regard to the offense charged in Counts Two and Three

17     is that the defendant knowingly used or caused to be used

18     instruments of communication in interstate commerce in

19     furtherance of the fraudulent conduct.

20             Instruments of communication in interstate

21     commerce include the mails, wires, and electronic

22     communications over the internet, such as emails, chats,

23     and messaging.

24             To satisfy this fourth element, it is not

25     necessary for the government to prove that a defendant was

1    personally involved in the use of an instrument of

2    communication in interstate commerce.  If a defendant was

3    an active participant in the alleged scheme to defraud,

4    and engaged in conduct he knew or reasonably could foresee

5    would naturally and probably result in the communication,

6    then you may find that he is responsible for the

7    communication even though he did not participate in the

8    communication directly.

9         To support a conviction for securities fraud, a

10   use of the mails, interstate wires, or internet need not

11   be central to the execution of the scheme to defraud.

12   Indeed, the actual purchase or sale need not be

13   accompanied or accomplished by the use of interstate means

14   of communication.

15        Moreover, the matters sent through the mails,

16   interstate wires, or internet need not contain fraudulent

17   material or anything criminal or objectionable.  However,

18   to prove that a use of interstate means of communication

19   was in furtherance of criminal conduct, the government

20   must prove that the use did serve to further or advance in

21   some way the object of the fraudulent conduct.

22        At this time, I'm going to take a short break.

23   I have more instructions for you dealing with the other

24   counts in the indictment, specifically the wire fraud

25   counts, Counts Four through Nine, and the conspiracy

1    count, Count One.

2              Please do not discuss the case during this

3    recess.  Indeed, the rules that have applied to date

4    continue to apply.

5              Why don't we say that we will be in recess for

6    15 minutes, okay?

7              Thank you.

8                   (Whereupon, the jury left the courtroom.)

9              THE COURT:  Please be seated.

10             With regard to timing, the reading has covered

11   what amounts to 23 pages and I have about a little more

12   than half that much remaining.  I've got about another

13   12 pages, and that took me over an hour?

14             MR. PETRILLO:  Started at 10:07 apparently, so

15   40 minutes.

16             THE COURT:  Thank you.

17             We give the jury 15 minutes, and then it takes

18   me another 20 minutes and I'm done, that would bring us to

19   approximately 11:30?

20             At that point the defense would like the

21   government to go ahead with its closing?

22             MR. PETRILLO:  Yes, Your Honor.

23             THE COURT:  And the government would ask me to

24   release the jury?

25             MR. NOVICK:  Yes, Your Honor.

1           THE COURT:  Why would I do that, please?

2           MR. NOVICK:  Your Honor, in the government's

3    view, not dissimilar points from what Mr. Mukasey made

4    last week:  If we were going on Friday, we would have a

5    different view.  We're going to go, and then I suspect

6    we'll have time for one defense summation, and then three

7    days before the jury hears the remainder of the two

8    defense summations and then the government's rebuttal.

9           The government's position is that the fairer way

10   to proceed to the government -- I believe to both parties,

11   but particularly to the government -- is that it all

12   happens at the same time; in other words, continuous to

13   one another.

14          So we would start first thing Monday morning, do

15   as much as we can do, conclude Tuesday morning with maybe

16   the last defense summation and then rebuttal, and the jury

17   would go right in, after hearing all of the arguments,

18   into deliberations, rather than having a separation of

19   three days between what we've said in our principal

20   closing; understanding that we'll have rebuttal, but

21   rebuttal is going to be responsive, it's not going to be a

22   restatement of the government's argument.

23          So from the government's perspective, Your

24   Honor, we would like to be able to speak to the jury not

25   before a three-day break, but around the time.  We think

1   that's the fairer way to proceed.

2        It also gives no party unfair advantage with

3   regard to preparing their own remarks.

4        And I don't think it changes -- depending on the

5   Court's schedule for next week -- I don't think it

6   changes, if anything it increases the likely efficiency of

7   the jury since they will be going into their deliberations

8   immediately after hearing all of the parties' arguments

9   and not a couple of the arguments.

10        So that's the government's position, Your Honor.

11        THE COURT:  Okay, thank you.

12        MR. MUKASEY:  Judge, the defense is ready to

13   roll at least with one defense summation today.  I think

14   the real issue of concern is not the continuity but making

15   sure the jury starts to hear the collection and summation

16   of evidence from both sides in connection with the charge,

17   right after the charge.

18        I think charging them this morning and then

19   sending them away for Friday, Saturday, and Sunday sort of

20   separates the impact of the charge and the importance of

21   the charge from the arguments that will follow.

22        We want the jury to connect the summations to

23   the charge, not separate them.

24        THE COURT:  Okay.  Mr. Novick, your principal

25   argument or the argument for the government would be

1   90 minutes, approximately?

2           MR. NOVICK:  I think it is probably going to be

3   a little bit longer than that, Your Honor, somewhere

4   between 90 minutes and two hours.

5           THE COURT:  Okay.

6           MR. NOVICK:  I would say, Your Honor, in

7   response, number one, I think that the charge -- they will

8   have a copy of the charge with them in the jury room.

9   They're not going to have a copy of our summations.  And I

10  do think that given, as the Court indicated earlier, this

11  is an entirely incredibly significant portion of the

12  trial, it's our opportunity to speak to them, and we

13  think -- just as Mr. Mukasey didn't want Mr. Brennan if we

14  started first thing this morning, to have all weekend to

15  prepare his rebuttal, we think that the -- and be the only

16  voice that's heard next week when the jury goes into the

17  deliberation room, we would like to be able to do our

18  principal closing much closer to the time when the jury is

19  actually going in.

20          And it also gives us a chance, Your Honor, to

21  digest the changes that Your Honor has made just now to

22  the charge and so we can incorporate them.  It's not a

23  critical piece, but I just mention that as well.

24          There are some differences that I will fix on my

25  PowerPoint, but I want to make sure I have the

1    opportunity.

2              THE COURT:  All right.  My inclination is to

3    proceed as we normally would; that is, not take the rest

4    of the day off.

5              I think what I'll do is finish these

6    instructions and then ask the jury to take their lunch

7    break.  That will give the government an opportunity to

8    make whatever revisions it needs to make, and then we

9    should have four hours this afternoon, not including a

10   break, in which to present arguments.  That gives the

11   government two hours, if that's what it needs, and it gets

12   one of the defense summations into the record.  Then we

13   release the jury.

14             I think at that point we're doing about as well

15   as we can, all things considered.  The charge will still

16   be recent and in the jury's minds; they will have heard

17   from both sides of the case, which I think is good; they

18   won't be dismissed with just the government's view; nor

19   will the defendant be deprived of an opportunity to fully

20   present a closing.

21             So I think that's what we ought to do, and I

22   think that's probably what the jury wants us to do.  So I

23   think that makes sense, and I hope that this will give the

24   government enough time to make whatever revisions are

25   necessary.  All right?

1           So why don't we say, we'll take 15 minutes now,

2    and then I'll wrap up the charge, and then we'll break for

3    lunch.

4               (Whereupon, a recess followed.)

5

6               (Whereupon, the jury entered the

7               courtroom.)

8           THE COURT:  Thank you, everyone.

9           I'm going to turn momentarily to instructions on

10   the other counts of the indictment.  I have instructed you

11   with regard to the elements of the counts alleging the

12   crime of securities fraud.  It remains for me to instruct

13   you on the counts alleging wire fraud and conspiracy.

14   This is going to take perhaps 20 minutes, something like

15   that, at which point we're going to break for lunch, and

16   after lunch, we're going to turn to the closing arguments.

17          Thank you, as always, for your attention.

18          Dealing with the counts of the indictment

19   charging wire fraud, specifically Counts Four through

20   Nine, I instruct you as follows:

21          Counts Four through Nine allege that the

22   defendants knowingly, willfully, and with intent to

23   defraud devised a scheme to obtain money or property from

24   Nomura clients buying or selling RMBS bonds by means of

25   materially false and fraudulent representations, and

1    caused to be transmitted electronic communications in

2    interstate commerce in furtherance of the fraudulent

3    scheme.

4         Each of these counts, Counts Four through Nine,

5    identifies an email sent on a certain day, and each of

6    those emails provides the basis for the charge in the

7    respective count; in other words, each of these counts

8    charges the same crime, wire fraud, but the counts differ

9    in that each alleges use of a particular wire

10   communication, an email, in furtherance of the alleged

11   scheme.

12        Again, you must consider each count separately

13   as to each defendant.

14        The relevant statute with regard to the wire

15   fraud counts is Title 18, United States Code,

16   Section 1343, which provides, quote:  "

17        Whoever, having devised or intending to devise

18   any scheme or artifice to defraud, or for obtaining money

19   or property by means of false or fraudulent pretenses,

20   representations, or promises, transmits or causes to be

21   transmitted by means of wire, radio, or television

22   communication in interstate or foreign commerce, any

23   writings, signs, signals, pictures, or sounds for the

24   purpose of executing such scheme or artifice shall be

25   guilty of a crime."

1          The elements of the offense of wire fraud are

2    the subject of the instructions that I will give you now.

3          To sustain its burden of proof under these

4    counts, the wire fraud counts, with regard to a defendant,

5    the government must prove the following four elements

6    beyond a reasonable doubt:

7          First, there was a scheme to defraud, that is a

8    scheme to deprive another of money or property by means of

9    false statements as alleged in the indictment;

10          Second, the false statements were material;

11          Third, the defendant knowingly and willfully

12    participated in the scheme to defraud with knowledge of

13    its fraudulent nature and with specific intent to defraud;

14    and

15          Fourth, in the execution of the scheme, the

16    defendant used or caused the use of interstate wires as

17    specified in these counts of the indictment.

18          I will now describe each of these elements in

19    more detail.

20          The first element the government must prove as

21    to wire fraud counts is that there was a scheme to

22    defraud.  The alleged scheme to defraud at issue in the

23    wire fraud counts is substantially the same as the alleged

24    scheme to defraud at issue in the securities fraud counts.

25    In other words, just as with the securities fraud counts,

1    the wire fraud counts allege that the defendants engaged

2    in a scheme to obtain money or property from certain

3    buyers and sellers of RMBS bonds by means of materially

4    false or fraudulent statements and representations as

5    specified in the indictment.

6            With regard to the second element, materiality,

7    to support a conviction for wire fraud, a false or

8    fraudulent representation must relate to a material fact.

9            As discussed earlier, a material fact is one

10   that could reasonably be expected to be of significance to

11   a reasonable investor in the non-agency RMBS market in

12   making an investment decision.

13           In considering this element, you should be

14   guided by the instructions on materiality that you had

15   been given with regard to the element of materiality under

16   the securities fraud counts.

17           The third element the government must prove

18   beyond a reasonable doubt is that the defendant

19   participated in the scheme to defraud knowingly and with

20   specific intent to defraud.

21           The terms of "knowingly," "willfully," and "with

22   intent to defraud" have the same meaning as set forth

23   above in the instructions on the elements of the

24   securities fraud counts.

25           To establish this element of the mail fraud

1    counts, the government must prove:  One, that a defendant

2    participated in the unlawful scheme, knowing the purpose

3    of the scheme was to obtain money or property from

4    investors in RMBS bonds by means of material false

5    statements; and, two, that at the time he participated in

6    the scheme, he did so with intent to defraud the

7    investors.

8            Because the crime of wire fraud, like securities

9    fraud, requires an intent to defraud, a defendant cannot

10   be convicted if he acted in good faith.  Remember, a

11   defendant has no burden to establish that he acted in good

12   faith.  Instead, the burden is on the government to prove

13   a defendant's fraudulent intent, and thus lack of good

14   faith, beyond a reasonable doubt.

15           The fourth element the government must prove

16   beyond a reasonable doubt is the use of an interstate wire

17   communication in furtherance of the scheme to defraud.  To

18   support a conviction, a wire communication must pass

19   between two or more states as, for example, a telephone

20   call between New York and New Jersey.

21           The use of the wires need not itself include a

22   fraudulent representation, nor does the law require that

23   the wire precede the fraud; however, the wire must serve

24   to assist in carrying out the scheme to defraud.

25           It is not necessary that a defendant be directly

1       or personally involved in the wire communication as long

2       as the communication was reasonably foreseeable in the

3       execution of the alleged scheme to defraud in which the

4       defendant participated.

5              The government must establish beyond a

6       reasonable doubt the particular use of the wires charged

7       in these counts of the indictment; however, it does not

8       have to prove the wires were used on the exact date

9       charged in the indictment.  It is sufficient if the

10      evidence establishes that the wires were used on dates

11      substantially similar to the dates charged in the

12      indictment.

13             I turn now to the topic of aiding and abetting

14      liability.

15             In addition to charging each defendant with

16      committing the offenses of securities fraud and wire

17      fraud, the indictment charges each of them with aiding and

18      abetting the commission of those offenses.

19             A defendant's culpability as an aider or abettor

20      of an offense provides an alternative basis for finding

21      him guilty of that offense.  The aiding and abetting

22      statute, Section 2 of Title 18 of the United States Code,

23      provides, quote:  "Whoever commits an offense against the

24      United States or aids, abets, counsels, commands, induces,

25      or procures its commission, is punishable as a principal."

1          Under this statute, one who aids and abets a

2     principal in the commission of an offense is just as

3     guilty as the principal.  To be criminally liable as an

4     aider and abettor, a person must associate himself with

5     the crime, participate in it as something he wishes to

6     bring about, and seek by his action to make it succeed.

7          To establish that a defendant knowingly

8     associated himself with a crime, the government must

9     establish that he had the state of mind required to commit

10    the crime as a principal.

11         With regard to securities fraud and wire fraud,

12    this requires the government to prove that the defendant

13    participated in the alleged scheme to defraud knowingly,

14    willfully, and with intent to defraud as I have explained

15    those terms to you.

16         To establish that a defendant participated in

17    the commission of a crime, the government must prove that

18    he engaged in some affirmative conduct or overt act for

19    the purpose of bringing about the crime.  Mere presence of

20    a defendant when a crime is committed, even coupled with

21    knowledge by the defendant that the crime is being

22    committed, or merely associating with others who commit a

23    crime, is not sufficient to establish aiding and abetting.

24         Moreover, one who has knowledge that a crime is

25    being committed but inadvertently does something that aids

1    in the commission of a crime is not an aider and abettor.

2    An aider and abettor must know that the crime is being

3    committed and act in a way that is intended to bring about

4    the success of the criminal venture.

5             To determine whether a defendant aided and

6    abetted a securities fraud offense or wire fraud offense

7    charged in the indictment, ask the following questions:

8             Did he participate in the charged offense as

9    something he wished to bring about?

10            Did he knowingly associate himself with the

11   criminal venture?

12            Did he seek by his actions to make the criminal

13   venture succeed?

14            If the answer to all these questions is yes,

15   then the defendant may be found guilty as an aider and

16   abettor of the charged offense.  If the answer to any of

17   these questions is no, however, then the defendant is not

18   an aider and abettor.

19            I'll turn now to the conspiracy count, which is

20   Count One of the indictment charging conspiracy to commit

21   securities and wire fraud.

22            The defendants are charged in Count One with

23   conspiring to engage in securities fraud and wire fraud in

24   violation of the statutes defining those offenses.  Each

25   defendant is accused of having been a member of a

1      conspiracy to violate those statutes.

2              A conspiracy is a kind of criminal partnership,

3      a combination or agreement of two or more persons to join

4      together to accomplish an unlawful purpose.

5              The crime of conspiracy is separate and distinct

6      from the offense that is the object of the conspiracy

7      which we refer to as the substantive offense.

8              The indictment in this case charges the

9      defendants with the crime of conspiracy to engage in

10     securities and wire fraud, that's the Count One that I'm

11     discussing now, plus substantive counts of securities

12     fraud in Counts Two and Three, and wire fraud in

13     Counts Four through Nine.

14             Because the offense of conspiracy and the

15     substantive offense that is the object of the conspiracy

16     are separate and distinct, a defendant may be found guilty

17     of conspiracy even though the substantive offense is not

18     committed.

19             The statute relevant to the conspiracy count is

20     Title 18, United States Code, Section 371, which provides:

21     "If two or more persons conspire to commit any offense

22     against the United States, and one or more of such persons

23     do any act to affect the object of the conspiracy, each is

24     guilty of an offense."

25             In order to prove the conspiracy charge against

1    a defendant, the government must establish each of the

2    following essential elements beyond a reasonable doubt:

3              First, two or more persons entered into the

4    unlawful agreement charged in the indictment starting in

5    or about 2009; second, the defendant knowingly and

6    willfully became a member of the alleged conspiracy; and,

7    third, one of the members of the conspiracy committed one

8    or more overt acts in furtherance of the conspiracy.

9              The first element the government must prove

10   beyond a reasonable doubt is that two or more persons

11   entered into an agreement to achieve an unlawful

12   objective.  In this case, the indictment alleges an

13   agreement to engage in securities fraud and wire fraud.

14             To prove the existence of a conspiratorial

15   agreement, the government must prove that two or more

16   people explicitly or implicitly came to an understanding

17   that they would act together to pursue an unlawful

18   objective.  It is not necessary for the government to

19   prove that the conspiracy lasted throughout the entire

20   period alleged in the indictment, that is from 2009

21   through 2013, but only that it existed for some time

22   within that period.

23             In determining whether the government has met

24   its burden of proof regarding this first element, you must

25   consider all the evidence that has been admitted with

1    regard to the conduct on statements of each alleged

2    co-conspirator.

3            Taken together and considered in light of all

4    the surrounding circumstances, the acts and statements of

5    the alleged co-conspirators may be sufficient to convince

6    you that the alleged conspiracy actually existed.  This is

7    for you to decide based on your careful consideration of

8    all the evidence.

9            You need not find that the alleged

10   co-conspirators stated in words or in writing what the

11   scheme was, its objects or purposes, or every precise

12   detail of the scheme, or the means by which its purposes

13   were to be accomplished.  It is sufficient if the

14   defendants came to an understanding that they would seek

15   to accomplish the illegal objects of the alleged

16   conspiracy.

17           However, it is not sufficient for the government

18   to show that the defendants or others merely associated

19   with each other or even that they committed separate

20   crimes during the same period.  Instead, you must find

21   that an alleged conspirator agreed to participate in what

22   he knew was a group venture toward the common goal of

23   breaking the law.

24           In order to return a verdict of guilty on the

25   conspiracy count, you must unanimously agree that at least

1    one of the objects charged in Count One was an object of

2    the conspiracy, and you must unanimously agree as to the

3    object of the conspiracy.

4        The second element the government must prove

5    beyond a reasonable doubt is that the defendant acted

6    knowingly, willfully, and voluntarily; that is, he

7    knowingly, willfully, and voluntarily became a member of

8    the conspiracy.

9        To act knowingly means to act consciously and

10   deliberately rather than mistakenly and inadvertently.  To

11   act willfully means to act purposely and with the intent

12   to do something unlawful.  Thus, a defendant enters into a

13   conspiracy knowingly and wilfully if he joins and

14   participates in the conspiracy with knowledge of and the

15   intent to further its unlawful objectives.

16       The government need not prove that a defendant

17   was fully informed of all the details of the conspiracy or

18   knew all the participants.  However, mere association by a

19   defendant with a conspirator does not itself make the

20   defendant a member of the conspiracy even if he knows of

21   the existence of the conspiracy.  To be guilty of the

22   crime of conspiracy, a defendant must intentionally

23   participate in the conspiracy with the purpose of helping

24   to achieve at least one of its unlawful objectives.

25       The extent of a defendant's participation has no

1    bearing on the issue of guilt.  A conspirator's liability

2    is not measured by the extent or duration of his

3    participation.  Indeed, members of a conspiracy may

4    perform separate and distinct acts and may perform them at

5    different times.  Some may have major roles while others

6    have minor ones.  An equal role is not what the law

7    requires.  Even a single act may be sufficient to draw a

8    defendant within the ambit of a conspiracy.

9         The third element the government must prove

10   beyond a reasonable doubt is that at least one of the

11   overt acts charged in the indictment was committed by at

12   least one of the conspirators at or about the time and

13   place alleged.  The indictment does charge a number of

14   overt acts.

15        An overt act is an action intended to help

16   achieve the object of a conspiracy.  An overt act need not

17   itself be a criminal act, but it must contribute to

18   furthering the conspiracy.

19        Your decision as to whether a defendant knew he

20   was conspiring to commit securities and wire fraud

21   involves a decision about his state of mind.  It's

22   impossible to prove the operation of a person's mind by

23   what we call "direct evidence."  You can't look into a

24   person's mind to see what he was thinking, but careful and

25   intelligent consideration of all the facts and

1    circumstances shown by the evidence may enable you to

2    infer with a reasonable degree of accuracy the extent of a

3    person's knowledge.

4         If you find beyond a reasonable doubt that a

5    defendant was a member of the conspiracy charged in the

6    indictment, then any acts done or statements made in

7    furtherance of the conspiracy by persons also found by you

8    to have been members of the conspiracy may be considered

9    against that defendant, even if the acts were done in his

10    absence and without his knowledge.

11         Before you may consider the acts and statements

12    of a co-conspirator in deciding the issue of a defendant's

13    guilt, however, you must first determine that the acts

14    were done and the statements were made during the

15    existence of the conspiracy and in furtherance of the

16    conspiracy.

17         If the acts were done by someone you find not to

18    have been a member of the conspiracy, or if they were not

19    done during the existence of the conspiracy, or if they

20    were not done in furtherance of the conspiracy, then they

21    may not be considered as evidence against the defendant.

22         If you find that a defendant is guilty on the

23    conspiracy count, then you may also find him guilty of a

24    substantive offense committed by a co-conspirator provided

25    you find each of the following elements beyond a

1    reasonable doubt:

2           First, the substantive offense, securities fraud

3    or mail fraud, was actually committed;

4           Second, the person or persons who committed the

5    substantive offense were members of the conspiracy;

6           Third, the substantive offense was committed

7    pursuant to the common plan and understanding among the

8    conspirators;

9           Fourth, the defendant was a member of the

10   conspiracy when the substantive offense was committed; and

11          Fifth, the defendant could reasonably have

12   foreseen that the substantive offense would be committed

13   by a co-conspirator.

14          If you find all five of these elements proven

15   beyond a reasonable doubt, then you may find a defendant

16   guilty of the substantive offense even if he did not

17   personally participate in the acts constituting the

18   substantive offense.

19          The reason for this rule is that a

20   co-conspirator who commits a substantive offense in

21   furtherance of a conspiracy is deemed to be the agent of

22   the other conspirators.

23          In sum, a defendant's guilt can be established

24   as to the counts of securities and wire fraud in the

25   following three ways:

1            If the defendant committed each element of the

2      offense; if he aided and abetted the offense; or if the

3      offense was committed by a co-conspirator in furtherance

4      of the conspiracy.

5            I have just referred to the concept of agency,

6      and I have an instruction for you on the subject of

7      agency.

8            A person is an agent if he is authorized to act

9      on behalf of another known as a principal.  An agent owes

10     certain duties to his principal.  I instruct you that, as

11     a matter of law, the defendants were at all times acting

12     as principals on behalf of Nomura and not as the agent of

13     the counterparties.

14           In other words, when a defendant bought an RMBS

15     bond from a counterparty, he was not the agent of that

16     seller; and when a defendant sold an RMBS bond to a

17     counterparty, he was not the agent of that buyer.

18           As a principal, the defendants owed no duty of

19     loyalty to the counterparties and were acting in their own

20     self-interest, not the interest of the counterparty.

21           That completes my instructions with regard to

22     the offenses charged in the indictment.  I will have more

23     instructions for you with regard to how you should go

24     about your deliberations, but I'm going to hold off on

25     giving you those instructions until after you've heard the

1    closing arguments of counsel.

2              We will turn to closing arguments after lunch.

3    If it's all right with you, we will take an hour for

4    lunch, and then we will hear the closing arguments,

5    starting first with the closing argument of counsel for

6    the government.

7              Because the government has the burden of proof

8    in this case, it goes first by way of presenting what's

9    called the principal argument, reserving time to present

10   rebuttal after closing argument is presented on behalf of

11   the defendants.

12             We expect that the government's principal

13   argument may take up to possibly two hours.  We expect

14   that we will have enough time this afternoon, after lunch,

15   to hear the closing argument on behalf of Mr. Shapiro.

16             After that, we will adjourn for the day, and we

17   will resume Monday, at which time closing argument will be

18   presented on behalf of the other defendants, Mr. Gramins

19   and Mr. Peters, and the government will present its

20   rebuttal.

21             With all of that accomplished, I will give you

22   those instructions with regard to how you should approach

23   your deliberations and ask you to retire to deliberate.

24             So that's where we are.  Okay?

25             Thank you, as always, for your kind attention.

1    We'll recess now for lunch.

2                    (Whereupon, the jury left the courtroom.)

3            THE COURT:  Is there anything we need to do

4    before the closings?

5            MR. NOVICK:  No, Your Honor.

6            MR. MUKASEY:  No, Your Honor.

7            THE COURT:  Thank you.

8                    (Whereupon, a recess followed)

9            THE COURT:  All set?

10           MR. NOVICK:  Yes, Your Honor.

11                   (Whereupon, the jury entered the

12                   courtroom.)

13           THE COURT:  Thank you, everyone.  We're ready to

14   hear the government's closing argument.

15           Mr. Novick?

16           MR. NOVICK:  Thank you, Your Honor.

17           Good afternoon, everybody.

18           You cannot lie about significant things in order

19   to take other people's money.  It's a simple

20   straightforward rule.  It's not a novel idea.

21           If we step back five weeks before we started

22   this trial, and I told you about that rule, your common

23   sense would have told you that that sounds right, that

24   people know that you cannot lie about important things to

25   take other people's money.  It's true whether you're a

1    used car salesman, it's true if you're in the real estate

2    business, and it's particularly true if you're in an

3    industry responsible for, tasked with control of, the

4    wealth of people and all the critical institutions you

5    heard about during the course of this trial, things like

6    pension funds, endowments, charities.

7              So what this case is about is really not whether

8    that simple rule exists, because we know it does.  This

9    case is about two things:

10             Number one, were those lies that the defendants

11   told to their customers significant; did they figure

12   significantly in the deliberations of their victims of

13   their customers?

14             And, number two, did the defendants act with an

15   intent to make more money, to do what I just suggested.

16             Let me take a step back, hit the pause button,

17   and tell you why I want to suggest that those are the two

18   critical questions here.  And I want to talk -- and I'm

19   going to put some stuff up on the screen here, and I'm

20   going to talk very briefly about the charges the Judge has

21   instructed you on.  And I'm going to come back to these in

22   a little while again, and you're going to have the

23   instructions.  And what the Judge has instructed you is

24   the law, but I'm going to sort of shorthand it for our

25   discussion.

1          There are four basic elements the Judge talked

2    to you about with regard to security fraud.  First, we

3    have to prove a misrepresentation, scheme to defraud, or

4    fraudulent practice; second, materiality, that the

5    misrepresentation was material; third, that the defendant

6    acted willfully with the intent to deceive; and, fourth,

7    that interstate commerce was used in furtherance of this

8    scheme.

9          So let's talk about this, and let me explain to

10   you why I get down to those two questions.

11         The first element, misrepresentation, we know

12   the defendants lied.  We've seen evidence of the

13   defendants' lies for the last several weeks, and I don't

14   think there's much dispute over the fact that the

15   defendants told lies to their customers.  So let's take

16   that one off the screen.

17         Interstate commerce, I'm going to talk about

18   that near the end a little bit, but those are, at least

19   with regard to securities fraud, essentially those

20   Bloomberg chats that would travel between New York,

21   New Jersey, and Connecticut.  The two counts you're going

22   to hear about involve the two Connecticut victim

23   companies, the Hartford Investment Management Company and

24   Ellington Management up in Fairfield County.  So let's

25   take that one off.

1            So again with securities fraud, what we're

2    really talking about here is materiality and that intent

3    to deceive and to defraud your customers.

4            Wire fraud, again, same thing, four elements:

5    Scheme or artifice to defraud by means of

6    misrepresentations or false or fraudulent representations;

7    Number 2, materiality; Number 3, intent to defraud; and,

8    Number 4, the use of interstate wires in furtherance.

9            And again, let's get rid of that first one

10   again, because we know there were lies told in this case,

11   we know the defendants lied to their customers over and

12   over again, and we're going to talk about some of those

13   lies in a minute.  And we'll see, and I'm going to talk

14   about at the end, that there were wires, interstate wires,

15   Bloomberg messages and chats in furtherance of this scheme

16   to defraud and these misrepresentations.

17           So again takes you back to those two questions:

18   Materiality and intent.

19           Then the third charge is conspiracy, it's

20   actually the first count in the indictment, and that has

21   three elements:  Conspiracy to commit securities and wire

22   fraud; have to prove that the defendants, each defendant

23   individually joined the conspiracy; and that one member,

24   at least one member of the conspiracy committed at least

25   one overt act in furtherance of the conspiracy.

1         And I'm going to talk about the conspiracy at

2    the end, but basically it's a criminal agreement too

3    engage in securities and wire fraud.  So it really comes

4    back to the same two questions I talked to you about a

5    second ago.  Let me put those up on the screen.

6         Again, did the defendants intend that their lies

7    would deceive and harm, for purposes of wire fraud, their

8    victims?

9         And, Number 2, would the truth have been

10   significant to the deliberations of a reasonable investor?

11        Now, to talk about this, I'm going to talk about

12   the evidence in the case in four basic categories, and I

13   put up a graphic up on the screen here.  I'm going to talk

14   about the structure of the market, and how the structure

15   of the market tells you that this information, the pricing

16   information, was critical information to the reasonable

17   investor, and how the defendants would use it to further

18   their scheme to defraud.

19        Number 2, action and reaction, I'm going to talk

20   about some of the trades.  And you can see in realtime how

21   the lies affected what the victims were doing, what the

22   customers were doing.

23        Number 3, I'm going to talk about the testimony

24   of the victims and the co-conspirators.  And again, I'm

25   going to go through a few of the trades, particularly the

1    ones at that you heard testimony about, and we'll listen

2    and revisit some of the testimony you heard about the

3    importance of the lies and importance of the statements

4    about price in a price negotiation.

5            And, fourth, stolen profits, we're going to try

6    to put numbers -- we are going to put numbers to some of

7    the lies the defendants told so you can understand both

8    the motive of the defendants and why these things were

9    significant to -- or would be significant to a reasonable

10   investor as they're giving away this additional money to

11   the defendants, not knowing about the true information.

12           So let's talk first about the market.

13           What do I mean by the market?

14           Here, I'm really talking about the structure of

15   the market, the way the market was set up.  You heard

16   testimony about this, and you've seen evidence about it,

17   but essentially Nomura sits, the defendants sat, in the

18   middle of a market where they would broker transactions

19   between a buyer and a seller.

20           The buyer didn't know who the seller was, and

21   the seller didn't know who the buyer was; and Nomura was

22   in control of the information, and they would exploit that

23   control of the information.

24           And so that's what I mean when I talk about why

25   the structure of the market tells you that these lies

1     about price were important, were critical -- I would say

2     not just significant but critical to the deliberations of

3     a reasonable investor, and assisted the defendants, that

4     exploitation of their position in the market, assisted the

5     defendants in carrying out their scheme.

6              So a couple of ways in which we know this.

7              First, the control of the information.  When it

8     came to perhaps the most critical piece of information in

9     a negotiation -- and that is what price was the buyer

10    bidding, what price was the seller offering in the context

11    of the negotiation -- the only by the seller knew what the

12    buyer was bidding, and the only way the bidder knew what

13    the seller was offering, was if and when the broker-dealer

14    Nomura, the defendants, chose to give that information.

15             So every time during the course of this trial

16    and the defense summations you hear things like

17    "analytics, checking away, color," just remember and think

18    to yourself:  The model doesn't tell me whether the

19    defendant was lying; a model doesn't tell me whether he's

20    right or wrong about what price is being bid or offered on

21    the other side of that transaction.

22             There's one source and one source only for that

23    piece of information, and that was Nomura.

24             And let's look.  You can see this in operation

25    in a number of the government's exhibits, and I'm just

1    going to point out a few of them here, and I'll just -- by

2    way of assistance, when I put up exhibits on the screen,

3    in the bottom right-hand corner I'll give you what exhibit

4    number it is in case you want to take it down.

5           Here, I'm going to run through a few documents

6    that sort of show how the defendants controlled the

7    information back and forth between them and their

8    counterparty, between them and their customer, and how

9    they both understood that, how the defendants and the

10   victims and the customers understood that that was how

11   information was conveyed.

12          So here's Government's Exhibit 21A.  When I do

13   21A-12, that just means it's Exhibit 21A, 12th page.

14          So Mr. Shapiro says, I think if you counter 86,

15   they may get to 85.  To them.  Just my guess.  I wish I

16   could get the guy higher.

17          Again, why is that -- why am I talking about

18   that; because it's an example of them communicating with

19   their customers, controlling the flow of information back

20   and forth.  It's how they operated, it's how this market

21   operated.

22          Take a look at another exhibit, Exhibit 16B,

23   page 7.  Mr. Peters says, INDA's stalling out.  This guy

24   won't get to 83 even.

25          Again making affirmative representations about

1    what's happening on the other side of the trade,

2    controlling the flow of information.  And again, that's

3    why their role in this was so important and the

4    information about price was so critical to the

5    deliberations of the customers.

6            Another exhibit, 18A, page 25, Mr. Harrison

7    talking to Mr. Gramins saying, Okay, have you shown him 60

8    or not?

9            Mr. Gramins says, Yes, showed him that bid.

10           And Mr. Harrison says, Show him 60-24.

11           No model is going to fulfill that role.  No

12   checking away, nothing.  You're engaged with a seller or a

13   buyer on the other side of the transaction.  The only way

14   you have to affect what you want to do, what you want to

15   show, is through the broker-dealer.

16           Mr. Wollman told you, I think they were

17   brokering a trade for me, so they were acting as a broker,

18   a facilitator.

19           Mr. Marks said, I only speak through the broker

20   so I rely on the information they give me.

21           These witnesses, the witnesses that you heard

22   during the trial, understood that function, understood

23   that the broker-dealer was the source of information, the

24   critical, the only source of information about price.

25   Maybe not about the analytics or anything else like that,

1    but about price in a negotiation about what the other side

2    was bidding or offering, Mr. Marks understood that the

3    only source for that was going to be the broker-dealer.

4         And even if you don't take my word for it, look

5    what Mr. Gramins says in another negotiation.  He says in

6    Government's Exhibit 11B, I am purely looking to broker.

7    He understands it.  He's communicating to his

8    counterparty, his customer, about what he believes is

9    going on here.

10        It's not -- he doesn't say, I'm purely looking

11   to act as a principal.  He says, I am purely looking to

12   broker.

13        That's number one, control of the information.

14        Number two, compensation.

15        When I say "compensation," I don't mean -- I'm

16   going to talk about compensation at Nomura later, but what

17   I mean by compensation is how much the broker-dealer was

18   being compensated, how much the defendants and Nomura were

19   being compensated for the trades that they were doing.

20        Because when you look at that, and we're going

21   to see lots of evidence of that, you see how the

22   negotiation over that compensation -- that four ticks,

23   eight ticks, pay on top -- assume significance in these

24   deliberations.  They actually talked about it.  They would

25   negotiate over it, or they would negotiate with the seller

1    and then they'd say, Okay, or they would negotiate through

2    the broker-dealer with the seller, through the defendant

3    with the seller, and they would say, "All right, add eight

4    ticks on top or add four ticks on top of the price that

5    you pay," telling you again that these things were

6    important when they were discussed.

7              Mr. Marks explained that there were multiple

8    negotiations going on, We have to negotiate the commission

9    when it's stated and have to negotiate with the seller as

10   well.

11             And you saw this repeatedly.  You recall that

12   Mr. Brennan put up the chart where he would mark down

13   every time someone talked about pay on top or commission.

14             Government's Exhibit 13E, page 2, Mr. Gramins

15   saying, Do you mind sticking with the quarter-point or

16   eight ticks; Exhibit 14C, page 9, Mr. Shapiro talking to

17   Mr. Harrison and saying, Can we do a quarter-point on

18   out-of-comp stuff.

19             You remember, that's eight ticks.

20             Mr. Peters telling, I believe, Mr. Wulfsohn, Out

21   of comp we usually work for eight ticks, I'll work four

22   here to get something done.

23             Exhibit 18A, page 22, Going rate for POA --

24   remember, that's pay option ARM trades -- is usually eight

25   ticks, telling that to Mr. Harrison.

1          Exhibit 18A, page 25, Mr. Harrison telling

2    Mr. Gramins, Go earn that eight.

3          Exhibit 21A, page 16, Mr. Harrison in a trade

4    with Mr. Shapiro, when Mr. Shapiro was brokering a trade

5    between Mr. Harrison and two other investors on the other

6    side, Mr. Harrison says, Eight ticks is still the right

7    pay on top here, after Mr. Harrison -- excuse me -- after

8    Mr. Shapiro had misrepresented his acquisition price -- or

9    excuse me -- his buy price.

10          Mr. Marks says, Okay, you want to try to get

11    them at 08, and I'll pay you 16?

12          And he told you that in the middle, the

13    in-between there, the difference was the commission,

14    eight ticks.

15          Mr. Abbas, in a trade of a PPSI bond off of a

16    BWIC prior to the trade that you heard about during the

17    trial, Will pay four ticks on top.

18          So again, over and over again, you're hearing

19    discussion about commission.  You're hearing discussion

20    about the price that the broker-dealer was going to earn

21    on these facilitated transactions, on these broker

22    transactions, telling you again that these are important

23    parts of the negotiation, these are significant, they play

24    a significant role in what the broker-dealer -- excuse

25    me -- what the counterparties, what the victims, what the

1    customers think about when they're negotiating these

2    transactions.

3              Mr. Abbas tells you that this is something they

4    will negotiate in the course of their communications.  And

5    Mr. Marks explains to you exactly what this is.  It's the

6    difference between the buy and the sell price.  That's the

7    commission, that's what Nomura earns for brokering these

8    transactions.

9              So let's go back to our graphic.

10             Topic Number 1 was the market.  Market structure

11   tells you why these statements about price are so critical

12   because these are the only source, this is the only

13   source, the broker-dealer, the defendants, were the only

14   source for that critical piece of information, the price

15   on the other side of the transaction.

16             Let's go to Number 2, action/reaction, what I

17   mean by that.

18             Here, what I want to do is walk through some of

19   the trades -- not all of them, we don't have time for

20   that, you have them in evidence, but a few of the trades

21   to give you a sense of what I would argue is the best way

22   to see both the intent of the defendants as well as the

23   importance of the statements to the reasonable investors

24   and to the investors in these cases or these trades, to

25   see actually in practice how the lies, the actions, caused

1    the reaction, the change in price or Nomura and the

2    defendants making more money.

3           So what we're going to do here is go through a

4    few of the trades with that in mind.  I'm not going to

5    cover every statement in the trade.  I'm going to do it

6    relatively quickly, but just to give you a sense of what

7    I'm talking about, again, how the action drove the

8    reaction.

9           And you can look at it both in terms of intent,

10   look at it from the perspective of the defendant, why he

11   was doing what he was doing; and from the perspective of

12   the victim, why did he move price, what were the

13   statements that caused him to change his bid or his offer.

14          Let's take a look first at Trade Number 10.

15   That is the sale of an AHMA bond, January 5, 2010, from

16   Joel Wollman at QVT and another firm called C12, and the

17   buyer here was Christopher Creed from Goldman Sachs asset

18   management.  And Mr. Gramins was the facilitator, he

19   brokered this transaction between the two.

20          And just to pause here, when I say "Trade 10,"

21   this is the same as Government's Exhibit Series 10.  So

22   the exhibits you'll have in evidence will be Government's

23   Exhibits 10, A, B, C, D, et cetera.

24          So let's take a look first at what we know

25   happened before any of the conversation that we're going

1    to look at happened, and that is that Gramins bought from

2    C12 two-thirds of the piece of bond that he's going to

3    sell to Goldman Sachs in a second, 22,000,000 at a price

4    of 47.

5           So there's going to be a 33 million-dollar piece

6    of the bond that he sells to Goldman Sachs; here, he buys

7    at 47 one piece of that, before we get into the actual

8    communications.

9           Okay?  So keep that 47 price in your mind.

10          Then Mr. Wollman communicates with Mr. Gramins,

11   and Mr. Wollman first offers his 11 million-dollar piece,

12   that other piece of the 33, to Mr. Gramins at 47-16.  He

13   gets talked down to 47 and 8 ticks.  And then we go to the

14   other side of the trade, and you see Mr. Gramins talking

15   to now Christopher Creed at Goldman Sachs, and he first

16   lies.

17          He says, Being offered 33,000,000 AHMA at 49.

18          Now, remember we talked about a second ago, he

19   actually -- not only was he not offered it at 49, he

20   already bought two-thirds of it at 47, and he was being

21   offered the other $11 million of it, the other third of

22   it, by Mr. Wollman at 47 and 8 ticks.

23          So Lie Number 1.

24          Lie Number 2, Guy says he knows about the 46

25   handle print in December, thinks these should be up at

1     least two to three points.

2                No evidence of that on the other side.  In fact,

3     he's already bought it at 47, and he's already got an

4     offer at 47 and 8 from Mr. Wollman.

5                Lie Number 3, I would easily bid 48 on a BWIC

6     today and miss.

7                He's already bought the bond at 47, and in

8     negotiations to buy the rest of it at 47 and 8.

9                Let's go back to the other side, Mr. Wollman.

10    Here, you see Mr. Wollman actually does, in fact, then

11    sell the 11 million-dollar piece at the same price, at 47,

12    okay?  So it was at 47 and 8 -- we'll talk about this in a

13    little while, he gets lied to as well -- and Mr. Wollman

14    ends up selling at 47.

15               Now let's go back to the other side with

16    Mr. Creed, look at some more lies.

17               Mr. Creed says, What do you think I need, 48-12,

18    48-20?

19               Because he wants to buy it for as cheap as

20    possible.  He has the offer at 49.  He says, Can I get it

21    for 48-12, 48-20?

22               Mr. Gramins lies again, Lie Number 4, Happy to

23    show what you want, but honestly don't think this guy is

24    going to budge.

25               He already bought the bond.

1           Reaction -- this is what I'm talking about,

2    action/reaction -- what does Mr. Creed say, Okay, I'd pay

3    the 49, but try to fill me at best available.

4           Lie Number 5, Mr. Gramins says, Will see if I

5    can get you done at the three-quarters, be back.

6           Lie Number 6, Guy isn't moving at all, says he

7    has seen a ton of paper get lifted today and wants to just

8    stick to his guns.  So is 49 flat okay?

9           Lie Number 6, because we know he's already

10   bought the bond at 47.

11           And then the reaction, Mr. Creed, who wanted to

12   buy the bond for cheaper, he buys at 49.  Action/reaction,

13   cause and effect.  He lies, the defendant lies in order to

14   get Mr. Creed to pay more money.  Nowhere is it clearer to

15   see what the intent of the lies are than if you actually

16   just go through the trades.  You can do this in every

17   trade.

18           We'll do a few more.

19           Trade 11, February 9, 2011, this was a trade

20   between Mr. Reiger of Monarch hedge fund and PK Banks of a

21   hedge fund called DW, facilitated, brokered by Mr. Gramins

22   again.

23           Let's start on -- we're going to focus on the

24   PK Banks' side, the DW side, but I want to show you first

25   what happens on the Monarch side.

1       Monarch is the seller of the bond in this case,

2   and it's a WAMU bond.  There's a bunch of WAMU bonds in

3   this trial, but this is one of the WAMU bonds, Washington

4   Mutual.

5       Mr. Reiger says, Okay, I would show to you -- so

6   he's offering -- I would show to you at 52 and 24.  Let's

7   see where this goes.

8       So keep in back of your head, offer is 52-24.

9   Let's go to the other side of the transaction.

10      Mr. Gramins lies to Mr. Banks.  He says, Have an

11  order on 10,000,000 WAMU at 53-16.

12      Remember, it was 52-24.  He lies and says 53-16.

13  That's Lie Number 1.

14      Reaction, Mr. Banks makes a bid, 51 and 16.

15  Action/reaction.  Let's go to the other side again,

16  Mr. Reiger changes his bid.  Now he's -- excuse me, his

17  offer.  Now he's gone down.  He says, I would show it at

18  51-28 net to you.

19      Okay?  So remember 51-28 now.  Let's go to the

20  other side.

21      Mr. Gramins says, Have the WAMUs down to 53 now.

22      Lie Number 2.  We know it was 51-28.

23      My guess is that there's a bit more room but has

24  to be a 52 handle.

25      Lie Number 3.

1           And what's Mr. Bank's reaction; Boo.

2           Why; because he wants to buy it as cheaply as

3     possible.

4           Reaction, I'd go 52, I'd go to 52.

5           He raises his bid by a half a point, again based

6     on what the defendant -- the lies the defendant was

7     saying, was telling him, showing you why these lies

8     mattered.  They weren't talking about analytics here, they

9     weren't talking about models.  They're talking about the

10    bids and the offers, the prices.

11          Let's go next, Mr. Gramins says on WAMU I have

12    52-24 now.  No evidence on the other side of that trade

13    that anything changed with Mr. Reiger, nothing.

14          Says, I have -- Lie Number 4, remember, it was

15    51-28.

16          And then Mr. Banks says, Okay, so my last

17    iteration was my 52 bid versus 52-24 counter.

18          Lie Number 5, Mr. Gramins says, Yes.

19          We know it was 51-28.

20          Gramins says, Think the next one should be your

21    best.

22          So Mr. Banks raises his bid again, 52 to 52-10

23    all in.  You see he does a six-tick pay-on-top here, Best

24    at 52-4, paying you 52-10 all in.

25          Raises his bid by another ten ticks because of

1    the lies that Mr. Gramins told him.  Action/reaction shows

2    the importance of these statements to these investors.

3            And then go back to the other side, he closes

4    the deal here with Mr. Reiger at 51-20, and he says the

5    he's paying him on top of that.  He was paying him on top

6    of that, just a lot more than he realized.

7            And then that's where it gets done at 51 and 20,

8    bought from Monarch.  Go back to the other side of the

9    transaction, Gramins says, Done at 52-10.

10           Mr. Banks buys it at 52-10, and then Mr. Banks

11   says, You still get paid something?

12           He says, Yeah, thanks for giving me wiggle room

13   over 52.  Don't think he would have let them go for less

14   than that.

15           We know he let them go at 51-20, another lie.

16           And then what happens?  The reaction, Mr. Banks

17   and DW buy at 52-10.  Action/reaction.

18           Let's move on to Trades 14 and 15.  These were

19   basically done together, trades involving sales of bonds

20   from MKP facilitated by Mr. Peters, and then Mr. Shapiro,

21   and the purchaser of the bond was Putnam with Zach

22   Harrison.

23           The Trade 14 was a HVMLT bond, and Trade 15 was

24   an LXS bond, but they were done together.

25           First thing of relevance is that Mr. -- that

1    Nomura buys the LXS bond, you can see that Exhibit 15B on

2    the left-hand side, buys the LXS bond at 52, and buys the

3    HVMLT bond at 62.  And that happens before the chats that

4    we're about to look at, before the statements we're about

5    to look at.

6              Let's go forward.  Keep those in mind, okay?

7              And then a few minutes later, Mr. Peters, who

8    had been talking to Mr. Harrison about this transaction,

9    says, They're going to come right back to us -- now

10   they've already bought the bonds, so that's not true --

11   this is the worst timing ever but have to get on a train

12   to DC.  Handing the baton to Ross.  You're still in pretty

13   good hands I guess.

14             So he hands the baton over to Ross, says they're

15   going to come back to Mr. Harrison, but we know they've

16   already bought the bonds.

17             So Mr. Shapiro takes over and then he lies.  He

18   says, We bought DBALT LXS HVMLT at 57.5, 53 and a half,

19   and 62.75.

20             So let's see where those lies are.  Remember,

21   they actually bought the LXS bond at 52, so a point and a

22   half lower, and they actually bought the HVMLT bond at 62,

23   three-quarters of a point lower.  So again, two lies to

24   Mr. Harrison in this case.

25             What happens?  Mr. Harrison agrees to pay a

1    quarter-point on, quote, out-of-comp stuff -- because this

2    was out-of-comp situation, not a BWIC transaction --

3    eight ticks.  And the reaction here, the result, is that

4    it trades, and Mr. Harrison buys first the LXS bond at 53

5    and 24 ticks; not 8 ticks, which is what he had agreed to

6    pay, but 48 ticks over Nomura's acquisition price.

7            And on the other one, trades at 63, 32 ticks

8    over Nomura's price when, again, he had agreed to pay

9    eight.

10           So again, by that lie, by giving him that false

11   price, he paid orders of magnitude above what he had

12   actually negotiated to pay.

13           Look at another one, Trade 19.  This was a sale

14   of an OAK bond from Mr. Harrison to TIAACREF, which was

15   facilitated, brokered, by Mr. Shapiro.

16           Let's start here.  We know what's going to

17   happen is that TIAACREF is going to purchase the bond at

18   88.125, or 88 and 4 ticks.  So keep that in your mind.

19           What happens on the other side.  I'm not going

20   to go -- there's a lot of back and forth in this

21   particular trade, but right before that happens, what do

22   we know, Mr. Shapiro lies.  He says that TIAA --

23   Mr. Harrison doesn't know who the person on the other side

24   is, who the party on the other side is, but he says they

25   improved to 86 and a half, and said, Let's trade or not

1    trade because it's quitting time.

2           Lie Number 1, we know 88 and a quarter was

3    actually where they were going to buy, almost 2 points

4    higher.

5           The reaction, Mr. Harrison agrees to sell at

6    86 and 8, with 8 ticks pay on top.  In this case it's

7    reversed because Mr. Harrison is selling the bond, not

8    buying the bond.

9           Lie Number 2, Mr. Shapiro confirms that that's

10   the price, it's 86 and 8 ticks to Mr. Harrison, and 86 and

11   16 to Mr. Shapiro, with an 8-tick pay-on-top.

12          But we know, in fact we saw the truth a second

13   ago, really the buyer was buying at 88 and a quarter.

14          And here's your reaction:  Putnam sells at 86

15   and 8 ticks, paying much more than they had negotiated to

16   pay.  Again, action/reaction, cause and effect.

17          Let's take a look at Trade 21, December 14,

18   2011.  The seller of this bond was Mr. Harrison.  It's a

19   GPMH bond, and there will be two purchasers here, Libremax

20   and -- Mr. Milman from Libremax and PIMCO, Mr. Shapiro

21   brokering the transaction.

22          So take a look first at Exhibit 21A.  Earlier on

23   in the transaction, Mr. Harrison talks about selling this

24   particular bond.  It's a large piece of bond, you'll

25   remember.  It was like a 240 million-dollar original face

1   bond.

2              And he says, I want to get out somewhere around

3   85 and a quarter.

4              He tells this to Mr. Shapiro because he trusts

5   him, he tells him, I want to get out at 85 and a quarter,

6   but they agreed to start higher.

7              Because when you're selling, you want to sell

8   for as much as possible.  We heard that several times

9   during the course of the trial.

10             So Mr. Shapiro tells Mr. Harrison, I'll

11  start 88, why not.

12             Let's go to the other side of the trade,

13  Mr. Milman.  He says, Happy to get to 87.

14             Shapiro says, I think 87 is probable.

15             And that's, again, for a piece of the bond.

16             What does Shapiro say to Mr. Harrison?

17             He said, Hedgie said not going up right now.

18             Lie Number 1.  Hedgie was already at 87.

19             So what do I need to show West Coast; 86.

20             So Mr. Harrison says -- he now is offering 86.

21  He lowers based on this first lie, actually says 85-28 --

22  and we're going to see in a second that, in fact, both of

23  the bonds get purchased at 87, so these are all lies.

24             Says, They aren't going to pay over 85.

25             Again, they're going to pay 87.  This is a lie,

1    Lie Number 2.

2              I think I can get her to pay 85 for the whole

3    piece.

4              Lie Number 3.

5              And Mr. Harrison says, Okay, 85.  In other

6    words, you're going to transact at 85, and I pay from

7    there?

8              And Shapiro says, Yes.

9              So Mr. Harrison is lowering his offer to 85

10   based on what Mr. Shapiro said.  Lie Number 4.

11             Mr. Harrison says, Okay, reaction, here it is,

12   let's print this beast, eight ticks pay on top.

13             So because we're on the sell side, he agrees to

14   sell for 85, as the 85 price, but subtract out 8 ticks, so

15   it would actually be 84 and 24.  And that eight ticks, at

16   least what Mr. Harrison thinks, is going to be earned on

17   the other side.  So he thinks he's selling at the 85 price

18   and the buyer is buying 85, and he's giving Mr. Shapiro

19   those 8 ticks, not the 2 points and 8 ticks that actually

20   happens here.

21             Mr. Shapiro says, Okay, we're good, ticket's

22   coming.

23             There is the ticket, 84 and three-quarters, and

24   here's the truth:  It actually is purchased, both pieces

25   of the bond are purchased at 87, one by Libremax and one

1    by PIMCO.  That's Exhibit 21D.

2              Last trade to look at in this section.  We're

3    going to look at a few more later, but for this purpose

4    the last trade is Trade 29, November 22, 2013.  This was a

5    trade between TCW, Harrison Choi -- you heard the phone

6    call, and we'll look at that in a second -- and

7    Mr. Wollman at QVT, brokered, facilitated, by Mr. Gramins.

8              We focused -- you heard testimony by Mr. Wollman

9    during the trial about that trade.  For the next couple

10   minutes I'm going to focus on the other side of that

11   trade, statements made by Mr. Gramins to Mr. Choi.

12             So first, again, lots of statements made in

13   these.  I'm going to focus you down on a couple of them.

14             Mr. Choi is the seller of the bond.  He makes an

15   80 offer.  Around that same time, Mr. Wollman, after

16   getting pressed by Mr. Gramins, agrees to offer -- excuse

17   me -- bid 80 flat.  So at that point you have an offer

18   of 80, and a bid of 80.

19             But what happens on the other side?  Then

20   there's that phone call between Mr. Gramins and Mr. Choi.

21                  (Audio played)

22        MR. NOVICK:  Lie.  Bid was 80.  They hadn't

23   talked about compensation yet.  You heard Mr. Wollman.

24   Lie Number 2, He is paying me on top.

25             He's lying to Mr. Choi about the bid on the

1    other side.

2              What happens next?

3                   (Audio played)

4              MR. NOVICK:  What are you hearing from

5    Mr. Grammins here:  The way you look at it versus I look

6    at it, versus the model looks at it, versus everyone else.

7              What does that tell you about the significance

8    of all of that in the context of these price negotiations?

9              It doesn't mean anything.  The only thing that

10   matters is what's being told to them about what the bidder

11   offer is on the other side.  Model isn't going to tell you

12   whether Mr. Gramins is lying to you.  How each different

13   party looks at it isn't going to tell you whether they're

14   lying to you.  The only thing you know is what Mr. Gramins

15   chooses to share, and here it causes Mr. Choi, who wants

16   to do a trade, and he has to move price because he's being

17   told it can't get done at 80.  So he lowers his offer to

18   79-08, not because of any analytics but because that's

19   what he was told, because of the information that he was

20   being given, the lies that he was being given from the

21   other side of the trade.

22             And then what happens, trade gets done at 79

23   and 08, Mr. Choi sells the bond at 79-08.

24             So remember what I've been talking about here,

25   with regard to action/reaction, and think to yourself as

1    you go through each of these trades, and you'll have them

2    all in evidence, think to yourself, the price,

3    misrepresentation that was made, and how it led to a

4    particular result; how it caused the buyer to pay more,

5    the seller to receive less, and how it changed bids and

6    offers.

7              Look at each different decision, because there

8    are many in each of these different trades; decision what

9    to bid, what to offer, whether to buy the bond at all, and

10   where to settle.  Each of those, where to actually do the

11   trade.  Each of those are different decisions they have to

12   make in each trade, and the information, the

13   misrepresentations, the lies the defendants were telling

14   impacted that; didn't just assume significance in the

15   deliberation, which is the standard, they were critical,

16   critical to that discussion, critical to what these

17   customers, what these investors knew and understood about

18   where they could buy that bond at that -- or sell that

19   bond at that particular time.

20             Category 3, victims and co-conspirators, what do

21   I mean by that?

22             I want to talk about -- you heard from four

23   traders at victim institutions, insurance companies, hedge

24   funds, and you heard from three co-conspirators.  So I

25   want to talk about their testimony from the perspective

1    again of explaining to you why the price

2    misrepresentations, why the lies that were told by the

3    defendants, mattered to a reasonable investor, and why

4    they were done with the intent to deceive, why the

5    defendants lied with the intent to deceive and to defraud

6    these investors.

7         First thing I'm going to do is, I'm going to

8    talk again now about some additional trades.  I'm going to

9    talk about the trades, though, really as a vehicle to talk

10   about what the victims told you about what happened here

11   and why, what was told to them, the lies that were told to

12   them mattered or were material.

13        Trade 26, this was a trade between the seller,

14   Mr. Sunshine from Bracebridge hedge fund, and Aadil Abbas,

15   who came and testified to you from the Hartford Management

16   Company.  And it was facilitated jointly, brokered

17   jointly, by Mr. Chao and Mr. Gramins, Mr. Gramins talking

18   to Mr. Sunshine, and Mr. Chao talking to Mr. Abbas,

19   chatting with Mr. Abbas.

20        Let's take a look first at Exhibit 26E, page 1.

21        First thing that happens, Mr. Abbas bids 78-22.

22   Remember, he had bought the bond at that price that

23   morning.  It was a PPSI bond, he did a BWIC in the morning

24   with Nomura and agreed to pay 78-18 plus 4 ticks on top,

25   so 78-22.  Now he's told there's an additional piece of

1    the bond so he bids the same thing all in, 78-22.

2            Let's go to the other side of the trade.

3            Mr. Sunshine, he tells Mr. Gramins that he's

4    going to offer for the whole piece of the bond, 78 and a

5    half.  So you had a bid at 78-22, and an offer at 78-16.

6    You had a trade there, with Nomura making six ticks.  But

7    it doesn't get done there.  Remember what happens next.

8            Mr. Chao comes back and he lies.  He gives a

9    false offer.  He says -- he didn't say the offer is 78-16.

10   He says the offer is 80-16, above where Mr. Abbas had bid.

11           Then Mr. Abbas raises his bid to 79 and says, If

12   the guy is really looking to trade, I'll show 79 best.

13           We're going to talk about that again in a

14   second, but let's remember what Mr. Abbas said about this.

15           When I asked him, would that information have

16   been important to you, to know that the bid wasn't 80-16,

17   it was actually 78-16.  And it's almost obvious, it's

18   important because I could have bought it at 78 and 22,

19   which is cheaper than what I eventually ended up paying.

20           Of course that's true.

21           Mr. Chao told you -- remember Mr. Chao?  He

22   testified about this trade as well.  He said the effect

23   would be that hopefully Mr. Abbas would increase his bid

24   based on that information.  Of course that's true.

25           Why else would you lie about the offer if not to

1     raise the price that the buyer is going to pay?

2              And Mr. Chao explains that the point of that is

3     to increase the spread, to drive up the amount of money

4     that Nomura is going to make on the trade.

5              Let's go back into the trade for a second, a

6     couple of other points to make.

7              At 20:21:14, and then at 20:27:25, Mr. Chao

8     starts narrating what he's going to do, talking about:

9     Seller's looking to trade, usually likes to engage, Don't

10    think we want to move best level right away; Just showed

11    him 78-16 to get started; We'll show 78-24, see what comes

12    back.

13             And he goes through that, talks about

14    information that he's receiving and sharing with the party

15    on the other side.  And in fact, Mr. Gramins, who's

16    talking to the other side of this transaction, does none

17    of that.

18             So why is he doing it?  Why is he narrating this

19    in this way?  Why is he lying in this way?

20             Mr. Abbas explains, in part, All of that

21    information made me think at that point he was engaged

22    with the seller, giving you that false sense that what

23    you're being told is the truth:  I'm not just representing

24    where the offer is; I'm telling you, I'm having this

25    conversation with him, and I'm going to work for you; I'm

1    going to go back -- I'm not going to show best

2    immediately, I'm going to step it out a little bit, I'm

3    going to try to get the best price I can for you.

4              He says, All of the color, all of that is the

5    color that I'm receiving regarding an ongoing negotiation.

6    From that angle it's important.

7              There's no other source that Mr. Abbas is -- for

8    that moment as to what is going on, on the other side of

9    that trade than what he hears from Mr. Chao, none

10   whatsoever.  You can't check away for that.  You can't go

11   look at your model.  That's what he had to work on, and

12   that's why it was important.

13             Mr. Chao says, he explains exactly what I was

14   just explaining, give Mr. Abbas sort of an illusion, a

15   false illusion, that we were trying to buy the bonds

16   cheaper for him.

17             Focus on what the defendants said.  Focus on how

18   they conducted these trades, these false illusions, sense

19   that I'm working for.  Nobody's claiming here that anybody

20   is a fiduciary.  The only person who has mentioned the

21   word "fiduciary" in this trial is the defendants.  We're

22   not claiming that.  What we're telling you to look at

23   these words, what are they doing?

24             They're conducting themselves to give this false

25   sense they're trying to get the best price possible for

1    them, and that's how they do it.

2              And then what happens?

3              Mr. Chao says, 79 and 2 is done to you.

4              Mr. Abbas buys at 79-02, and what does he tell

5    you, If I had known the offer of 78 and a half, I would

6    never have paid 79 and 2.

7              So that's the effect I could see.  And of course

8    that's true, of course that's true.

9              Mr. Abbas explains even more succinctly, I would

10   have paid lower, lower is better.

11             He told you he was fine buying at 79 and 2,

12   nobody's quarreling with that.  These guys are big boys,

13   they're going to buy bonds at prices they think are okay,

14   but they want to buy cheaper, increases the yield.

15   Remember, everybody explained that.

16             Let's talk about Trade 22.  That was a trade

17   you'll recall with Mr. Marks and Mr. Peters involving a

18   JPALT bond on December 21, 2011.  Mr. Harrison was selling

19   to Marks, Mr. Peters was brokering the trade.

20             So here, and I'm going to get to the real end of

21   it here, Mr. Marks says, Okay, you want to try to get them

22   at 08, and I'll pay you 16?

23             And Mr. Peters says, Yeah, I'll see if I can get

24   that done.

25             So essentially Marks is bidding 38-08 and 8

1       ticks pay-on-top.  He explained that to you.  Mr. Marks is

2       paying 8 ticks commission and bidding 38-08.

3                Other side of the trade you see what really

4       happens, Mr. Peters goes over and he gets Mr. Harrison to

5       actually sell to him at 37 and 28.  That's 12 ticks lower

6       than what he told Mr. Marks he was doing.

7                Go back to Mr. Marks' side and what do we see.

8                Mr. Peters says, Okay, that works, can be done

9       at 38-16.

10               So he lies.  He confirms that earlier deal, that

11      they were going to do 38-08 to him, 38-16 to Mr. Marks.

12               And Mr. Marks explained, that's what it meant,

13      that he was able to buy the bonds and sell them to me at

14      those prices they had discussed, even though that was, we

15      now know, was a lie.  Mr. Marks didn't know that at the

16      time.

17               So what does Mr. Marks says, I would probably

18      try to see if I could buy the bonds at a cheaper price.

19               Now, could he have?

20               We don't have a crystal ball, but would it have

21      assumed significance in his deliberation?  Of course it

22      would have.  If he had negotiated to pay eight ticks on

23      top, eight-tick commission, and he knew he was buying the

24      bond for 12 ticks cheaper, of course he would go back and

25      try to say, All right, let me pay eight ticks from there.

1          Of course it assumes significance in the

2     deliberation because they were talking about price and

3     Mr. Peters was lying about price.

4          Mr. Marks goes on to explain that, I only speak

5     for the broker, I have to rely on the information they

6     give me.  There are multiple negotiations going on.  He

7     sees himself negotiating with the seller and also with the

8     broker-dealer over the pay-on-top, over this commission,

9     when it's disclosed, when they are talking about it.  And

10    here, obviously they were.

11         Trade 16.  As you can see, I'm just going

12    through the different witnesses you heard from.  So we

13    talked about Mr. Abbas, you heard from him.  Mr. Marks,

14    you heard from him.  Let's go through a Zach Harrison

15    trade.

16         This is a bond that was traded on March 23,

17    2011, an INDA bond.  Mr. Harrison was the seller;

18    Mr. Wulfsohn was the buyer; and Mr. Peters was the broker,

19    the facilitator here.

20         We'll start on the Mr. Wulfsohn side, and we're

21    going to focus on the Harrison side.

22         So what do we know, Wulfsohn bids 83 flat.  So

23    keep that 83 number in your mind.

24         Mr. Peters says to Mr. Harrison, On INDA, the

25    guy is same as my bid right now, 82 and a half.  Need to

1    try to get him up.

2           So he lies, tells Harrison the bid is 82 and a

3    half when we know it was actually 83.

4           Mr. Harrison tells you, In this kind of

5    transaction, I was negotiating with another end account

6    through Nomura.  Relaying information back and forth was

7    important and would have factored into the strategy I

8    employed and decisions I made.

9           And of course that's true because he's acting

10   based on what he's being told; and if he's being told

11   lies, he's acting based on those lies.  And you see that

12   in the context of this transaction, and Mr. Harrison

13   explained that to you.

14          Let's go back into the transaction.

15   Mr. Wulfsohn agrees to pay bids 83-12.

16          On Mr. Harrison's side, Mr. Peters lies, says

17   the buyer bid 82-28, not 83-12.

18          And Harrison agrees to accept 82-20 with an

19   8-tick pay-on-top.  So again, talk about action/reaction,

20   before, reacting to those lies.

21          Harrison explains this, Again, in this

22   transaction, I was essentially negotiating this with other

23   account without knowing who it was, and I was doing it

24   through Tyler, and the relaying of this information back

25   and forth was how I devised my strategy and made decisions

1    on whether or not I should trade the security and at what

2    price.

3              Remember what I said before, we're not looking

4    at just one decision that these investors had to move that

5    these lies could move.  We're looking at multiple

6    decisions:  Are you going to trade; what price are you

7    going to trade; what bid are you going to make?

8              All of these can and were affected, influenced,

9    by the lies that were being told.

10             So we talked about Abbas, Chao, Harrison, let's

11   talk a little bit about Mr. Wollman, Trade 13.  This is

12   March 16, 2011, the sale of an INDX bond from MKP to QVT.

13   This is a BWIC, a bid wanted in competition, a bid list in

14   auction.

15             So what do we have?

16             Mr. Wollman says, I'll take a shot at 18-1.

17             He instructs Mr. Gramins to bid 18 and 1 tick on

18   a BWIC.

19             Mr. Wollman explained what that meant.  He said,

20   I would communicate what I wanted him to bid on my behalf.

21   I would expect him to go do that.  And if I were to win

22   the bond, we'd agree on the commission of what on-top

23   price I was going to pay.

24             This was very similar to what Mr. Abbas had

25   explained as well; that the buyer buys the bond and then

1    pays the on-top commission.  You saw that in Mr. Abbas'

2    earlier trade, four ticks on top.

3              So then what happens?

4              Gramins directs a bid of 17 and 17, 16 points

5    lower than what was instructed.  He sends that bid

6    internally, and then Mr. Romanelli forwards that bid.

7    Remember, he was a salesman who worked with Mr. Gramins.

8    He follows Gramins' instruction and submits that 17-17

9    bid.

10             Mr. Gramins explains, reports to Mr. Wollman

11   that he won the bid, and he asks for eight ticks

12   pay-on-top.  So he thinks that the bond was done at 18

13   and 1, he's going to pay 8 ticks on top, so 18 and 9.

14             So Mr. Wollman agrees to pay eight ticks

15   pay-on-top, and Mr. Wollman explains the lie here, telling

16   him, giving him the false sense that he had actually put

17   in the 18-and-1 bid is what caused him to pay the 8 ticks

18   on top.  It influenced the all-in price I ultimately

19   agreed to pay.  I certainly would not have paid on top,

20   and I would have had an issue with him not using my 18-1

21   bid as originally directed.

22             And he explained why that was, because what

23   would have happened?  When Gramins put the 17-17 bid in,

24   and someone bid higher than that, and Mr. Wollman loses

25   out on that bond that he wanted to buy for his investors.

1          Let's move on.  I gave you some examples of

2     trades in which these victim investors explained to you

3     why the lies were so significant; why the information, the

4     price information that they were getting, would have

5     assumed importance in their deliberations.

6          But you also heard the Judge instruct you that

7     you can consider and think about the relationships between

8     the defendants and their customers.  And you heard about

9     the trust relationships here, particularly with regard to

10    Mr. Harrison, and you also heard some testimony from

11    Mr. Wollman about how he evaluated what information to

12    credit, what types of information to credit.

13         Remember that what Mr. Wollman -- we talked

14    about that AHMA bond way back in the action/reaction

15    section, and he was lied to, you may remember there.  He

16    was told 47 is best best, so he moved his offer down to 47

17    in that original trade that I had talked to you about.

18         And I believe Ms. Cherry asked him:  When he

19    says 47 is best best, did you believe him?

20         He says, Yes, because he told me, he's acting in

21    his broker capacity, and it's an objective fact, so I

22    thought he was telling the truth.

23         Mr. Wollman explained what he meant by

24    "objective fact" earlier in his testimony:  Some

25    statements are either true or not true, that's what I

1    consider an objective fact, things that are numbers, and

2    there's no ambiguity around objective facts.  It's not

3    color, not like 52 handle or 60 area, but I'm in a price

4    negotiation with someone who is brokering a trade between

5    me and somebody else, and what the price is on the other

6    side is an objective fact.

7            Mr. Wollman told you -- Mr. Wollman, with his

8    Harvard degrees, working for a hedge fund, sophisticated

9    counterparty, told you that this is the evaluation he went

10   through, that he thought about this and credited it

11   because it's a objective fact, why would they lie about an

12   objective fact?

13           He told you he didn't think, he didn't

14   understand this to be an acceptable practice before or

15   after anybody got indicted for the same conduct.

16           Let's talk about Mr. Harrison for a second.  He

17   thought trust was critical because, remember, it's not

18   models that trade these bonds, it's not their computer

19   programs that trade these bonds, it's not these big

20   institutions that just trade bonds with each other, there

21   are people who are engaging in negotiations who actually

22   execute these trades.

23           And Mr. Harrison viewed how much he trusted the

24   people that he was dealing with, in particular these

25   defendants, as a critical piece of information.  It's part

1    of his evaluation as to what to believe and what not to

2    believe, and the defendants knew that, because they knew

3    how much he trusted them.

4         Mr. Harrison explained that Shapiro, Peters, and

5    Gramins were among his most trusted individuals that he

6    dealt with.  And two of them -- remember, he had a list of

7    three.

8         And, Shapiro and Peters are on a list I had

9    which I considered to be the three most trusted people I

10   dealt with.

11        And so that's what's in his mind when he's

12   hearing these statements from them, when he is he's

13   getting lied to over and over again, he believes it for

14   lots of reasons.  It's the only source of information he

15   has for it at that moment, but he also believes it because

16   these are trusted counterparties.  He's had years of

17   experience.  Mr. Wollman told you, his experience with

18   these defendants goes back to when they were at Lehman,

19   long experience, things that are reasonable investor in

20   this market would consider, would think about, when

21   deciding whether to credit information that they're being

22   told, credit this -- these objective facts in a

23   negotiation that they were told.

24        You also saw some exhibits, Mr. Harrison

25   expressing to Mr. Shapiro, It's a really complex rule,

1      don't lie, exhibit 3Q, page 14.

2               Mr. Harrison telling Mr. Shapiro, If I only

3      dealt with people I trust as much as you, it would be

4      quiet.  Exhibit 3H, page 12.

5               These were the things that a reasonable investor

6      takes into the marketplace with him:  Who do I trust; who

7      can I trust; what is my history with these people?

8               Mr. Marks told you that he'd trade with

9      Mr. Peters again, but he might not believe what he said.

10     The fact that he knew now that he got lied to would affect

11     what he believed, affect how he conducted himself.

12               Let's talk very briefly about co-conspirator

13     testimony, on the purpose for these lies, again, that

14     these lies were made with the intent to deceive and to

15     defraud.

16               You heard from Mr. Dinucci.  He said, When we

17     would misrepresent the price that we were buying or

18     selling at, we could further dictate what the commission

19     was going to be by lying to the client.

20               Seems obvious enough, spoken by someone who

21     worked with and trained by the defendants, and in

22     particular, Mr. Shapiro and Mr. Gramins.

23               Mr. Feely, Why would you lie about where you

24     bought a bond or where could you sell a bond?

25               To make more money.

1           Mr. Chao, the effect was to get either one side

2    or both sides to lower their offer or increase their bid,

3    and that would increase the spread or money that Nomura

4    earned on the trade.  Couldn't get clearer than that.  And

5    that's what we saw in these trades that we've gone

6    through.

7           So again --

8           THE COURT:  Please forgive the interruption, but

9    I wonder if this would be an appropriate time to pause?

10          MR. NOVICK:  Sure.  That's fine with me, Your

11   Honor.

12          THE COURT:  Because we've been at it for a

13   while, and I think Darlene could probably use a break, so

14   forgive me.

15          MR. NOVICK:  Absolutely, Your Honor.

16          THE COURT:  Members of the jury, we're going to

17   take a short recess now.  Why don't we say 15 minutes,

18   okay?  Please don't discuss the case.

19               (Whereupon, the jury left the courtroom.)

20          THE COURT:  Please be seated.  I didn't want to

21   do that to you, but we needed to do it at some point.

22          MR. NOVICK:  I understand, Your Honor.  It's as

23   good a time as any.

24          THE COURT:  What do you think you have left,

25   just generally?

1           MR. NOVICK:  I started at -- I probably have

2    about 40 minutes left, roughly.

3           THE COURT:  Okay, all right.  Thank you.

4               (Whereupon, a recess followed)

5

6               (Whereupon, the jury entered the

7                courtroom.)

8           THE COURT:  Thank you everyone, we're ready to

9    resume.

10          Mr. Novick?

11          MR. NOVICK:  Thanks, Your Honor.

12          So let's take stock of where we are.

13          Remember we've -- I told you that what this --

14   these four categories of evidence were going to show you

15   was two things:  That the lies that the defendants told

16   were significant, that they would factor significantly in

17   the deliberations of a reasonable investor; and, number

18   two, that the lies they were told were done with the

19   intent to deceive, done with the intent to take money from

20   their customers, from their counterparties.

21          And so far we've looked at three of those

22   categories of evidence, three of those things:

23          The function of the market, the way in which

24   Nomura exploited the defendants, exploited their position

25   in the market because they were the only source of

1       information that was happening that was being given on

2       either side of the trade about what the price was being

3       offered or bid.

4              The second thing we talked about was

5       action/reaction, looking at the trades and looking at in

6       fact how that played out over time, over and over and over

7       again, in each of these different trades, a lie and a

8       movement in price, a lie and Nomura makes more money.

9              Then we talked about the victims and the

10      co-conspirators who explained to you -- they came in and

11      they testified, they walked you through trades, and they

12      explained to you on the one hand for victims why these

13      lies mattered to them, why they would have assumed

14      significance in their deliberations about price; and the

15      co-conspirators, they explained to you why -- what the

16      purpose of all this was, to make more money for Nomura.

17             So now we're onto the fourth category, I call it

18      stolen profits.  What do I mean by that?

19             Well, in many of these cases, you can actually

20      put numbers to the lies that the defendants told which can

21      help you understand, will help you understand why they did

22      it, why the defendants were lying over on over again and

23      why it would have assumed significance in the

24      deliberations of a reasonable investor, because we're not

25      talking -- at the end of the day when we're talking about

1    ticks, when we're talking about points, that's money, and

2    whether you're Nomura or you're one of these victim

3    investor, one of these hedge funds, they're in the

4    business to make money, and if Nomura makes more money,

5    guess who makes less money, their customers.

6           So let's talk about that for a little bit.  Look

7    at stolen profits.  And as way into that, I want to talk

8    about a couple of exhibits you saw about why the

9    defendants or what purpose this riskless trading, this

10    brokering of deals between buyers and sellers, had for

11    Nomura.

12           So this was Exhibit 116, page 8, Mr. Gramins'

13    annual review.  And he talked about -- you remember

14    Mr. Raiff explained that 2011 was a tough year for the

15    RMBS market.  But they were able to create substantial

16    alpha, substantial gain, through low risk/riskless trading

17    with key relationships.  It was an important way to help

18    keep their P & L afloat when the rest of the market was

19    going down.

20           And Mr. Peters' evaluation as well.  Talks about

21    trading both in agented roles, his word and not mine, and

22    by taking position risk.  Two different roles they played

23    in the market.  These were important things, this was a

24    way they made money.

25           So I'm going to go through a few of the trades

1    and I'm going to explain to you, much in the way

2    Mr. Harrison did, how you can actually put numbers to

3    these lies basically by taking the difference between the

4    truth and the lie, and we'll do that for five or six of

5    them.

6            Trade number 14, this was one of the two trades

7    we looked at before.  They were traded on the same day, it

8    was between MKP was the seller and Mr. Harrison at Putnam

9    was the buyer.

10           So let's first look at the lie.

11           We know that Mr. Shapiro told Mr. Harrison that

12   he had bought the HVMLT bond at 62.75, which in ticks,

13   remember ticks, 32 ticks for one point, so .75 is 24

14   ticks, three quarters of a point.  That was a lie.

15           The truth we know, we saw before, Exhibit 14B,

16   was 62 flat.  That's where he really bought it.  I haven't

17   talked about ticks on top or anything like that.  The

18   difference between the lie and the truth is 24 ticks or

19   .75 percent.

20           What do we do then?  We multiply it,

21   Mr. Harrison explained, by the current face of the bond,

22   and in this one this was Exhibit 14D, roughly 36 and a

23   half million dollars.

24           And what does that yield?  So the hidden profit

25   here, the profit that was yielded by lying, the difference

1    between the lie and the truth was 270 -- almost $274,000.

2           Now, we know in this case looking back at the

3    exhibits we saw before, that Mr. Shapiro asked for eight

4    ticks on top of this one, so if you take eight ticks,

5    which is a quarter of a point so .25 percent, and multiply

6    that by the current face, you get $91,000 that they would

7    have made by itself.  That's what they would have made for

8    brokering this transaction in how much time?  From the

9    beginning of that negotiation to the end, two hours and 41

10   minutes that they would have made $91,000, but they made

11   that hidden profit by lying.  So the total profit here was

12   $365,324.

13          They made an extra $274,000, they took no

14   additional risk, no additional work, all they had to do

15   was lie.  That's why it's so tempting and that's why it's

16   wrong.

17          Let's look at Trade 15.  It's the same day, same

18   exhibits.  So here this was talking about the LXS bond

19   that we looked at earlier.  53-16 was the lie.  That's

20   what he told Harrison he was buying at.  Remember

21   Harrison, his most trusted counterparty.  Minus 52 for the

22   truth, that's what Nomura actually bought the bond at.  So

23   that's 48 ticks, that's a point and a half.

24          So you would take the current face, in this

25   case, this piece of bond was $24.7 million, multiply that

1    by the 48 ticks -- remember 48 ticks would be a point and

2    a half so 1.5 percent -- and you get $371,000 of increased

3    profit over what they would have gotten if they told the

4    truth, over what Nomura would have made if Shapiro had

5    told the truth.

6         Same analysis here.  The agreed upon comp eight

7    ticks, $61,000.  So again, same amount of time that they

8    were talking about this, two hours, 41 minutes, a total

9    profit of $427,000 for about two and a half hours work of

10   work.

11        Let's look at another one.  This was Trade 18.

12   Putnam bought a HVMLT bond September 21, 2011.  I didn't

13   go through this one in detail before but we'll walk

14   through it very quickly now.

15        Mr. Gramins lied to Mr. Harrison, said right now

16   I have him offering to me at 61.  He seems pretty trenched

17   in there; and that's in fact where it got done.

18        The truth -- that's where Mr. Harrison

19   transacted or where he believed.  The truth was actually

20   that he bought it at 60.  So one point, 32 ticks in this

21   case.

22        Difference?  Current face, $32.3 million.  So 32

23   ticks is one point, so that's easy.  $323,000 of hidden

24   profit that they made simply, again no additional work, no

25   additional risk, just by lying.

1          In this case, remember Mr. Harrison, this is the

2     one where he told Mr. Gramins, go earn that eight, and

3     then he agreed to pay 61-08.  So the price he thought that

4     Nomura was acquiring the bond at, 61 plus eight ticks.  So

5     what's that eight ticks in this case?  About $81,000.  How

6     long did this one take?  A little bit longer, about seven

7     and a half hours.

8          So the total profit here, the hidden profit from

9     the lie, 323,000 plus the agreed upon compensation, so you

10    get a total of $400,000.

11         Let's take a look at Trade 19.  Putnam sold this

12    OAK bond.  We looked at this earlier.  The truth,

13    remember, was 88 and four ticks, we saw that 88.125.  And

14    since Putnam's the seller here, we're going to reverse it.

15    So the truth is on top.  What they actually sold the bond

16    for was 88 and four ticks.  What they told Mr. Harrison

17    they were selling the bond for was 86 and 16.

18         So the difference is 52 ticks.  Multiplied by

19    the current face, $20.5 million, and you get hidden profit

20    of $333,000.

21         Here the agreed upon comp was eight ticks.  And

22    you actually saw that in their trade itself.  We saw it

23    before, agrees to pay -- Mr. Harrison agrees to accept

24    86-08.  So he reduces the price he's going to get by eight

25    ticks.  So what they actually agreed to was $51,000.  A

1    little under six hours for a total compensation of

2    $380,000.

3              Again, why am I showing you this?  To give you a

4    sense of the motive, why the defendants were doing what

5    they were doing.  It meant real money.  You could lie and

6    mark up these bonds without them knowing it.  In fact,

7    lying to make them think you were only making eight ticks

8    and you can make significant additional money by doing no

9    additional work.

10             And on the flip side.  Why would it matter to

11   reasonable investors?  Because they like to know.

12             You heard them talk about what a reasonable

13   commission was.  In these cases -- in many of these cases,

14   in particular this one, they negotiated for that

15   eight-tick commission.  So that would have assumed

16   significance in their deliberations.

17             Just a couple more.

18             Trade 13.  That was the BWIC involving

19   Mr. Wollman.

20             The lie was 18 and one tick.  He told -- in

21   other words, he told Mr. Gramins to put in the 18 and one

22   bid.

23             The truth, they actually bought it for 17 and 17

24   ticks.

25             For a total of 16 ticks of hidden profit by the

1    current face, and you get the total hidden profit of a

2    little under $100,000.

3            Remember what Mr. Wollman told you about that

4    one?  We talked about it earlier.  He agreed, based on

5    their lies, to pay eight ticks -- based on Mr. Gramins'

6    lies, to pay up eight ticks, and that was $48,000.  Again,

7    in this case for about two hours worth of work for a total

8    profit of $145,000.

9            Trade 21, this was that particularly large -- we

10   went through this before -- that large piece of bond that

11   Putnam sold to PIMCO and to Libremax and that Shapiro

12   facilitated the transaction.

13           You remember that both sides -- excuse me --

14   both PIMCO and Libremax agreed to buy at 87.  So that's

15   the truth.

16           The lie was that they were actually buying --

17   they had agreed to a price of 85, two points lower.  So

18   that's a difference of 64 ticks.  Thirty-two ticks in a

19   point, 64 ticks.

20           Current face on this one is quite large.  It's

21   $56.2 million.  Multiply the two points, hidden profit of

22   $1.1 million.

23           Don't forget what they had actually agreed here

24   was eight ticks, even though -- Mr. Harrison said, Even

25   though this is a large bond, I'm still going to let it go

1    for eight ticks.  That's $140,000 that Mr. Harrison was

2    willing to pay for how much work?  About five hours.

3            And don't forget, in five hours, they're not

4    constantly negotiating this thing back and forth.  Five

5    hours from where they started the negotiation to where

6    they ended it.  For a total profit of about $1.26 million.

7            No additional work, no additional risk.

8    Brokering that transaction, they make an additional

9    $1.1 million.

10            And the last one I'll do here is Trade 22 where

11    Mr. Marks, Ellington, bought this JPALT bond that we went

12    through a little bit earlier.

13            You remember there, the lie -- little hard to

14    see -- was Mr. Marks and Mr. Peters or Mr. Peters telling

15    Mr. Marks that he was acquiring the bond at eight ticks or

16    38-08 and then he was going to sell it to Mr. Marks at

17    38-16, and so the lie was the acquisition price at 38-08.

18    We know the truth, Nomura actually bought the bond for 37

19    and 28 ticks.  So a difference there of 12 ticks between

20    the truth and the lie, multiplied by the current face,

21    about $11 million.  Hidden profit in this trade of

22    $41,000.

23            The agreed upon comp, even in this smaller

24    trade, eight ticks, $27,000, for again a little over two

25    and a half hours.  Total profit of almost $70,000.  No

1    additional risk, no additional work.

2              And what did Mr. Raiff explain to you?  He said

3    all else being equal, a higher P & L as a trader meant a

4    larger bonus.  This is what these guys are motivated for,

5    they wanted to make money.  Their victims wanted to make

6    money, they wanted to make money.  And by their lies, they

7    wanted to drive up the amount of money they were making.

8              It's not a surprising motive.  It makes sense

9    here.  And Mr. Raiff explained to you exactly why.  The

10   more they made for the desk, the better the desk did, the

11   better they would do.

12             And Mr. Raiff also explained to you that who was

13   the person who basically had decision-making power over

14   how much each person on the desk made?  It was

15   Mr. Shapiro, because he was the person running the desk;

16   he was the person running that business; he had the best

17   knowledge of the people and the market and was most

18   qualified to make those decisions.

19             So again, for no additional risk, the defendants

20   were able to make significant additional money.

21             You can look at each trade, you can go decision

22   by decision, change of price by change of price, and put

23   numbers to it and see why the defendants -- what their

24   motive was, why the defendants were doing what they were

25   doing.  Why were they lying?  They were lying to make more

1    money.

2              And whose money was that?  It doesn't come from

3    thin air.  It comes from the pockets of their victims.  It

4    comes from the pockets of these traders, their companies.

5              Mr. Harrison, who said that Nomura was his most

6    trusted counterparty.  It came from his company's pocket.

7    Mr. Wollman, it came from QVT's pocket, and each of the

8    other one's we've talked about during the course of the

9    last few weeks.

10             So again, these are four different ways, each

11   good enough by themselves, but together, four different

12   ways that show you how critical the information, the price

13   information, was that Nomura, that the defendants, were

14   conveying between buyer and seller when they were sitting

15   in the middle of that market, sitting on top of that wall

16   and exploiting their position on that wall.

17             So I told you at the beginning that those were

18   going to be the two critical questions that were going to

19   drive you here today, drive your deliberations, which is:

20   Were these lies significant to a reasonable investor; and,

21   Did the defendants intend to deceive, intend to defraud,

22   intend to take money through these lies?  And this has

23   told you the answer to that question is yes, of course,

24   it's obvious.

25             So what I want to do at this point now is I want

1    to take a step back.  So those were the two key points

2    that are going to help you decide the securities fraud and

3    the wire fraud counts.  And I want to spend a little time

4    going back and actually just talking about the counts.

5            So we've answered, I think, the two critical

6    questions.  Let's go and see how the indictment actually

7    works.

8            So first, the substantive counts.  What I mean

9    by "substantive," not the conspiracy.  So the wire fraud

10   and the securities fraud counts.

11           First, interstate commerce.

12           I put this chart up here.  You have all of these

13   exhibits in evidence.

14           Why did I put this chart up here?  So that you

15   can understand and see what the documents are, what the

16   individual wires are in furtherance of the scheme that are

17   in the indictment, and I'll just walk through them very

18   briefly.

19           So Count Four -- and these all basically are

20   communications, they are Bloomberg messages, between the

21   Bloomberg system from New York and New Jersey and a

22   Connecticut recipient.  So in some cases, Hartford

23   Investment Management, some cases Ellington, and in some

24   cases both.

25           Remember, that's what gets us here.  That's why

1      we went through that whole thing with Mr. Abbas and

2      Mr. Marks to show that they actually received these

3      documents in Connecticut, okay?

4              So they had interstate wires coming into

5      Connecticut.

6              So Count Four is a March 7, 2011 trade post

7      advertising the trading of a WAMU bond, another WAMU bond;

8      and those are Exhibits 12J, K and L.

9              And 12J is a Nomura document, and K and L show

10     you it went to HIMCO and Ellington here in Connecticut.

11             I'm going to talk about what these documents

12     show in a second.

13             22E and I, those are the December 21,

14     confirmation, these VCON tickets, confirming the trade

15     from where Mr. Marks purchased the bond from Nomura, the

16     JPALT bond from Mr. Peters.  And that gets received in

17     Ellington, and that's 22E and I.

18             Count Six is the same trade but it's the trade

19     post, the marketing email after the fact, after that

20     particular trade, that goes to HIMCO and Ellington

21     advertising the fact that they had traded that.

22             Count Number Seven, March 8, 2012 trade post

23     advertising the trading of a AAA bond that you heard about

24     during Mr. Chao and Mr. Dinucci's testimony.  It's 25H, I

25     and J.

1            Again, H is the one that came from Nomura's

2    files; I and J is a document that shows that it traveled

3    to Connecticut.

4            Count Eight is a May 1, 2012 trade post

5    advertising the trade of a PPSI bond.  That's Trade 26,

6    the one where Mr. Abbas bought the bond through Nomura

7    from Bracebridge, which we talked about a little while

8    ago, and that went to HIMCO and Ellington.

9            Again, you can find all these in the 26 exhibit

10   series.

11           And then Count Number Nine, 26H and N, is the

12   confirmation of that same trade.  So the trade that

13   Mr. Abbas did where HIMCO purchased the bond through

14   Mr. Gramins and Mr. Chao from Bracebridge, this is the

15   confirmation confirming all the terms of that agreement,

16   of that sale.

17           So let's talk about this a little bit.

18           You heard that the wire itself -- and these are

19   the wires, these emails, these Bloomberg messages -- don't

20   need to be a fraudulent representation themselves and it's

21   also not required that they precede the fraud.  You'll see

22   in a number of these trade posts, they come after that

23   particular misrepresentation.  But it has to have served

24   to assist the fraud in some way.  And so let's talk about

25   those counts, the trade posts for a second.  And those are

1    Counts Four, Six, Seven and Eight.

2             Give you an example:  12J, one of the counts,

3    Count Number Four.  This was a trade post advertising the

4    trading of a $3.2 million piece of a WAMU bond that you

5    saw during Trade 12.  So it's related to one of the

6    fraudulent trades you've seen in the evidence but it comes

7    after that trade is done, they advertise this so they can

8    do more trading.

9             And then you saw in the evidence the fact that

10   HIMCO received that.  That was 12K.  Mr. Abbas explained

11   to you that it was received at The Hartford.

12            So a lot of the witnesses talked about the

13   purpose of these trade posts, that really the purpose was

14   to generate more business, and you understood that the

15   only way to keep this going, to increase the flow, to

16   increase people coming to them to buy more bonds, to

17   transact more bonds through Nomura, was to send these

18   marketing emails out.  And we saw in the evidence that it

19   worked many times because -- and why is that?  Let's just

20   pause on that for a second.

21            Why is that?  Because you, as a customer, would

22   know that Nomura had just traded it, so you'd know who

23   owns it, you'd know who was interested in it and you'd

24   know what price it traded at.  Nobody else would know that

25   information.

1            All right, let's give an example of that.

2            This was Exhibit 26L.  This was a trade post on

3     May 1, 2012.

4            In that scenario, remember, Mr. Abbas had bought

5     a $7.2 million piece of this PPSI bond on a BWIC in the

6     morning through Nomura with Mr. Chao.

7            After that purchase, he sent out -- or Nomura

8     sent out a trade post advertising, you can see it's the

9     third one down, that they traded a $7.2 million piece of

10    this PPSI bond.

11            What happened then?

12            Exhibit 26B, later on in that day -- so this is

13    the afternoon after that morning trade -- Mr. Chao comes

14    back to Mr. Abbas and says, Also have a custy who saw we

15    traded PPSIs.  Have a customer who saw we traded it and

16    wants to show an 80 bid for 1.5 million.

17            Well, Mr. Abbas explained this to you.  He

18    explained that what happens is the customer sees these

19    marketing emails and calls up Nomura, and now Nomura is in

20    touch with this other customer, and now they can broker

21    this trade between the other customer and Mr. Abbas.

22            It goes on a little bit here.  You can look at

23    the next document.

24            You see later on in that exhibit, Mr. Chao says,

25    Hey, we are ITW, or in touch with; in other words, we know

1    a seller who wants to sell ten plus million dollars more

2    of this PPSI bond.

3            How does he know that?  Well, again, Mr. Abbas

4    explains.  After looking at that message that Nomura sent,

5    someone reached out to Nomura and said they owned the PPSI

6    bond ten plus million.

7            And that starts the back and forth, the brokered

8    transaction that becomes the lie that's ultimately told to

9    Mr. Abbas.

10           So later on, after this happens, that ten plus

11   million is the bond that actually gets sold, or at least a

12   large portion of that bond actually gets sold to

13   Mr. Abbas.  When he goes up, remember, from 78-22 to

14   79-02, because he was lied to about what this additional

15   seller said, how much he was offering it.

16           Remember Mr. Gramins got the 80-16 offer and

17   then they went and they -- excuse me -- the 78-16 offer,

18   and then they lied and marked it up two points, he and

19   Mr. Chao, to 80 and 16.

20           So again, these trade posts are critical to

21   facilitating the ongoing business of the desk and

22   facilitating this scheme to be able to continue operating.

23           Mr. Chao explains to you the same thing.

24           Mr. Marks also said, he explained hopefully

25   they -- the dealer wants to control the market for that

1    particular security and any similar securities so that

2    people know they're trading those kinds of bonds or that

3    particular bond, that they would be the place to go to go

4    talk to and they would be able to facilitate more

5    transactions between buyers and sellers.

6           The VCONs, the confirmation tickets, Counts Five

7    and Nine.  Those were the wires related to Trade 22 and

8    26.  Let's just take a look at one of those for a second

9    and explain why this was in furtherance of the scheme.

10          This is the ticket, Exhibit 26H, Count Five --

11   sorry, Count Nine -- in which Mr. Del Col, one of the

12   salesmen at Nomura, sends the confirmation to Mr. Abbas.

13          The necessary step.  Remember, it doesn't settle

14   until three days later, but they have to confirm all the

15   details of the transaction, it has the price, has the size

16   of the bond, says Nomura sells to HIMCO, Abbas and Chao,

17   the type of the bond.  Has all the critical information.

18   Again a necessary step in furtherance of this particular

19   part of the scheme, the lie that had already been told

20   where Mr. Abbas then purchases the bond.

21          So let's move onto the securities fraud counts.

22          These are Counts Two and Three, and these

23   concern, again, the two chats with the Connecticut

24   victims:  Ellington and HIMCO.  Mr. Marks and Mr. Abbas.

25          So these are not wires.  These -- excuse me --

1    these are not the Bloomberg messages, these are actually

2    the Bloomberg chats, which again you heard a long time ago

3    from Mr. Mossman that Bloomberg's computers are in New

4    York and New Jersey and so these chats were had between

5    Connecticut and New York and New Jersey.

6         And so in Exhibit 22A, Count Two, is the chat

7    between Peters and Mr. Marks where Mr. Marks lies to

8    Peters concerning a JPALT bond, and the May 1, 2012 --

9    excuse me, Exhibit 26E, Count Three, that's that bond I

10   was just talking about where Mr. Abbas buys from Nomura

11   and Mr. Chao, and this is a chat between Mr. Chao and

12   Mr. Abbas.  And that's Count Three.

13        Let's talk now about the conspiracy charge,

14   which is actually the first count.  The Judge told you

15   about it second.  And again this is, I told you about this

16   before, essentially an unlawful agreement between the

17   defendants, and others -- you heard from the junior

18   traders, the co-conspirators -- to commit wire fraud and

19   securities fraud.  And you heard several of the

20   co-conspirators here talk about how they learned to do

21   this kind of activity, these lies.  How they learn how to

22   manipulate, deceive and defraud their counterparties,

23   their customers.

24        Mr. Dinucci said, When I first joined Nomura,

25   this was a tactic I had seen other traders use and wanted

1   to employ in our day to day business.

2          He saw Mr. Gramins and Mr. Shapiro doing it.

3          Mr. Feely:  They would tell me how to say

4   something or how to go about a specific situation.

5          Who would tell you that?

6          Mr. Shapiro and Mr. Peters.

7          Mr. Chao:  Where did you learn about that

8   practice from?

9          Talking about lying.

10         I mostly learned it from Mr. Gramins and

11  Mr. Dinucci.

12         He observed them doing it as well.

13         Again, you've seen a lot of evidence already

14  about the nature of this conspiracy.  You've seen traders

15  working together, Mr. Gramins and Mr. Chao in one case,

16  but you also see the junior traders explaining how they

17  learn these fraudulent practices, how they learn these

18  things.  And Mr. Chao told you that they did it to make

19  more money.

20         Mr. Feely said the same thing.  Mr. Dinucci said

21  the same thing.

22         They also explained in the context of this

23  conspiracy that they had to talk to each other because

24  they had to keep the lies straight.  Mr. Dinucci explained

25  that to you.  Had to make sure the client knew exactly

1    what prices we were relaying when they were not the

2    accurate prices, make sure everybody on the desk

3    understood that, because they don't want to get caught.

4              Mr. Feely:  You would make sure that everybody

5    understands the lie, is aware of it, just in case the

6    client would reach out to them directly that same day or

7    down the road.  You don't want anybody to be unprepared or

8    without the knowledge of what the story that's been told

9    to that specific client.

10             Few examples of this in the documents,

11   Exhibit 27C.  This is Trade 27.  This is a forward of a

12   chat.  Let's just look at the chat very quickly.

13             This was a trade in which Mr. Fleisher -- one of

14   the other traders on the Nomura desk, junior traders on

15   the Nomura desk -- said to Mr. Harrison, Has a

16   22 million-dollar WAMU bond -- another WAMU bond -- he's

17   looking for a higher level than last week at 85-16.  In

18   other words, the seller on the other side is looking for

19   85-16.

20             He goes to Mr. Harrison, and in fact he had

21   already bought it for 83.  So he's lying to Mr. Harrison.

22             That's Trade 27.

23             So what happens then?  Mr. Harrison gets a

24   little bit of information here from another trader at

25   another firm, Dan Ezra, who says, I see some information

1    where you just bought 82 area.  In other words, gave him

2    some -- Harrison some reason to believe that maybe 85

3    wasn't the real information, he wasn't getting good

4    information or that somebody was lying.

5              Didn't know where I heard it.

6              He didn't know whether it was Nomura or whether

7    it was, in this case, Credit Suisse; but he didn't think

8    it was Nomura.

9              So what happens here?  Mr. Fleisher, immediately

10   after being confronted with this, he forwards it to

11   Mr. Shapiro and Mr. Gramins, again because they are all on

12   the desk.  Mr. Shapiro and Mr. Gramins are the two senior

13   traders.  Mr. Fleisher has an issue and he forwards that

14   email to his bosses.

15             Another example.  This was -- we looked at this

16   a little while ago, Trade 11.  This was where Mr. Gramins

17   had said that he had an offer on a 10 million-dollar WAMU

18   bond for 53-16.  He was saying that to PK Banks; do you

19   remember?  That was one of the first trades we did.

20             And in fact, Mr. Rieger had said the offer was

21   52-24.  So remember, a lie, one of the action/reaction

22   ones we went through earlier.

23             What happens?  Mr. Gramins forwards that lie to

24   Mr. Sebiri, Mr. Gramins himself and Mr. Shapiro.  Calls

25   it:  Subject, PK chat.  It's PK Banks.

1            Remember also Trade 14.  This is one we talked

2      about awhile ago where Mr. Peters was talking to

3      Mr. Harrison about a bond and he was going to sell the

4      bond to Mr. Peters and he had already bought it.  Remember

5      he had bought both bonds earlier, the Trade 14 and Trade

6      15, but then he lied to Mr. Harrison and said that they're

7      going to come right back to us and he hands the reins over

8      to Mr. Shapiro and then Mr. Shapiro ends up lying to him

9      again and causing Mr. Harrison to pay more.  So again,

10     evidence of the conspiracy.

11            Mr. Raiff also explained to you, because you

12     remember that Mr. Shapiro was the head of the desk, when

13     we talk about compliance, and I'm sure you'll hear

14     something about compliance, but Mr. Shapiro had a role in

15     compliance.  Mr. Raiff explained supervisors are really

16     the first line of defense in terms of compliance, because

17     they're the people sitting among the traders, they're the

18     ones who know what's going on in the market, know what's

19     going on at their desk, and it's their primary

20     responsibility to know what's going on on the desk, to see

21     what's going on on the desk.

22            Again, showing you that this was a conspiracy

23     among the people on the Nomura RMBS desk with Mr. Shapiro

24     at the head.

25            Pause very briefly here.

1            The Judge explained to you in his instructions

2     that in addition to proving the existence of a conspiracy,

3     each defendant's membership in the conspiracy, we also

4     have to show that at least one person who was a member of

5     the conspiracy committed at least one overt act.

6            I'm not going to go through all the overt acts.

7     They will be in the indictment that you'll have.  But

8     generally speaking, the overt acts are chats, these trade

9     posts that we talked about before, and confirmations, the

10    trade confirmations.

11           And again, they don't need to be

12    misrepresentations in themselves.  They just need to

13    further in some way these misrepresentations, these lies,

14    this scheme, that the defendants were running.

15           Okay, just about done.

16           I want to come back now to where I started.  I

17    told you at the very beginning, a couple hours ago, that

18    you cannot lie about important things to take other

19    people's money.  I told you that's an obvious proposition,

20    one that you would have known before the Judge ever

21    instructed you on the law.  And I want to add onto that.

22           Not only is it obvious, not only should it have

23    been obvious to these grown men in a financial industry

24    trading hundreds of millions of dollars, they also knew it

25    because it's in the securities laws.  They are registered

1    brokers or were registered brokers with the -- with FINRA.

2    They had to take exams, they had to be familiar with

3    securities regulations.

4          So they know it because it's obvious, because we

5    all know it; they were required to understand it, and this

6    is Rule 10(b)(5), out of the Nomura compliance manual.

7    You can't engage in manipulative, fraudulent and deceptive

8    practices.

9          And the compliance manual also talks about

10   exactly what we're talking about here, you can't make

11   misrepresentations of material facts.

12         This isn't a new rule.  This is the Securities

13   and Exchange Act of 1934.  This is not a new rule.  This

14   was the rule before Litvak.  It was the rule after Litvak.

15   Nobody needed someone to get indicted to know that you

16   cannot lie about important things to make more money, to

17   take more money from other people.

18         Mr. Raiff told you that it was not okay even in

19   the pre-Litvak period to lie, to make misrepresentations

20   in these principal-to-principal transactions.

21         Now, despite all of that, despite the

22   obviousness of the rule, despite their training as FINRA

23   registered broker-dealers, despite the fact that they were

24   required to know these things as in compliance at Nomura,

25   you've heard questions during the course of this trial

1    where the defendants attempt to blame anybody else for

2    what has happened to them here.  Their company didn't tell

3    them they couldn't do it; their customers should have

4    figured out, should have known they were liars; the

5    government should have figured out what they were doing

6    and stopped it; they even blame the laws of the United

7    States as if there's supposed to be a law, that there

8    needs to be a law, saying that a broker-dealer can't lie

9    to a QIB on Tuesday.  You need some specific law to tell

10   you what you can't do.

11           But that's not how our laws, our society works.

12   We have simple, straightforward rules:  Don't lie about

13   important things to take other people's money or property.

14           Put it a different way.  You're driving down the

15   highway and you see everybody driving 80 miles an hour;

16   does that mean that it's okay to drive 80 miles an hour?

17           Now, if you're going 80 miles an hour and all of

18   a sudden you see the lights and sirens coming on, are you

19   upset because you didn't know that it was a crime?  It was

20   wrong to speed?  No, you're upset at that moment -- I

21   would be upset, someone would be upset -- because you got

22   caught.

23           These defendants are not upset because they

24   didn't know that it was wrong to lie, they're upset

25   because they got caught, and now we are asking you to hold

 1    them responsible and find them guilty.

 2              Thank you.

 3              Thank you, Your Honor.

 4              THE COURT:  Would you like to proceed?

 5              MR. KLEIN:  Your Honor, I do need to just move

 6    the podium.

 7              THE COURT:  Okay.

 8              Members of the jury, why don't we say that we'll

 9    take five minutes in case somebody needs to use the

10    restroom or otherwise, and in the interim, counsel for

11    Mr. Shapiro will get ready.  Okay?

12                   (Whereupon, the jury left the courtroom.)

13              THE COURT:  Five minutes.

14                   (Whereupon, a recess followed)

15

16                   (Whereupon, the jury entered the

17                   courtroom.)

18              THE COURT:  Thank you everyone, we're ready to

19    resume.  We will hear now the closing argument on behalf

20    of Mr. Shapiro.

21              MR. KLEIN:  Thank you, Your Honor.

22              Ladies and gentlemen of the jury.  Good

23    afternoon.  I know it's been a long day, so I ask you to

24    please bear with me just a little longer.

25              Ladies and gentlemen, the government is asking

1    you to convict these three gentlemen sitting at the table

2    behind me and they're asking you to do that even though

3    not a single one of the alleged co-conspirators believed

4    that he was committing a crime:  Not Frank Dinucci, not

5    Caleb Chao, not Alejandro Feely.  None of them came into

6    this courtroom and testified that they understood that

7    when they were at Nomura working with these gentlemen that

8    they had a clue that they were committing a crime.

9            Now, counsel finished his summation by talking a

10   little bit about compliance at Nomura.  Well, guess what?

11   The compliance materials were available to Frank Dinucci

12   and Caleb Chao and Alejandro Feely.  They took Series 7

13   exams and Series 63 exams; the 1934 Act was around long

14   before they were; and yet not one of them took that stand

15   and told you that they understood that they had committed

16   a crime when they were at Nomura engaging in these

17   tactics.

18           Now, the Judge instructed you -- and I'm just

19   going to paraphrase, so you should rely on the Judge's

20   instructions, not what I say -- but the Judge instructed

21   you in substance that in order to commit a crime including

22   conspiracy, you have to act knowingly and with the intent

23   to do something the law forbids.  In other words, if you

24   don't know that what you're doing is illegal, you can't be

25   guilty of engaging in a conspiracy.

1            Now the government is also asking you to convict

2     these three gentlemen for defrauding individuals that they

3     refer to as "victims" even though I would submit to you

4     that not a single one of the victims that testified in

5     court, the so-called victims, appeared to think that they

6     had been defrauded.

7            Aadil Abbas, do you remember him from HIMCO?  He

8     continues to trade with Caleb Chao to this day.  Caleb

9     Chao is the Nomura trader that the government claims

10    defrauded Aadil Abbas.

11           Now, here's what Caleb Chao said about that.

12           I'll ask if we could put it on the screen.

13           Essentially, I'll let you read it, but Chao was

14    saying that he still trades with Abbas to this day.

15           Now, ask yourselves, would Aadil Abbas continue

16    to trade with Caleb Chao if he believed Chao had defrauded

17    him, criminally defrauded him?

18           Ask yourself another question:  Would HIMCO,

19    Aadil Abbas' employer, allow Abbas and allow HIMCO to

20    trade with an individual that they believed had defrauded

21    them or their investors?  Not a chance.

22           Now, Joel Wollman, he came in here and testified

23    and he told you that lying was unacceptable to him

24    personally when dealers misrepresent information about the

25    price at which they bought a bond, and that may well be

1    true, it may be unacceptable to him.  But did even Joel

2    Wollman come across like someone who appeared to have been

3    defrauded?  I mean, you saw the guy testify.  You saw how

4    sophisticated he was.

5           Do you remember one of the defense lawyers asked

6    him a question about a November 2013 trade and the lawyer

7    had to ask the question about five or six times until he

8    got the wording precisely right, and even then it wasn't a

9    hundred percent correct, but it was close enough that

10   Mr. Wollman answered the question.

11          Now, I'm not being critical, but I'm pointing it

12   out because it shows how careful he is.  It shows how

13   precise he is.

14          Is he someone who is likely to give any sort of

15   significant weight to an oral representation by a dealer

16   that's unverified, unconfirmed, no supporting

17   documentation in a market that is riddled with deception?

18          Now, what about Zach Harrison?  You heard him

19   testify.  I think he was here for maybe three days.

20          Now, at one point in his testimony, I don't know

21   if you remember this, but at one point in his testimony,

22   he was asked some questions on cross-examination about

23   something that was termed in the questioning "manipulating

24   a BWIC."  What we're talking about is essentially rigging

25   one of these BWIC auctions.

1            And what did Zach Harrison say?  He said a lot

2     while he was here, but one of the things he said was he

3     thought it was okay because everyone in the market

4     understands that there's deception.  It's a

5     non-transparent market and it's riddled with

6     misinformation because there is no central place you can

7     go and check prices.  And when you understand that, you

8     take that into account in terms of what kind of weight you

9     give unverified information.

10            What did Eric Marks tell you?  He said if he

11     could trade with Tyler Peters tomorrow, he would do it.

12            Now, he also told you that as a general matter

13     he checks a lot of what he does with his supervisor, Rob

14     Kinderman and he often was checking trades with Rob

15     Kinderman.  Did he say, "I need to check with my

16     supervisor," did he say, "I need to check with Ellington"?

17     He didn't hesitate:  I'd trade with him tomorrow.

18            Is that the testimony of somebody who appeared

19     to think he was defrauded?  I don't think so.  Do you?

20            So what's going on here?  Why are these men

21     sitting in a courtroom charged with participating in a

22     criminal conspiracy with co-conspirators, so-called

23     co-conspirators, who deny having participated, who deny

24     having had knowledge at the time that they were engaged in

25     a crime.

1          Not a single witness who showed up in this

2     courtroom told you that they understood or believed that

3     using these negotiation tactics was a crime.

4          And why are these defendants accused of

5     criminally defrauding victims who don't appear to believe

6     they were defrauded?  Could it be that maybe, just maybe,

7     it's the government that has it wrong?  Could it be that

8     the victims don't feel defrauded because they're not

9     actually victims?  And could it be that the alleged

10    co-conspirators, they don't think they committed crimes

11    because no crimes were actually committed?

12         And I would submit to you that that's precisely

13    what the evidence has shown over the last few weeks; that

14    the alleged -- what are called the alleged crimes, were

15    actually arm's length negotiations between sophisticated

16    parties, all of whom did their homework, all of whom acted

17    in their own self interest, and everyone understood that

18    this market between 2009 and 2013 was riddled with

19    deception and misinformation and that you had to verify

20    anything before giving it significant weight.  That's what

21    the evidence shows here.

22         Now, I'd like to talk for a minute about how

23    this market worked and how market participants interacted

24    with one an another; because you can't really understand

25    the allegations in this case without understanding how the

1      RMBS market worked.

2              So how did that market work?

3              Well, I came up with an analogy of tackle

4      football.  How can it be permissible and legal for a

5      220-pound man running full steam into another human being?

6      How is that allowed?

7              Well, if you're playing tackle football, then

8      it's allowed, and if you understand that those are the

9      rules of the game, then it's permissible.

10             And so how did the RMBS market work?  And what

11     were the rules of this particular game?

12             Well, I want to start by talking about three

13     basic dynamics that I think we've seen apply in the RMBS

14     market in the 2009 to 2013 timeframe.

15             As Mr. Petrillo told you when we -- he's the

16     tall guy, I'm the short guy.  As Mr. Petrillo told you

17     when we delivered our opening statement on behalf of

18     Mr. Shapiro:  Every single trade that is charged in this

19     case involved an arm's length principal-to-principal

20     transaction.  That's the first dynamic in this market.

21             Nomura sat on one side of the table, a

22     sophisticated counterparty, QIB counterparty they're

23     called, sat on the other side.

24             And I'll ask if you could put the diagram that

25     you saw during opening up on the screen.

1          Do we have a second box?

2          You were shown in the government's summation a

3     diagram with a wall dividing the two counterparties, but

4     what the evidence has shown in this trial is that everyone

5     faced Nomura and everyone, all of the counterparties in

6     all of the trades at issue here, transacted with Nomura.

7     They didn't transact with one another.

8          So some of the people that you've heard testify

9     used the word "broker" or they used the word

10    "facilitator"; but go back, and if you need to, you can

11    ask for testimony to be read back, and you can look at the

12    exhibits, and go back and see what they said when they

13    were questioned about what they mean; they differentiated

14    between maybe a riskless principal trade where you're

15    taking on some risk but not as much risk as an inventory

16    trade.  But everyone understood that Nomura was always

17    using its own money to buy and sell.  And everyone

18    understood that every trade with two counterparties

19    dealing with Nomura were two separate transactions.

20          We can take that down now.

21          And the testimony confirmed that the QIBs acted

22    in the interest of their investors, as they well should,

23    and that the Nomura traders acted in the interest of their

24    employer and Nomura's investors, their shareholders.

25          Let's show what Aadil Abbas said about his

1    understanding about that.

2         He said that he understood that a trader working

3    at a dealer like Nomura has an obligation to act in the

4    interests of Nomura and Nomura's investors.

5         Nomura never acted as an agent or an adviser and

6    they never had a fiduciary duty.

7         And Mr. Novick is correct, the defense has

8    brought up the issue of fiduciary duty.  Because when

9    you're sitting on the same side of the table with an

10   agent, somebody that has a fiduciary duty to you, the

11   expectations are dramatically different than when you're

12   sitting across the table, principal to principal, each

13   party using their own money, transacting in a market where

14   you can't verify pricing information and you know

15   deception is a part of the market.  They're very different

16   contexts.

17        And what did Jonathan Raiff say about this?  He

18   said in response to the question, Isn't it the case that

19   when Nomura transacts in RMBS bonds, when the non-agency

20   desk transacted, it did so as a principal?  I think you

21   heard that from a lot of people.

22        And this is written in black and white on all of

23   those 10b-10 confirms that you've seen.  We'll just put

24   one up on Defendants' Exhibit 1143.  And all of these

25   confirms say in black and white, they advise the

1      counterparty institutions.  Nomura did not act as an

2      adviser.  Nomura did not act as a fiduciary.  We sold as

3      principal, we bought as principal.

4              And if we can blow up the document itself, in

5      the commission box, all of them say zero.

6              Maybe we can't blow up the document, but I'm

7      sure you remember there's a box that says COMM, and they

8      all said zero.

9              And by the way, that's why the counterparties

10     told you, they didn't share everything with Nomura.

11             Do you remember what Eric Marks said about this?

12     He said that he himself would not share too much

13     information with a broker -- he's using the term "broker"

14     loosely -- because I'd be under the impression they would

15     use it against me.  So I wouldn't share my maximum amount.

16     And even the amount I do show, I would expect him to hold

17     something back just to have wiggle room.

18             So why is Eric Marks not sharing everything

19     because of his view that the dealer may use it against

20     him?  If the dealer is acting on his behalf, why would he

21     think the dealer may use it against him?  Because they're

22     on opposite sides of the table, not on the same side.

23             Even the actions of Joel Wollman tell you the

24     exact same thing.

25             Mr. Wollman said that in BWIC trades and in

1    order trades, he perceived Nomura to be a facilitator; do

2    you remember that?  But how does he act with Nomura in an

3    inventory trade?

4          Let's take a look at Government's Exhibit 10J

5    briefly, and this was a trade that Mr. Novick talked

6    about, and this is the trade in which QVT, Mr. Wollman, is

7    negotiating with Mr. Gramins on one side, and let's just

8    focus on what's on this side of the trade.

9          Mr. Gramins says, Can show you 46-16.

10         Then Mr. Wollman says 47-8.

11         Gramins says, Be back.

12         Then what does Mr. Wollman say?

13         I don't have another round in me.  Maybe a tick

14   or two to manage expectations.

15         About 25 minutes later, Mr. Gramins comes back

16   and he says, Other side says 47 best best.

17         Now, I understand that the government is arguing

18   that these negotiations involve misrepresentations, but

19   I'd like you to just focus on how Mr. Wollman is

20   interacting with Mr. Gramins.  After Mr. Gramins says, 47

21   best best, otherwise wants me to move on to other holders,

22   meaning, if you don't like 47, we'll go elsewhere.

23         What does Joel Wollman say?  Okay, let me look.

24   Okay, fine.

25         Now what does that show?  It shows that when

1    Mr. Wollman said 47-8 is my best, maybe I have -- I don't

2    have room for an another round, but maybe just a tick or

3    two, he's doing what Eric Marks told you he does when he

4    deals with dealers.  He doesn't show his full hand because

5    he knows he's dealing with a counterparty across the table

6    in a principal-to-principal transaction.

7            But don't take my word for it.  You heard from

8    the Judge, and the Court instructed you as a matter of

9    law, that every trade in this case is a

10   principal-to-principal transaction and that Nomura was not

11   acting as an agent for any counterparties.

12           And I'll ask if we can just put that on the

13   screen, just so that you can see it.

14           And if you just focus on the last line, it says:

15   As a principal, the defendants owed no duty of loyalty to

16   the counterparties and were acting in their own self

17   interest, not the interest of the counterparty.  And

18   that's what the evidence showed as well.

19           We can take that down.

20           Now, in addition to pointing out in his opening

21   that these were principal-to-principal transactions,

22   opposite sides of the table, Mr. Petrillo also told you

23   that the evidence would show that all the investors in

24   this case were sophisticated, that they were qualified

25   institutional buyers, and that they did their homework,

1    and I think the evidence has shown that in spades.

2          The evidence has shown that the investors made

3    investment decisions based on a highly sophisticated

4    multi-tiered, bottom up, top down process.  And you saw

5    all of the investors talk about their process, about the

6    computers they used, about the computer scientists and

7    mathematicians that used those computers, about their

8    investment committees, and you saw in some of the

9    materials that they have databases of tens of millions or

10   a hundred million loans.

11         They don't just look at the loans state by state

12   or even city by city, but they go zip code by zip code.

13   They doublechecked and they triple checked because that's

14   what their investors paid them to do.  Their investors

15   paid them to make independent investment decisions in this

16   market, this non-transparent market, where deception and

17   misinformation were a feature of the market.

18         Now, the third dynamic that's at work in this

19   market that I want to touch on is that investors, all of

20   whom as you saw are highly sophisticated.  These highly

21   sophisticated investors in this market, they don't give

22   any sort of significant weight to unverifiable information

23   when they're doing multimillion, tens of millions of

24   dollars worth of transactions.

25         Because, number one, it's not smart to do that

1    when you don't have supporting documentation and you can't

2    confirm information; and number two, everybody told you

3    that they understood this was a non-transparent market

4    where there were sharp practices.

5              And the chat communications that you saw confirm

6    this as well.

7              And so when you look at just these three

8    dynamics, and I'm going to say more, I'm not going to sit

9    down right away.  I'm a lawyer, so I'm going to keep

10   talking for awhile.  But just looking at these three

11   dynamics, that should give you reasonable doubt about

12   whether these sophisticated investors in this market

13   viewed unsupported, unverified dealer representations in

14   negotiations as significantly altering the total mix of

15   information available.

16             Now, with respect, the government has

17   overreached here.  Now, I'm not condoning the practices of

18   making misrepresentations or engaging in deception, even

19   in negotiations, and many find these sorts of practices

20   distasteful or unacceptable; but Ross, my client, is

21   charged with committing federal crimes, he's not charged

22   with ethical lapses or with engaging in sharp conduct or

23   with breaching Nomura's compliance policies.  He's not on

24   trial here for violating a regulatory provision, and he's

25   not charged with a regulatory infraction for failing to

1    supervise.

2           The government chose to charge crimes here, and

3    when the government charges criminal acts, the standard of

4    proof that applies is beyond a reasonable doubt.  It's the

5    highest standard that our legal system allows for, and

6    that's for a reason.  Criminal accusations are the most

7    serious acquisitions that a citizen can face; and when

8    criminal accusations are lodged, the Constitution demands

9    that they be proved beyond a reasonable doubt.

10          And I would ask you to examine the evidence here

11   very carefully, because when you review the evidence and

12   the testimony and the documents and when you apply your

13   common sense, I don't think the government has come close

14   to proving the allegations they've charged, these crimes,

15   beyond a reasonable doubt.

16          Now, let me say a little more about the

17   reasonable doubt standard.

18          What is reasonable doubt?  The words almost

19   define themselves.  And as the Court instructed you, it's

20   a doubt that's based on reason and common sense, it's a

21   doubt that would make a reasonable person hesitate to act.

22          So proof beyond a reasonable doubt is proof of

23   such a convincing character that a reasonable person would

24   not hesitate to act or to rely on it in the most important

25   of his or her affairs.

1           Reasonable doubt is to a fact is what would make

2    or cause a reasonable person to hesitate to act in

3    reliance on that fact in a matter of the utmost

4    importance.

5           So how can I explain that to you?  You may

6    understand that just reading the language, but let me ask

7    you to think about it in terms of a decision that you

8    might have to make.

9           So let's say you're thinking about using all

10   your savings to go back to school and get a degree and

11   you've thought about doing this and you're almost --

12   almost there, you're about committed to doing it, and then

13   you think, well, I've also been wanting to put a down

14   payment on a house, so let me stop and let me think about

15   it some more.  You hesitate.  That's reasonable doubt.

16          Or if you're thinking about having a medical

17   procedure done or maybe your child needs to have a medical

18   procedure and you think about it a little bit more and you

19   say to yourself, let me talk to the doctor once more or

20   let me get a second opinion.  You hesitate.  That's

21   reasonable doubt.

22          And the question here is whether the

23   government's case makes you hesitate or pause when you

24   think about whether they've proven the elements of the

25   crimes they've charged.

1            Now, I do agree with the government that two

2    very significant elements in this case are materiality and

3    intent, but I disagree very much about -- with the

4    government about what the evidence has shown with respect

5    to those two elements.

6            So let me focus on materiality first and I'll

7    come back to intent.

8            The Court instructed you on the element of

9    materiality and told you that a matter is material if it

10   is of such importance that it would not just affect but

11   significantly alter the total mix of information that

12   these sophisticated investors had in the RMBS market.

13           And let's just put it on the screen so you can

14   look at it.

15           We can take that down.

16           And information about Nomura's profit margin or

17   about Nomura's acquisition cost, that type of information

18   did not significantly alter the total mix of information

19   available to these investors.  I would submit to you that

20   the testimony absolutely fails to support the notion that

21   this kind of information significantly altered the total

22   mix of information available to these investors.

23           Now, the government asked a number of investors

24   that testified here whether it would have been important

25   for them to know Nomura's true acquisition cost, but

1    that's different than the question of whether that

2    information significantly alters the total mix of all of

3    the information that these investors had at their disposal

4    at the time they were trading.

5          So I'd like to go through kind of a top ten list

6    of reasons why you should have reasonable doubt about

7    whether this type of information, information about

8    Nomura's acquisition cost, their profit margin, whether

9    that type of information in a trade negotiation is

10   material, whether it significantly alters the information

11   available to sophisticated investors.

12         So the first number one reason of this top ten

13   list that I'm going to give you, is that you've heard

14   testimony repeatedly that these investors regularly trade

15   and traded, in 2009 to 2013, without any information about

16   dealer cost or profit margin.

17         So think about that.  These investors regularly

18   traded without this information.

19         If it is information that is so important that

20   it would significantly alter the mix of information

21   available to investors, how could they trade without it?

22   How could they fulfill their fiduciary obligations without

23   having that information.

24         When these investors thought there was a piece

25   of information that was material that they really needed,

1    they wouldn't child without having that information.

2           Remember Zach Harrison when he testified about

3    something called CLTV, that's cumulative loan to value.

4    It's essentially a metric that talks about the amount of

5    the loan relative to the property that the loan is made

6    against.  And he told you about a conversation that he had

7    with Arvind Mohan who's a trader at Barclays.  And we saw

8    some chat communications between Zach Harrison and Arvind

9    Mohan.  And he told Mr. Mohan -- and we could put this up

10   on the screen -- that if CLTV data is not available for a

11   particular bond, that Mr. Harrison wouldn't even consider

12   the bond.  He says, Just to be clear, it's not as if I

13   like the bond, but there's no CLTV.  When there's no CLTV,

14   we stop looking at it.

15          Now, this doesn't mean that the CLTV information

16   is going to drive Mr. Harrison's investment decision in a

17   particular trade, but it means that when he's looking at a

18   trade, there's certain things that he wants in the mix of

19   that information, CLTV is one of those pieces of

20   information.

21          But when Mr. Harrison, what does he do when he

22   doesn't have information about a dealer's acquisition cost

23   or a dealer's profit margin?  You saw the Putnam

24   prospectus, one of the prospectuses that goes to

25   investors, it's Defendants' Exhibit 1741.  And on page 77

1      it says that although this Putnam fund does not typically

2      pay commissions for principal transactions in fixed income

3      securities -- RMBS are fixed income securities -- an

4      undisclosed amount of profit is included in the price that

5      the fund pays.

6              So Putnam is telling investors, we trade on your

7      behalf with your money in circumstances where we don't

8      know how much money the dealer is making.  That means we

9      don't know what the acquisition cost is, we don't know

10     what they could resell a bond for, we don't know what the

11     profit margin is.

12             And I'm not saying that some people wouldn't

13     want to know this information or think it's important at

14     some level, but it's not material.  They don't view it the

15     way that Mr. Harrison views CLTV data.

16             What did Aadil Abbas tell you about whether he

17     would trade without information about a dealer's profit

18     margin, without knowing the price at which a dealer buys

19     or sells a bond?

20             He's asked:  Isn't it true that very often when

21     you buy RMBS, or at least some of the time, you don't know

22     what the dealer is paying?

23             That is correct, he answers.

24             And that doesn't stop you from being able to

25     assess whether a bond is a good investment.  It doesn't

1    stop you from being able to assess based on all of the

2    other information that's in the total mix available to you

3    whether this is a good investment for HIMCO or HIMCO's

4    investors.

5            Was what does Eric Marks say about this from

6    Ellington?

7            He was asked:  Is it fair to say that in many

8    cases you do trades with counterparties and dealers

9    without information about their markup?

10           Answer:  Yes, many times I do not know the

11   markup.

12           And he says many times he doesn't know the

13   acquisition price.  And he says it's pretty typical, in

14   fact, for traders who have been in the industry for a long

15   time as dealers not to provide this information, and when

16   he doesn't have this information, he's still able to

17   trade, he's still able to fulfill his fiduciary duties to

18   investors.

19           So I would ask you:  Do you need anything more

20   than just knowing this to hesitate, to have reasonable

21   doubt about whether this type of information that the

22   QIB's regularly trade without is material?

23           We can take that down.

24           Now, reason number two why you should have

25   reasonable doubt that this information is material:  Every

1        investor that you heard from told you they don't seek to

2        confirm or verify dealer cost or profit margin, not a

3        single investor testified to ever asking Nomura, or any

4        other dealer, for a confirmation of Nomura's buy or sell

5        with another counterparty or to see a copy of a chat

6        communication that Nomura was having with another

7        counterparty.

8                    What does Eric Marks say about this?

9                    He's asked:  In circumstances where a dealer may

10       represent to you the price that they're buying a security

11       that they're going to reoffer to you, they don't provide

12       you with a confirmation relating to the purchase from a

13       different counterparty?

14                   He says, Correct.

15                   They don't provide you with the internal

16       documentation verifying or confirming that price?

17                   He says, Correct.

18                   What does Zach Harrison say about this?

19                   You're not requesting --

20                   Well, he's talking about a situation where

21       Nomura is dealing with two counterparties and he's asked

22       whether in that circumstance is he -- does he request the

23       confirmation Nomura generates for the other side of the

24       transaction.

25                   Standard practice, no.

1           What does Aadil Abbas say about this?  I'll let

2       you read it, but he says the same thing.

3           So I'm going to ask you to think about the

4       significance of the testimony that we just looked at.  Can

5       it be that a highly sophisticated, qualified institutional

6       buyer managing billions of dollars and getting paid to

7       manage that money, can it be that these sophisticated

8       investors are actually paying Nomura a commission of

9       hundreds of thousands of dollars sometimes based on an

10      unverified, unconfirmed, oral representation with no

11      documentary support in transactions that involve tens of

12      millions of dollars?  No confirmation of the dealers

13      costs, no paperwork about what the dealer paid, no

14      receipt, no wire confirmation from a bank showing what

15      money passed.

16           Would a reasonable person ever act that way?

17      Ever pay a commission on a thousand dollar transaction,

18      let alone a 10 million-dollar transaction, without

19      confirmation?

20           I mean, just think about whether if you worked

21      for a company and you were being paid a commission based

22      on your sales, do you think it's likely that your

23      employer -- that you could go to your employer and say, I

24      had a great month, I sold $50,000 this month, please pay

25      me my $3,000 or $4,000 commission in a circumstance where

1    you haven't shown the employer the money, you haven't

2    shown the employer purchase orders or invoices, you

3    haven't shown your employer anything.  You just say, I

4    made these sales and so could you please pay me the

5    commission I'm supposed to make when I make sales.

6              I think every employer in any circumstance would

7    say, please show me the paperwork.  And it's not a matter

8    of trust, that's just the way the world operates.  People

9    don't do multimillion dollar transactions and pay

10   commissions on oral representations in the real world, and

11   these QIB investors, they didn't do that in the RMBS

12   market.

13             I mean, you saw how careful they were, you saw

14   how sophisticated they were.  Yes, they had discussions

15   about pay on top.  Yes, that was sometimes referred to as

16   a commission.  But don't you have to have reasonable doubt

17   that any of that was based on an unconfirmed oral

18   representation by somebody sitting on the other side of a

19   table in a market that's riddled with misinformation?

20             Eric Marks told you that like on the first day

21   he started working at Ellington, his boss told him that

22   people in this market will tell you anything, you better

23   be on guard.  They'll tell you anything to sell you a bond

24   higher.

25             I mean, did you see the chat between Tyler

1      Peters and Zach Harrison?  I think it's a very telling

2      chat in which -- it's Defendants' Exhibit 15A, and it

3      relates to the LXS bond that the government talked about.

4      We can put it on the screen.

5              And if we -- what Tyler Peters and Mr. Harrison

6      are talking about here is a change in the Intex model.

7      There was an error in the Intex model.  And Mr. Peters is

8      making Mr. Harrison aware of that.

9              Were you talking about the fact that Intex

10     needed to be corrected -- this is the second question down

11     from the top -- with respect to this bond?

12             Answer:  That's a good way to represent it, yes.

13             And then Mr. Peters says, I can go through exact

14     language with you.  Won't take long.

15             And then Mr. Harrison is being asked about this

16     in his testimony and he's being told, So you respond in

17     this chat at 15:45:06.

18             How does he respond?

19             If you can point me to it, I want to read the

20     second change.

21             And then he says, Read the first one myself.

22             So Mr. Peters is informing Mr. Harrison about a

23     change in the Intex model and Mr. Harrison doesn't take

24     his word for it.  He reads the first change himself and

25     then he wants to read the second model change himself.

1    And there's some back and forth in the chat about, you

2    know, locating the appropriate document.

3             I mean, this is a serious person who invests

4    serious money.  Is he really going to pay a hundred

5    thousand dollars commission or a 300,000-dollar commission

6    based on an unverified oral representation?  That's just

7    not how people do business.

8             So what's really going on here?  Like what's

9    going on with respect to these conversations in which

10   you've seen discussions about so-called commissions and

11   about pay on tops?  So what are these discussions?  It's

12   another way to negotiate.

13            You've heard many times trades occur without a

14   discussion about the pay on top.  So what's happening is

15   that Nomura traders are saying, in effect, I'm not going

16   to make that much money on this or I'm only going to make

17   X amount, and that X amount is the pay on top.  And so it

18   is a representation about how much profit they make and it

19   is, in some circumstances, a misrepresentation about how

20   much profit they would make if they trade at a certain

21   price, but people misrepresent their profit in lots of

22   different circumstances.

23            This goes back to the car salesman example that

24   Mr. Petrillo talked about in his opening statement.  It's

25   not that different than a car salesman in the course of a

1    negotiation saying, I can't go below $4,000 or $14,000

2    because I bought it just below that.

3            The difference is terminology.  In this market

4    the discussions involve the term "pay on top."  But the

5    actual profit to Nomura is never anything other than the

6    difference between the purchase price and the sale price.

7    That's all it is.  It's the markup.

8            When you negotiate to buy a car, for example,

9    you don't know whether the car salesman's telling you the

10   truth or not about the profit that the car salesman is

11   making or the dealership is making; but if you like the

12   price and you like the car and you've done your homework,

13   you can make a decision.

14           And no matter what the car salesman tells you

15   and no matter what the Nomura trader tells you, you can't

16   actually know whether that's the truth unless you see the

17   confirmation, unless you see the verification.

18           The government, in its summation, they kept

19   pointing to the question that they had asked of the

20   investor witnesses, and think about what that question

21   was.  They showed the investor witnesses copies of chat

22   communications that Nomura was having with another

23   investor, chat communications.  And they showed them

24   confirmations of a trade that Nomura did with an another

25   investor.

1              Now, in the RMBS market, they would never see

2      that.  They never asked for that in the RMBS market.  The

3      only thing they would get is an oral representation, and

4      they all knew an oral representation, you know, you can't

5      really give as much weight in this kind of a market.  But

6      if you're going to tell me that here's the documentation

7      showing that the other side of the trade occurred at X

8      price and then you're going to ask me if I want to know

9      that, yeah, who wouldn't want to know that.

10             But that's looking at things by hindsight

11     because at the time they never asked for that, and that's

12     not something that they would ever have.

13             What did Eric Marks tell you about this?  This

14     is one of the most telling pieces of testimony that came

15     out in the trial.

16             He was asked:  You've done transactions with

17     dealers from time to time in which they make a

18     representation to you about their markup being at a

19     certain level; that happens, right?

20             Yes, he says.

21             Question:  And there are times in which dealers

22     have made those representations to you and you didn't

23     believe them.  You thought they were actually making more

24     money than they were representing to you, correct?

25             Answer:  Yes.

1          Question:  And you don't know exactly how much

2     they're making because you don't have verification of the

3     exact prices that they're buying at, correct?

4          Answer:  Correct.

5          So what is Mr. Marks saying here?  What he's

6     saying is that whether Nomura gave him their actual price

7     or whether Nomura gave them a misrepresented price, either

8     way, in this market where he's known since day one from

9     his supervisor there's misinformation all over the place,

10     all he knows is what Nomura is telling him and he can't

11     really give it much weight.

12          That's a whole different kettle of fish than if

13     you're going to go and show him documentation seven years

14     later.  Now he knows for sure what the price was, and then

15     you're going to ask him "would it be important for you to

16     know that?  To have that information?"  That's a totally

17     different question.  That's a question that has no place

18     in the reality of the RMBS market, because no one got

19     confirmations of any of this information.  And without

20     confirmation, you can't know, not if you're a

21     sophisticated investor like Zach Harrison who won't even

22     take Mr. Peters' word for a model change in Intex.

23          Reason number three why you should have

24     reasonable doubt that this type of information about

25     dealer profit margin and acquisition cost is material.

1          We showed you the 10b-10 confirmations.  I won't

2     bother showing it to you again, but all of those 10b-10

3     confirmations are the records of the trades, they're the

4     trade contracts, and Mr. Raiff testified that he couldn't

5     remember the name of the regulation, but he did testify

6     that these confirmations are required by the regulators.

7          Every single trade in this case is memorialized

8     in one of those confirmations.  There is no information in

9     any of those confirmations about acquisition costs, dealer

10    profit margin, payment on top.  The commission box is

11    zero.

12         I mean, you might think that if this information

13    were material that there would be some effort to track it.

14    If this information, a dealer's acquisition cost, is

15    actually the basis for real money that someone's forking

16    over, let alone their investor's money, you might think

17    there would be some mechanism for recording it, tracking

18    it, maybe the regulators would require it.

19         I mention that Nomura sat across the table from

20    counterparties.  That was one of my three dynamics I

21    mentioned about the market.  That's also in and of itself

22    another reason why you should hesitate to find that deal

23    acquisition costs and profit margin is material.  When

24    you're sitting on opposite sides of the table, you don't

25    give the same kind of weight to representations that you

1       do when you're sitting with your agent on the same side of

2       the table.

3                Reason number five, the price was right.  If you

4       take away the lies and you put aside misrepresentation and

5       you just ask the witnesses, every witness that testified:

6       Did you think that -- did you want these bonds?  Yes.  Did

7       you think you got a good price for these bonds?  Yes.  Was

8       it in the interest of your investors?  Yes.  Would you

9       have done it if it was not in the interest of your

10      investors?  No.  All the witnesses gave that testimony.

11               And they said that even today, most of them, I

12      think, the ones we asked, I think, said even today based

13      on their analytics they think that's a good price they got

14      and they still think it was in the interest of their

15      investors.

16               Reason number six is the models, the

17      computerized models that you saw during the trial.

18               All of the investors testified essentially that

19      this was the central element of their investment decision;

20      that this was their investment bible, so to speak, it was

21      their investment process which you heard was

22      institutionalized.  Investment committees and portfolio

23      strategy groups and a detailed institutional investment

24      process that was set forth in written materials.  And then

25      you saw some of the modeling outputs, but there is a lot

1    more that goes into it.  We didn't see any of the inputs,

2    any of the data that really goes into the models that then

3    spits out the outputs.

4            And you heard testimony that there were many,

5    many computer scientists, mathematicians, a lot of

6    researchers and professionals who worked on this analysis.

7            You heard that Aadil Abbas and Eric Marks, they

8    told you that the modeling process not only guides their

9    assessment of a bond's value before they begin

10   negotiating, but it guides them through the negotiation.

11   And Eric Marks said that they keep modeling and analyzing

12   even after they've bought a bond.  They're always looking

13   at the model because that's what tells them the price at

14   which they're willing to buy and the price at which

15   they're willing to sell.

16           You heard Zach Harrison refer to his model as a

17   secret sauce, and we can just put that on the screen for

18   you to look at.  He referred to it as vectoria's secret.

19   He would talk about the models a lot in the chats, but I

20   think you've heard a lot about that, so I'm not going to

21   belabor it.

22           But I do just want to put on the screen another

23   portion of the materiality instruction that you heard from

24   the Court.  Because what the Judge instructed you is for

25   purposes of this case, a reasonable investor is an

1     investor in the non-agency RMBS market, and in determining

2     whether a misstatement was material, you must consider the

3     matter from the standpoint of such a reasonable investor,

4     and you should consider evidence relating to their

5     sophistication, their objectives, the information

6     available to them, the analyses they employed, and the way

7     the market worked.

8              And they all told you that the modeling process

9     and the investment process was a central tenet of how they

10    made their investment decisions.

11             Number seven is very short, it's related to

12    number six, and that reason is that none of the models

13    that you saw and none of the materials relating to the

14    investment process that you saw, and none of the testimony

15    indicated that dealer acquisition cost or dealer profit

16    margin played any role in the modeling process and in the

17    QIB's assessment of the value of a bond.  You heard they

18    were looking at the cash flows, they were trying to

19    project out the cash flows and that's how they valued the

20    bond.

21             Let's go to number eight -- and I know it's

22    getting late.  I don't think I'll be standing up here for

23    too much longer, the Judge will tell me to sit down

24    shortly.

25             But number eight is that there's no evidence

1    that these bonds would have been available cheaper.

2            Now, I thought when Mr. Novick first stood up, I

3    thought that he talked about not having a crystal ball and

4    conceded that we just don't really know exactly what would

5    have happened if the information flow would have been

6    different, but then towards the latter part of his

7    summation, he put up these charts and started doing math

8    about, you know, how much money was stolen; and it just

9    occurs to me that how do we know if any money -- if any

10   counterparty was deprived of any money if we don't know

11   exactly what would have happened if the negotiation had

12   been different?

13           And I would go further, and I would submit that

14   the evidence tells us that there's no bases to think that

15   these transactions would have occurred at different prices

16   in the absence of these misrepresentations about dealer

17   costs and about price.

18           And so why do I say that?

19           Well, number one, the investors all testified --

20   well, most of them -- that the bonds they purchased from

21   Nomura were the cheapest available that day that they

22   could locate.  And even though you know that Nomura was

23   able to buy those bonds cheaper, Nomura doesn't have any

24   obligation to pass along that price.

25           Now, I know that the evidence shows that at

1    times Nomura misrepresented the price at which they could

2    buy bonds, but the fact that they misrepresented the price

3    at which they could buy bonds, that doesn't tell you

4    anything about whether they would have been willing to

5    sell those bonds to other counterparties at the same

6    prices.

7              In fact, the evidence tells you exactly the

8    opposite.

9              If you go back and if you look at what Mr. Raiff

10   said, Caleb Chao, Aadil Abbas, Eric Marks, I think Zach

11   Harrison, I think they all acknowledged that the dealers,

12   including Nomura, they did their own modeling and they

13   develop their own views of where the bonds should be

14   bought and sold.

15             And Mr. Raiff, I think, told you that when I

16   asked him the question of whether they developed their own

17   views, I think his response was, yes, and often they were

18   quite strongly held views.

19             And so why is there a basis for thinking that if

20   the negotiation had gone differently or if the discussion

21   had gone differently, why is there a basis for thinking

22   that Nomura would have been willing to sell the bonds at a

23   lower price?  Especially given that you saw the chat

24   communications in which they say, you know, you could take

25   it or leave it, or in which I think some of the witnesses

1    testified and told you that one of the considerations in

2    negotiations with Nomura, they might walk away, they might

3    decide to go sell the bond to somebody else or buy a bond

4    from somebody else.

5          So I understand that a lot of the chat

6    communications, the language in the chat communications

7    involves a discussion about where Nomura is talking to one

8    counterparty about a price that's being offered by another

9    counterparty, but the reality, the reality of the

10   transaction is that each party is transacting with Nomura;

11   and I don't think there's any evidence that indicates that

12   Nomura would have transacted at different prices.

13         Even Aadil Abbas, I think the government

14   mentioned in their summation, that he had testified that

15   if he had known how much markup Nomura was making, that he

16   wouldn't have bought the bond, that he testified he

17   wouldn't have bought the bond at that price.

18         But, first of all, the kind of knowledge that

19   the government was talking about is looking at

20   confirmations.  Aadil Abbas told you that in the actual

21   RMBS market, he never gets confirmations and he actually

22   told you -- and you can ask to have this read back, or I

23   may show it to you in another slide, I think I have it --

24   he actually told you the only thing that you can know in

25   this market is what is the price offered to me and what is

1    the price that I'm willing to buy at?  Or what is the

2    price offered to me?  Or what is the price I'm willing to

3    sell at?

4           But everything else is just an oral

5    representation in a non-transparent market, and Aadil

6    Abbas said that in his testimony.

7           And he also said, by the way, on

8    cross-examination, that if you really liked the bond -- he

9    obviously couldn't remember the bond or how much he liked

10   it or what was in his head at the time -- but he testified

11   on cross-examination that even if he could hypothetically

12   know with certainty what Nomura was making and that they

13   were making, you know, 20 ticks more -- I forget the exact

14   number of ticks -- even in that hypothetical circumstance,

15   he might buy the bond.  It depends on how much he likes

16   it.  It depends on what else he's looking at.

17          Reason number nine:  The QIB investors in this

18   market -- I want you to step back for a second.  Because

19   we've looked at a lot of chats and we've looked at a lot

20   of back and forth discussions about ticks.  And you really

21   have to step back and just sort of assess the market from

22   a more macro, broader perspective.

23          Eric Marks told you about some of the huge

24   profits that Ellington made in this market.  He told you

25   that there were some bonds that Ellington purchased in the

1   2009 area -- era, and held those bonds for six, seven

2   years, and they went from ten to a hundred.  That's a

3   1,000 percent markup.

4            And we have that testimony on the screen if you

5   want to look at it.

6            Mr. Raiff told you that these RMBS bonds --

7            We could take that off the screen.

8            Mr. Raiff told you that the -- these RMBS bonds,

9   his testimony was that they could move several percentage

10  points over just the course of a few months, and these

11  investors, QVT, Putnam, HIMCO, Ellington, they were

12  looking to make huge scores by investing for the long haul

13  and by buying RMBS bonds dirt cheap and riding the housing

14  recovery.  That was the investment perspective.  Aadil

15  Abbas told you it was long term.

16           And remember, these were deeply distressed

17  bonds.  All these bonds were trading substantially under

18  par.  Par is 100 percent on the dollar.  These bonds were

19  trading in the 40's, 50's, 60's, 70's, substantially below

20  par.

21           And we can put up Mr. Abbas's testimony on one

22  particular bond where he said it was more than 20 percent

23  discount off par.

24           So whether an investor paid a few ticks more or

25  a few ticks less, I'm not saying that that's not something

1    that they might look at, I'm not saying that it's not

2    something that they may pay attention to, but when you

3    look at the context of what they're trying to do, they're

4    trying to buy the bonds that they think are going to be

5    the big score, and they're trying to buy those bonds at a

6    level that their model is telling them is going to make

7    sense.

8              So their model is saying, if you buy this bond

9    at or below this price, you've got a good shot at making a

10   big score; and in that type of circumstance, people may

11   negotiate to get a bond for a few ticks less or they may

12   not want to pay a few ticks more, but the context is that

13   their model, which is a significant part of the total mix

14   of information available to them, their model is telling

15   them maybe don't lose this opportunity, and if that's what

16   their model is telling them, you know, the assessment of

17   what they would do if they knew that the dealer was making

18   a little bit more, I'm not sure whether that would really

19   matter in the context at all.

20             But I don't see how you don't have reasonable

21   doubt as to whether that type of information as to dealer

22   cost significantly alters the total mix of information in

23   circumstances where their model is telling them you can

24   make a big profit on this.  Why risk that the dealer's

25   going to walk away if you push back too hard?

1    I'll just be another -- I think I can go another

2    couple minutes, and it will be a good time to stop, Your

3    Honor.

4        THE COURT:  All right.

5        MR. KLEIN:  And think about another piece of

6    testimony you heard that also places into context this

7    whole issue of, you know, how much does a few ticks

8    matter?

9        Do you remember when Zach Harrison was

10   testifying about something that was being referred to as a

11   parking scheme?  And then it was also being referred to by

12   him as transactions involving his core positions?

13       He told you that he was fired for cause from his

14   firm in connection with this activity, and the activity

15   that he was talking about was activity in which he would

16   be forced to sell a bond for reasons other than his view

17   on whether it was a good bond, and sometimes he would be

18   forced to sell a good bond for institutional reasons.  And

19   what he would do is sell it to a dealer and then he would

20   buy it back the next day and he would pay a few ticks

21   more.

22       Why would he do that?  Because he said these

23   were his core positions, these were bonds that he thought

24   were good bonds.  And when you're faced with the prospect

25   of potentially losing that bond, a few ticks -- at least

1    to Zach Harrison in those contexts -- didn't seem

2    particularly important.

3          I think the point that I'm making, I can perhaps

4    make more simply, and it's really just the point that when

5    you're looking at a potential windfall that you might get

6    from a bond, it's a lot more important to get the bond at

7    a price that's within your bogey, at a price that your

8    model tells you is good, than to risk fighting over it

9    over every last tick.

10          And I think you saw a lot of evidence in the

11    chats and you heard testimony that that was a significant

12    factor in the minds of these investors.

13          I think this would be a good stopping point.

14          THE COURT:  All right, thank you.

15          Members of the jury, we're going to adjourn now.

16    We are not sitting tomorrow.  When we resume Monday

17    morning, Mr. Klein will continue, I expect?

18          MR. KLEIN:  Yes.

19          THE COURT:  And you will hear the closing

20    arguments on behalf of the other defendants, followed by

21    the government's rebuttal argument, my final instructions,

22    and you will begin your deliberations at that time.

23          Between now and then, the beginning of your

24    deliberations, the same rules continue to apply.  You must

25    be careful not to discuss the case with each other or with

1    anybody else.

2              That said, I'll thank you very much for your

3    excellent service today.  Have a good weekend.  We'll see

4    you back here Monday morning.

5              Thank you.

6                   (Whereupon, the jury left the courtroom.)

7              THE COURT:  Please be seated.

8              It's been a long day.  Is there anything we need

9    to do?

10             MR. BRENNAN:  Not from the government, Your

11   Honor.

12             MR. SPIRO:  No, Judge.

13             MR. BROWN:  No, Judge.

14             THE COURT:  All right.  Thank you.

15                  (Proceedings adjourned at 4:24 p.m.)

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3                      In Re: U.S. vs. SHAPIRO

4

5

6              I, Darlene A. Warner, RDR-CRR, Official Court

7     Reporter for the United States District Court for the

8     District of Connecticut, do hereby certify that the

9     foregoing pages are a true and accurate transcription of

10    my shorthand notes taken in the aforementioned matter to

11    the best of my skill and ability.

12

13

14

15

16                     /s/_____

17                        DARLENE A. WARNER, RDR-CRR
                            Official Court Reporter
                           450 Main Street, Room #223
18                         Hartford, Connecticut 06103
                              (860) 547-0580
19

20

21

22

23

24

25