UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | No. 15-cr-00155 (RNC) |
| | : | |
| | : | |
| ROSS SHAPIRO and | : | August 10, 2018 |
| MICHAEL GRAMINS | : | |
| | : | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
ROSS SHAPIRO'S MOTION FOR RECONSIDERATION
<u>PURSUANT TO LOCAL RULE 7(c)</u>**

PETRILLO KLEIN & BOXER LLP
655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0330
*Attorneys for Ross Shapiro*

## TABLE OF CONTENTS

                                                                           **Page**

I.    *Litvak II* Mandates Mr. Shapiro's Acquittal On Count One ................................................ 2

        a.   No Reasonable Investor Would Have Subjectively Trusted
             Defendants Based On "Past Factual Experience" ........................................................ 4

        b.   The Testimony Of Abbas And Marks Concerning The "Importance"
             Of The Alleged Misstatements Must Be Disregarded In Light Of
             Their Testimony That *All* Information In A Negotiation Is "Important" ................. 7

        c.   The Government's Failure To Adduce Expert Testimony
             Rendered The Evidence Of Materiality Legally Insufficient ................................. 8

II.   This Prosecution Violates Due Process ................................................................................ 9

## TABLE OF AUTHORITIES

**Cases:** **Page**

*United States v. Carpenter*,
  791 F.2d 1024 (2d Cir. 1986) .................................................................................... 9

*United States v. Litvak* ("*Litvak I*"),
  808 F.3d 160 (2d Cir. 2015) ...................................................................................... 1

*United States v. Litvak* ("*Litvak II*"),
  889 F.3d 56 (2d Cir. 2018) ............................................................................... *passim*

*United States v. Weimert*,
  819 F.3d 351 (7th Cir. 2016) .................................................................................. 10

Defendant Ross Shapiro respectfully submits this reply memorandum of law in further support of his motion for reconsideration of the Court's Ruling and Order dated June 5, 2018 ("Order"). Misapprehending both the Court's holding in *Litvak II* and Mr. Shapiro's arguments, the government incorrectly asserts that the latter amount to "second guessing of the jury's assessment of credibility and resolution of competing inferences," and that because *Litvak II* resulted in remand, not reversal, the Court should reject his claims. G. Br. at 5, 8.

Not so. *Litvak II* concluded that "the testimony of various counterparty representatives was sufficient to sustain a finding of materiality." 889 F.3d 56, 66 (2d Cir. 2018) ("*Litvak II*") (quoting 808 F.3d 160 (2d Cir. 2015) ("*Litvak I*")). Unlike in *Litvak II*, however, in this case, there was insufficient evidence of materiality because *none* of the counterparty testimony concerning the purported "importance" of the alleged misrepresentations fell "within the parameters of the thinking of reasonable investors in the particular market at issue." *See Litvak II*, 889 F.3d at 65. The testimony of Wollman and Harrison, imbued with assertions about how they "trusted" defendants, evidenced subjective points of view *outside* "the parameters of the thinking of reasonable investors in the particular market at issue." *Id.* The testimony of Abbas and Marks also fell short because they deemed "important" all utterances in a negotiation, thus explicating no difference between information that would be "more important to a reasonable investor" and that which would be "less so." *See id.* at 62. As *Litvak II* recognized, not all information is material. *Id.* at 66 ("[S]ome misstatements [are] immaterial as a matter of law."). By characterizing as important *all* information in a negotiation, Abbas and Marks provided the jury with no reasonable evidentiary basis to evaluate legal materiality.

The government's arguments in opposition to the Due Process motion also miss the mark. That issue is not properly evaluated by reference to the sufficiency of the evidence standard, *see*

1

Order at 9-10, but through Court inquiry into whether, prior to the Litvak indictment, a person of ordinary intelligence could be charged with the knowledge that a statement about a principal's profit margin in an arm's-length principal-to-principal price negotiation would fall within the scope of materiality under the wire fraud and securities fraud statutes. Given the holding in *Weimert* and the legal research it reflects, the answer to that question is "no."

I.  *Litvak II* **Mandates Mr. Shapiro's Acquittal On Count One**

The government argues that *Litvak II* bars acquittal because "the testimony of various counterparty representatives was sufficient to sustain a finding of materiality." G. Br. at 8. It also claims that "any alleged error" here "was less egregious [than in *Litvak II*], played less of a role in the conviction," and that proof of materiality was "far more compelling" here. *Id.* at 8-9. These arguments are baseless. Under *Litvak II*, a judgment of acquittal is mandated because absent this erroneous, prejudicial evidence, the proof of materiality was legally insufficient.[1]

With respect to Mr. Shapiro, much of the government's argument is off the point. Whether evidence is prejudicial is irrelevant to the question of sufficiency. Nevertheless, the government's assertion that the error here was less egregious than in *Litvak II*, because the counterparty witnesses here did not testify that defendants were their "agents," is wrong. G. Br. at 9. *Litvak II* specifically rejected this idea, holding that the government's argument that Norris "trusted" Litvak based on his "subjective" point of view "ignores the settled law that those at either end of an arms-length transaction are acting only in their own self-interest." 889 F.3d at 70. Indeed, *Litvak II* acknowledged that the government expressly disavowed the existence of an agency relationship and that the District Court correctly instructed the jury that Litvak was actually *not* Norris' agent. *Id.* at 64, 68-69. The Court concluded nonetheless that these steps

---

[1] The government's claim that the "error . . . played less of a role in the conviction," G. Br. at 9, does not apply to Mr. Shapiro, who was not convicted of any offense.

2

were insufficient to cure any potential harm because the government's emphasis on "subjective trust as evidence of materiality became a back door for the jury to apply the heightened expectations of trust that an agency relationship carries." *Id.* at 70. Likewise here. *See* 5/11/17 Vol. IV Tr. 701:9-702:2 (factors Harrison considered when he "distributed [his] business" included "which broker-dealers [he] trusted"); 704:1-19 (Harrison: "I viewed how much I trusted the people I was doing business with [as] an important factor"); 5/24/17 Vol. X Tr. 2086:21-2087:4 (Wollman: "I seek those who I feel are most trustworthy"); 6/6/17 Vol. XIII Tr. 2713:8-12 (government summation: "And you heard about the trust relationships here, particularly with regard to Mr. Harrison, and you also heard some testimony from Mr. Wollman about how he evaluated what information to credit"). Thus, the underlying defect in the government's proof that animated *Litvak II* was present here in spades.

More importantly, the government's argument that the evidence of materiality in this case surpasses the evidence in Litvak, G. Br. at 9, is meritless. As discussed in Mr. Shapiro's opening brief, the testimony of the four counterparty witnesses did not establish a nexus to "that of the mainstream thinking of investors" in the nonagency RMBS market.[2] *Litvak II*, 889 F.3d at 65.

Nor did the testimony of the purported "co-conspirators" bear on "the parameters of the thinking of reasonable investors" regarding the importance of the alleged misrepresentations. Their testimony reflected their own points of view, not the objective perspective of a reasonable investor. Moreover, none testified that he believed the alleged misrepresentations would have been important to the counterparty's investment decision.[3] Rather, as the government

---

[2] The government's claim that the link between Wollman's testimony and the outcome of the trial is "far more attenuated" because this Court suggested Gramins was convicted due to his continued conduct after the *Litvak* indictment, G. Br. at 9, is irrelevant to Mr. Shapiro, who was neither convicted nor engaged in any post-*Litvak* alleged misconduct.

[3] The co-conspirators testified why they did *not* deem the alleged misstatements to be material. *See, e.g.*, 5/9/17 Vol. II Tr. 293:23-294:4 (Dinucci: "the tactic did not involve a misrepresentation as to the cash flows of the bond");

3

acknowledges, the alleged co-conspirators testified only about their *purpose* in making such statements and what they *hoped to accomplish*. *See* G. Br. at 10. This testimony was irrelevant to the issue of materiality.[4]

### A. No Reasonable Investor Would Have Subjectively Trusted Defendants Based On "Past Factual Experience"

The government also argues that the admission of subjective trust evidence in this case was proper because, unlike in *Litvak II*, the evidence admitted here was "borne of past factual experience with the defendants." *Id.* at 16-18. This argument is devoid of merit.

That a counterparty's subjective belief of trust in defendants was based on "past factual experience" does not alter *Litvak II*'s admonition against admitting such evidence. First, the government fails to explain why a counterparty witness' unreasonable view of subjective trust is somehow admissible under *Litvak II* because it is based on "past factual experience." In any event, the evidence adduced by the government actually demonstrated that no reasonable investor would have subjectively trusted such pricing information based on past experience. *All* of the counterparty witnesses testified that they generally *did not, and could not, know* whether defendants misrepresented information about Nomura's profit margin. *See, e.g.*, 5/25/17 Vol. XI Tr. 2300:22-2301:5 (Marks: "I would have no other way of independently verifying [pricing] information"); 5/22/17 Vol. VIII Tr. 1600:8-1601:9 (Abbas: "all you can really know for sure is

---

5/22/17 Vol. VIII Tr. 1688:12-19 (Chao explaining that in the absence of the alleged conduct, Nomura would still insist on the same trading price and clarifying that the alleged misrepresentations were a means to "deflect the blame from Nomura to the other client").

[4] The government also points to the "transcripts of the trades," which it claims provide evidence of the "effect" the alleged misrepresentations had on customer bids and offers. G. Br. at 10-11. The *Litvak II* Court, however, did *not* rely on similar evidence in that case in finding the evidence of materiality to be legally sufficient. Nor is the point reasonable. In a negotiation, any representation or misrepresentation may, by definition, be followed by a reaction (which may be pursuant to a pre-fixed negotiating strategy of the "reacting" party), and any particular "reaction" might follow from any number of factors, including negotiation representations, idiosyncratic negotiating strategies, or market conditions or dynamics. That a "reaction" followed a particular negotiating statement does not shed light on whether the misrepresentation was material. Evidence of materiality requires information about why the counterparty reacted in a particular manner, which requires evidence of the counterparty's thought process.

4

the price that you are willing to pay for a bond based on your analytics and the price at which a bond is offered to you"); 5/24/17 Vol. X Tr. 2160:9-13 (Wollman typically did not know "who the seller was"); 5/18/17 Vol. VII Tr. 1408:3-1409:10 (Harrison testifying that broker dealers, not his models, provided him with pricing information).

Given this testimony, it is a matter of logic that "past factual experience" could not have *possibly* (let alone reasonably) informed the counterparties about whether they could trust defendants accurately to reveal their profit margin. Accordingly, the idea that an objective reasonable investor in this market would have trusted defendants to reveal the truth about their profit margins, based on past experiences *that failed to reveal whether defendants had actually been truthful about their profit margins* is, at best, incongruous.

Moreover, under *Litvak II*, even if the counterparty witnesses, hypothetically, could have determined that defendants had truthfully represented their profit margin in the past, no reasonable investor *in this market* would have concluded, based on such past dealings, that he could trust that defendants would continue to do so in the future. *See* 889 F.3d at 61 ("An essential feature of all of these trades, however, is that the broker-dealer acts solely in its own interest as a principal."); *id.* ("In a sale by a counterparty to a broker-dealer, the counterparty has no legitimate expectation that the broker-dealer will resell the bond at the price paid to the counterparty."); *id.* at 69-70 (noting government's argument in summation that Litvak "aimed to establish a 'relationship of trust'" and ruling that "the government's argument [] ignores the settled law that those at either end of an arms-length transaction are acting only in their own self-interest").

Because the testimony of Harrison and Wollman was infected by "the government's concept of subjective trust as evidence of materiality," *id.* at 70, their testimony regarding the

information they deemed "important" must be disregarded. *See id.* at 69 ("It can hardly be the law that the 'point of view' . . . of an investor who is admitted to be wrong . . . is relevant to prove what a reasonable investor . . . would have deemed important.").

The government nevertheless argues that the admission of subjective trust evidence in this case was proper because this case, unlike *Litvak II*, "was replete with evidence of the defendants' efforts to instill a false sense of trust." G. Br. at 16, 18-21. Again, the government misreads both the evidence and *Litvak II*. Contrary to the government's claim, *Litvak II* itself was "replete" with similar evidence of the defendant's sales patter. *Litvak II* specifically referred to this evidence, noting that Litvak: falsely represented that he was "using" Norris' bid, represented that he had "bid" Norris' level and that he would "work for whatever you want," and commented to Norris that they had engaged in "good teamwork." 889 F.3d at 72 n.2. This sales chatter was substantially similar to that employed by defendants here. However, the *Litvak II* Court concluded that for an investor to be "deceived into believing that an arms-length relationship is one of special trust, . . . the means of deception must be of a character that would deceive an objectively reasonable investor, i.e., more than a salesman's banter." *Id.* n.13. Given the arms-length nature of the relationship between the counterparties and Nomura, and "the settled law" that these respective parties were operating "only in their own self-interest," it both begs credulity and conflicts with *Litvak II*'s holding to claim that sales banter similar to that used by Litvak could somehow deceive a reasonable investor in this market into trusting defendants' unverifiable statements.

The government, to no avail, also cites the testimony of the purported co-conspirators in support of its argument that defendants sought to instill a false sense of trust. *See* G. Br. at 18-21. The testimony cited by the government consists of explanations by the co-conspirator

6

witnesses of *why* they made misrepresentations and what they *hoped to achieve*. No witness testified that any counterparty was induced into subjectively trusting defendants, let alone that a reasonable investor in this market would be so induced by defendants' sales banter.[5]

Accordingly, the government's attempt to distinguish *Litvak II* from this case on grounds that defendants "falsely instilled a sense of trust in their victims" must be rejected.

### B. The Testimony Of Abbas And Marks Concerning The "Importance" Of The Alleged Misstatements Must Be Disregarded In Light Of Their Testimony That *All* Information In A Negotiation Is "Important"

The testimony of Marks and Abbas concerning the purported "importance" of the alleged misstatements must be disregarded because they embraced all information as "important," thus failing to establish any difference between information that would be "more important to a reasonable investor" and thus potentially material, and information that would be "less so." *Litvak II*, 889 F.3d at 62. As a result, the jury could not rationally employ this testimony in assessing whether information about Nomura's margin would be material to the reasonable investor in the nonagency RMBS market.

The government misleadingly and mistakenly argues that this argument is "nothing more than an attack on the credibility and weight of the witnesses' testimony." G. Br. at 24, 29. To the contrary, the point is that by testifying that *all* information in a negotiation was "important," these witnesses provided the jury with no rational basis to differentiate between legally material information and less important immaterial information.

---

[5] The government cites a chat in which Gramins represented to a counterparty that he was "purely looking to broker" to support its claim that defendants induced counterparties to trust them. G. Br. at 20. But in a different section of its brief, the government (arguing that the trial testimony about the intermediary role played by broker-dealers was consistent with the notion that the parties in this market transacted at arms-length) writes that "Gramins clearly did *not* intend to suggest [] that, by using the term 'broker,' he owed Rieger a fiduciary duty. Rather, Gramins used 'broker' to describe facilitating the purchase and sale of a bond between two counterparties." *Id*. at 14. Thus, the government appears to concede that no reasonable investor would have been misled by defendants' sales banter.

7

The government points to Marks' testimony that a particular misstatement was "important" because if he had received different information he "would *probably* negotiate differently." G. Br. at 29 (quoting Tr. 2333) (emphasis added). This cherry-picking of the record overlooks that Marks testified not only that this particular piece of information was "important" because of its ability to affect his future negotiations, but that "*every additional piece of information would be important* to [him] *and could affect [his] future negotiations.*" 5/25/17 Vol. XI Tr. 2334:11-13. Thus, the jury could not use this testimony to assess legal materiality, which, by definition, distinguishes between information that significantly affects the total mix of information available and information that does not.

The government cites Abbas' testimony that "Chao's lie was important" because, if he had been aware of it, he would "never have paid 79 and 2." G. Br. at 29 (quoting 5/18/17 Vol. VII Tr. 1515). First, this selective quotation omits Abbas' testimony that "I could have potentially bought it" at the same price. 5/18/17 Vol. VII Tr. 1524-25. Second, Abbas testified that he would have wanted access to any piece of information he could "get [his] hands on," 5/18/17 Vol. VII Tr. 1522:17-19, thus rendering nonprobative his testimony that he would have liked to know what his counterparty Nomura, a market principal, paid, or received, for bonds.

Concerning materiality, the testimony of Marks and Abbas provides no "nexus between [their] viewpoint and that of the mainstream thinking of investors in that market." *Litvak II*, 889 F.3d at 65.

### C. The Government's Failure To Adduce Expert Testimony Rendered The Evidence Of Materiality Legally Insufficient

Although *Litvak I* and *Litvak II* do not rule that expert testimony is required to prove materiality in all cases of this kind, the decisions do require that the government present sufficient evidence that "under an objective materiality test" the misstatements would have been

8

deemed significant. *See Litvak II*, 889 F.3d 66. Because the government failed to provide a connection between the counterparty witnesses' testimony in this case and the mainstream thinking of investors in the nonagency RMBS market, the government's failure to proffer expert testimony on the issue of materiality is fatal to its case. Absent such testimony, the evidence of materiality is insufficient in view of (1) the borderless nature of the testimony of Abbas and Marks, and (2) the fact that critical portions of Wollman's and Harrison's testimony must be disregarded under *Litvak II*.

## II.     This Prosecution Violates Due Process

As previously submitted, the Order did not address that, as explained by *Weimert*, the law has never supported attaching materiality to negotiation utterances between sophisticated parties; that no regulatory action or regulatory comment had ever deemed material statements in a negotiation about a party's historical cost; and that Nomura's compliance policies themselves effectively deemed such information immaterial. *See* Br. at 17-21. Rather the Court analogized to *United States v. Carpenter*, 791 F.2d 1024 (2d Cir. 1986), a case involving duties that *had* been the subject of a ruling in the Second Circuit and years of regulatory guidance, observed that the wire fraud and securities fraud statutes are understood to be wide in scope, and ruled, notwithstanding each cooperating witness' testimony that he did not believe that he was acting in a manner that the law forbids, that defendants had sufficient notice for constitutional purposes under a sufficiency of the evidence standard. *See* Br. at 17-18.

The government argues that the Court need not have addressed the *Weimert* ruling and analysis because Mr. Shapiro brought the case to the Court's attention in his post-trial motion. G. Br. at 30-31. But, the very basis of the motion for reconsideration concerning this issue is that the Court appears to have omitted to consider relevant legal authority, to wit, *Weimert*.

Next, the government appears effectively to contend, *see id.* at 31, that the Due Process issue is properly resolved through application of the sufficiency of the evidence standard. *See also* Order at 9-10. We are aware of no decision that has held that a Due Process challenge is for the jury to decide. And, here, in any event, every former Nomura desk employee testified that the perceived risk in the challenged negotiation tactic was a business risk, not a legal risk.

To be sure, the fraud statutes are broadly aimed at schemes of broad variety. *See* G. Br. at 32-33. But that does not respond to Mr. Shapiro's argument. Rather, supported by the *Weimert* court's research, *see United States v. Weimert*, 819 F.3d 351, 358 (7th Cir. 2016) ("[W]e know of no other case in which a court has found that deceptive statements about negotiating positions amounted to a scheme to defraud under the mail or wire fraud statutes."), Mr. Shapiro submits that a person of ordinary intelligence prior to the Litvak indictment could not be charged with the knowledge that a negotiating statement about a principal's own profit margin would fall within the scope of legal materiality. Nomura's compliance policies expressly permitted omission of this detail, confirming immateriality. *See also Litvak II*, 889 F.3d at 61 ("counterparty has no legitimate expectation that the broker-dealer will resell the bond at the price paid to the counterparty").

* * *

For the reasons set forth above, and in Mr. Shapiro's opening brief, this Court should reconsider its ruling and enter a judgment of acquittal on Count One of the Indictment as to Mr. Shapiro or, alternatively, dismiss the Indictment as a violation of Due Process.

                    Respectfully submitted,

                    PETRILLO KLEIN & BOXER LLP

By:  /s/ Guy Petrillo
     Guy Petrillo (CT19924)
     Joshua Klein (PHV07748)
     Amy Lester (PHV08919)
     655 Third Avenue, 22nd Floor
     New York, New York 10017
     Telephone: (212) 370-0330
     Facsimile: (315) 873-2015
     *Attorneys for Ross Shapiro*

**CERTIFICATION OF SERVICE**

I hereby certify that on August 10, 2018, a copy of foregoing Reply Memorandum of Law in Further Support of Ross Shapiro's Motion for Reconsideration Pursuant to Local Rule 7(c) was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York
August 10, 2018

  /s/ Leonid Sandlar
Leonid Sandlar (PHV07700)
655 Third Avenue, 22nd Floor
New York, New York, 10017
Telephone: (212) 370-0330
Facsimile:  (315) 873-2015
lsandlar@pkbllp.com